UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEVEN B. CHASIN, *et al.*,

        Plaintiffs,

v.

DISTRICT OF COLUMBIA,

        Defendant.

No. 05-cv-_____ (JR)

**MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to Rule 65, Fed. R. Civ. P., plaintiffs hereby move for a preliminary injunction preserving the *status quo* by prohibiting the District of Columbia Department of Fire and Emergency Medical Services from disciplining, discharging, or otherwise discriminating or retaliating against them because they continue to wear beards in accordance with the dictates of their religions; and ordering the Department, as preliminary relief, to allow them to take fit tests to show that they can achieve an adequate face mask seal while wearing their beards.

The defendant does not consent to the relief sought in this motion.

**POINTS AND AUTHORITIES**

**Introduction**

This Court is already familiar with both the facts and the legal issues presented in this case because they are the same, in every material way, as the facts and issues presented in the related case of *Potter v. District of Columbia*, No. 01-cv-1189 (JR).

Despite the fact that this Court just recently entered a preliminary injunction protecting the plaintiffs in the *Potter* case from discipline or discharge on account of their

religiously-worn beards, the Fire Chief has decided that other members of the Department will now be disciplined and discharged if they wear beards, no matter how sincere their religious reasons for doing so and no matter how long they have served with honor and safety in the Department. (One of the plaintiffs in this action is a thirty-year veteran of the Department and has worn his beard that entire time.)

Despite the fact that this Court has just ruled that the Religious Freedom Restoration Act requires the Department to administer fit tests to the plaintiffs in the *Potter* case to determine whether they can achieve an adequate face mask fit, the Fire Chief has decided that he will not permit other Department members who wear beards for religious reasons—such as the plaintiffs here—to take fit tests for the same purpose. Instead, he intends to discharge them regardless of whether they could achieve a perfectly adequate fit. Indeed, he intends to discharge them despite the fact that most of them *have already passed* formal fit tests with their beards.

While this Court's orders in *Potter* do not technically apply to individuals who are not plaintiffs in that case, the Fire Department has recognized, for the past four years, that other members with religiously-worn beards ought to be treated the same. Suddenly, however, in the wake of this Court's recent order requiring fit testing for the *Potter* plaintiffs, the Fire Chief has moved to retaliate against all other similarly-situated members.

One of the plaintiffs in this case—a sixteen-year veteran firefighter—has already been written up for discharge. The others will be in that situation within a matter of days.[1]

---

[1] Defendant's counsel (Mr. Utiger) has represented to plaintiffs' counsel that no plaintiff will be finally discharged prior to September 16, and that this date can be extended if necessary for the Court to rule on this preliminary injunction motion, thereby enabling plaintiffs and the Court to proceed by a motion for a preliminary injunction rather than by an application for a temporary restraining order. Plaintiffs' counsel appreciate that assurance.

Perhaps the Fire Chief is afraid that if men with beards are allowed to take the fit test, they will show that they can pass. Perhaps the Fire Chief feels the need to demonstrate that despite this Court's orders, it is his word that is law in the Fire Department.[2] Whatever the explanation, the Religious Freedom Restoration Act protects the plaintiffs in this case, just as it protects the plaintiffs in *Potter*. Accordingly, this Court should enter a preliminary injunction preserving the long-standing *status quo* against this retaliatory and well-nigh irrational action by the Fire Chief.

## Facts

### A. The Plaintiffs

As detailed in their respective declarations, the plaintiffs in this case are four paramedics and two firefighters employed by the D.C. Fire and Emergency Medical Services Department, all of whom have sincere religious reasons for wearing beards.

Plaintiff Steven B. Chasin has been a paramedic with the Department for more than fifteen years.[3] He has worn a short, neatly-trimmed beard for more than seventeen years as a sincere observance of his Jewish faith.

Plaintiff Kevin Conerly has been a firefighter with the Department for more than sixteen years; he has worn a beard for approximately twenty-five years, including during his

---

[2] Indeed, by placing plaintiffs on administrative duties, the Fire Chief is already demonstrating his ability to punish those who exercise their federal rights, because assignment to administrative duties imposes an immediate, heavy financial penalty on an employee, as explained in detail in the Declarations of plaintiffs Chasin (¶ 10), Conerly (¶ 9) and Sterling (¶ 7). At the same time, it serves no conceivable public safety purpose. *See infra* at 18 n.44.

[3] Paramedics are the highest level of emergency medical services personnel. They are qualified to administer intravenous fluids, to use manual defibrillators, to perform endotracheal intubations, to interpret electrocardiograms, and use other advanced medical equipment and techniques. *See* Chasin Decl. ¶ 2.

3

service in the United States Army prior to joining the Department. He wears his beard as a sincere observance of his Nazerite faith, which includes a vow not to shave. On September 8, 2005, he was recommended for discharge because he failed to report for duty clean-shaven.[4]

Plaintiff Dwight Evans has been a paramedic with the Department for *thirty* years; there is no paramedic senior to him in the Department.[5] He has worn a beard for thirty-three years, including during his service in the United States Army prior to joining the Department. Plaintiff Evans was a Baptist for most of his life, but became a Muslim in 2004 and wears his neatly trimmed beard as one part of his sincere observance of his new religious faith.

Plaintiff Shango Kwame Rashumaa is also a paramedic. He was a member of the Department from 1999 to 2002, when he left to undertake a journey of personal and spiritual growth, traveling in Africa and the Caribbean and studying his spiritual and cultural heritage. As part of his spiritual rebirth, he legally changed his name to what it is today. As spiritual observances, he follows a vegan diet, wears his hair in locks, covers his head, and does not shave his face. He rejoined the Department in April 2004; he has not shaved, as a matter of sincere spiritual observance, since before that time.

Plaintiff Jasper W. Sterling has been a paramedic with the Department for fourteen years and has worn a beard for approximately twenty-four years, including during his five years of service in the United States Air Force. He wears his beard in observance of his Muslim faith.

---

[4] *See* Conerly Decl. ¶ 8; plaintiff Conerly has confirmed to counsel by telephone that this occurred as expected.

[5] Plaintiff Evans will be eligible to retire when he reaches the age of 55 in April 2007, unless he is discharged for continuing to wear his beard.

Plaintiff Eleon A. Baker is a sergeant with the Department. He has been a D.C. firefighter for more than twenty years and has worn a short beard, following the tenets of his Nazerite faith, for about 19 years.

### B.  The Department's Policy and Practice

For at least thirty years, the Department has officially permitted its employees to wear 1/4-inch beards if they suffered from a medical condition known as *pseudofolliculitis barbae,* also known as "PFB" or "razor bumps."[6] Informally, the Department has allowed all employees to wear such beards for at least twenty years,[7] and subsequent to the decision of the District of Columbia Court of Appeals in *Kennedy v. District of Columbia*, 654 A.2d 847 (1994), all Department members were officially permitted to wear such beards.[8] During that time, hundreds of Department members have worn beards, yet there has not been a single incident in which a member's facial hair was responsible for a safety problem.[9]

While on a fireground, or in any other toxic atmosphere, firefighters protect themselves from respiratory injury by wearing a "self-contained breathing apparatus"

---

[6] *See* Evans Decl. ¶ 2.

[7] See Baker Decl. ¶ 3.

[8] The gist of the Court of Appeals' ruling was that since the Department *recognized* that firefighters with *pseudofolliculitis barbae* could safely wear their breathing apparatus with short beards, the ban on beards for other firefighters could not be justified as a matter of safety. Other firefighters accordingly had a right to wear such beards under the D.C. Human Rights Act, which prohibits discrimination based on "personal appearance . . . including . . . hair style and beards," unless such "style or manner of dress or personal grooming presents a danger to the health, welfare or safety of any individual." D.C. Code § 2-1401.02 (22).
 At the factfinding hearing in the *Kennedy* case, firefighter Kennedy demonstrated that he could obtain a good face mask seal with his beard, and the judge so found. *See* 654 A.2d at 855.

[9] *See* July 28, 2005, Declaration of Raymond Sneed, filed in *Potter* [R. Doc. 92]. This Court can take judicial notice of matters of record from other cases, *see Coleman v. Burnett*, 477 F.2d 1187, 1198 & n.50 (D.C. Cir. 1973).

5

(SCBA) consisting of a face mask connected to an air tank. The air tank provides a constant flow of pressurized clean air to the face mask, such that any imperfections in the fit between a firefighter's face and mask will result in a leakage of clean air to the outside atmosphere, rather than a leakage of toxic material into the face mask.[10]

The presence of facial hair might or might not cause an imperfect fit between a firefighter's face and face mask. Other variables, such as a thin face, prominent cheekbones, a long jaw or nose, or facial scars, might or might not also cause an imperfect fit between a firefighter's face and face mask. But because of the positive-pressure feature of the SCBA, an imperfect fit does not directly endanger a firefighter's life or health or the safety of others.[11]

A less perfect fit—whatever its cause—will result in a firefighter depleting his or her air supply somewhat faster than a more perfect fit. However, many individual variables, including body weight, physical fitness, respiratory efficiency, and physiological reaction to stress, will also affect the speed with which a firefighter depletes his or her air supply, and there is no reason to believe that facial hair will have a greater effect that these other variables.[12] Firefighter plaintiffs Conerly and Baker do not deplete their air supply faster than their fellow firefighters, and they have been working safely for more than 36 combined years with their beards.[13] It follows that firefighters with facial hair present no greater risk to themselves or others, when fighting fires or when operating in any toxic atmosphere, than other firefighters.

---

[10] *See* Tr. of Aug. 1, 2005, hearing in *Potter* at 86 (testimony of Capt. Flint)

[11] *See* Declaration of Alexander Santora, filed in *Potter* [R. Doc. 2]

[12] *Id.*

[13] Conerly Decl. ¶ 5; Baker Decl. ¶ 5.

6

In the spring of 2001, then-Fire Chief Ronnie Few announced strict enforcement of the Department's grooming policy, which prohibited (among other things) beards longer than 1/4 inch, hair longer than the top of the shirt collar (for men only), and head coverings (such as yarmulkes and kufis) that were not part of the official uniform.[14] Six firefighters who wore beards, long hair, and/or religious headgear brought suit under the Religious Freedom Restoration Act; that lawsuit was styled *Potter v. District of Columbia*, No. 01-cv-1189 (JR).

For the reasons outlined above, this Court was persuaded—at least tentatively— that the plaintiffs' religious practices did not present a safety problem, and entered a preliminary injunction in that case prohibiting the Department from taking any action against the plaintiffs because of their beards, long hair or kufis. *Potter*, Order of June 22, 2001 [R. Doc. 34]. For the next four years, the Department honored that injunction and, by order of the Fire Chief, exempted all other members of the Department who "object[ed] on a religious basis to any portion of the grooming regulations" from complying with the portion of the grooming regulations to which they so objected.[15]

In addition to firefighters, the Department employs approximately 200 emergency medical technicians (EMTs) and paramedics who respond to emergency medical calls in the District of Columbia.[16] Emergency Medical Service (EMS) personnel are not trained or equipped to work in hazardous atmospheres. Until some months after the terrorist attacks of

---

[14] Special Order 18, Series 2001. This Special Order is in the *Potter* record as Exhibit A to Plaintiffs' Motion for a Preliminary Injunction [R. Doc. 2].

[15] Special Order 48, Series 2001 (June 26, 2001). This Special Order is in the *Potter* record as Exhibit A to the Defendant's Response to The Court's Order of May 13, 2004 [R. Doc. 51].

[16] Chasin Decl. ¶ 6.

September 11, 2001, the Department's EMS personnel were not provided with, or trained to use, respiratory protection apparatus.[17]

Sometime in late 2001 or early 2002, the Department's EMS personnel were provided with face masks and "go-bags," which contain a filter that, when fitted to the face mask, creates an air-purifying respirator (APR) that provides protection against certain atmospheric hazards.[18] When these go-bags were issued, each emergency medical technician and paramedic was required to take a fit test to determine whether he or she could obtain a good seal. Plaintiffs Chasin, Evans and Sterling, who were Department members at that time, all passed the fit test; each had a beard at that time.[19] Thirty to forty of the approximately 200 emergency medical service personnel also had beards at that time, and each of them passed the fit test.[20] Plaintiff Rashumaa was issued a go-bag when he rejoined the Department in 2004; he passed the fit test at that time, with a beard.[21] Subsequently, the Department's firefighters were also provided with go-bags.

A face mask fitted with a go-bag filter operates as negative-pressure air-purifying respirator. Because outside air is pulled through the filter by the user's intake of breath, outside air could leak into the face mask in the event of a poor fit. For this and other reasons, the respirator formed by a face mask and go-bag filter is not approved for use in a toxic atmosphere.[22] Department personnel are not permitted to work in toxic atmospheres using their face masks and go-bag filters; indeed, when the go-bags were distributed, Department

---

[17] Chasin Decl. ¶ 5.
[18] *Id.*; Tr. of Aug. 1, 2005, hearing in *Potter* at 92 (Capt. Flint).
[19] Chasin Decl. ¶ 6; Evans Decl. ¶ 6; Sterling Decl. ¶ 4.
[20] Chasen Decl. ¶ 6.
[21] Rashumaa Decl. ¶ 2.
[22] Tr. of Aug. 1, 2005, hearing in *Potter* at 115 (Capt. Flint).

personnel were advised that they were intended for use in civil disturbance situations, for protection against non-lethal hazards such as tear gas, pepper spray, and the like.[23] Department personnel are not required to, and do not, carry their face masks and go-bags with them when they are off duty. They are kept at the station house with members' other equipment.[24]

### C. Recent Developments

On May 25, 2005, Fire Chief Thompson issued Special Order 20, Series 2005. That order requires all members to be clean-shaven in the area where the sealing surface of their face masks meet their faces.[25] Because the sealing surface of a face mask meets the face in the same area where a beard grows, the effect of Special Order 20 is that no member may wear a beard. Special Order 20 provides that disobedience will result in discharge.

At the time Special Order 20 was issued, Fire Chief Thompson also issued a "Notice to Persons Seeking Exemption to Special Order 20, 2005 for Religious Reasons." That notice stated:

> Special Order 20, 2005 does not provide for an exemption for religion or any other reason. However, because of court proceedings related to this issue, the Department will honor requests for a religious exemption until the court rules on this matter. These requests will no longer be honored **when and if the court rules that federal law does not require religious based exemptions to Special Order 20, 2005**.

Emphasis added.[26] Pursuant to that memorandum, the Department continued to allow

---

[23] Chasin Decl. ¶ 5.

[24] Tr. of Aug. 1, 2005, hearing in *Potter* at 21 (Mr. Potter); 45 (Lt. Sneed).

[25] Special Order 20, 2005, is in the *Potter* record as Exhibit A to the Second Declaration of Raymond Sneed [R. Doc. 73].

[26] This Notice is in the *Potter* Record as Exhibit B to the Second Declaration of Raymond Sneed [R. Doc. 73].

9

members who were not plaintiffs in the *Potter* case to wear beards for religious reasons in June, July and part of August 2005.

This court has never ruled that that "federal law does not require religiously-based exemptions to Special Order 20, 2005." To the contrary, on August 11, 2005, this Court entered an additional preliminary injunction in the *Potter* case ordering the Department to accommodate the religious beliefs of the *Potter* plaintiffs by allowing them (in the first instance) to take fit tests,[27] even though Special Order 20 provides that members with facial hair may not take fit tests.

Reneging on his May 2005 Notice, on August 24, 2005, the Fire Chief issued a new "Notice to Persons Seeking Exemption from Special Order 20 for Religious Reasons," stating that "[t]he Department is no longer honoring requests for a religious exemption," and that "failure to comply with Special Order 20 shall result in disciplinary action as set forth in the order" regardless of the religious basis for a member's wearing facial hair.[28] Thus, despite this Court's recent order requiring fit tests for the *Potter* plaintiffs, the Fire Chief will not permit other members with religious reasons for wearing beards to take fit tests before being discharged. Plaintiffs Chasen, Evans, Rashumaa and Sterling will be discharged despite having passed fit tests. Unless the Department is again enjoined by this Court, all of the plaintiffs in this case will soon be discharged unless they shave their beards.

D.  **Facts Relating to Accommodations**

Firefighter plaintiffs Conerly and Baker are in every material respect similarly situated to the plaintiffs in the *Potter* case. They can obtain adequate respiratory protection

---

[27] *Potter*, Order of August 11, 2005 [R. Doc. 97].

[28] The Fire Chief's Notice of August 24, 2005, is attached as Exhibit A to this memorandum.

10

in any situation in which they would be expected to work by wearing their self-contained breathing apparatus. There is no situation in which their go-bag filters would provide better protection.[29] Thus, no accommodation is needed aside from allowing them to use their SCBAs when they need respiratory protection.

Likewise, paramedic plaintiffs Chasin, Evans, Rashumaa and Sterling need no accommodation because respiratory protection did not become an essential part of their jobs just because they were issued go-bags. They are not trained or authorized to work in toxic environments.[30] Nor would their go-bag filters provide them with protection in such environments.[31] In nearly four years since the go-bags were issued, no EMT or paramedic has used one.[32]

Even should the plaintiffs be required to use their go-bag filters, there is no reason to believe that they cannot obtain a good face mask seal, with facial hair, at this time or in the future. Certainly that cannot be determined without giving them the opportunity to take a fit test.[33] Thus, if any further accommodation is needed, it may be adequate simply to allow them to take fit tests, as this Court has already ordered in Potter.

Paramedic plaintiffs Chasen, Evans and Sterling each passed a formal fit test when he was issued a face mask and filter in 2001 or 2002. Plaintiff Rashumaa passed a fit test when

---

[29] Tr. of Aug. 1, 2005, hearing in *Potter* at 83 (Ass't Chief Fitzgerald) ("Q. And isn't it true that a self-contained breathing apparatus provides better protection than an air purifying respirator? A. Absolutely.").

[30] Chasin Decl. ¶ 5.

[31] Tr. of Aug. 1, 2005, hearing in *Potter* at 115 (Capt. Flint).

[32] Chasin Decl. ¶ 7.

[33] The Department already owns the equipment needed to conduct formal fit tests. The cost to the Department of conducting fit tests on plaintiffs would be trivial. *See* Tr. of 30(b)(6) deposition of defendant in *Potter*, at 85-86.

11

he rejoined the Department in 2004. Each was wearing a beard at the time.[34] Thus, on the current record, the only reasonable conclusion is that each of them can obtain an adequate fit and can safely use the go-bag filter.

Finally, even if one or more of the plaintiffs could not pass a fit test—whether because of facial hair or any other reason—alternative equipment is readily available that will provide him with adequate respiratory protection in situations where the go-bag filter would be used.

The Department already owns a number of powered air-purifying respirators (PAPRs) manufactured by the same company that makes the face masks used by all Department members and the filters contained in the go-bags. These PAPRs are compatible (or "interoperable") with the Department's other respiratory protection equipment and with the equipment of other departments in the region.[35] A PAPR is similar to the APR formed by a face mask and go-bag filter, except that in a PAPR a battery-operated fan pushes air through the filter. A PAPR therefore creates a positive-pressure atmosphere inside the face mask, so that any leakage will be outward.[36] A PAPR also eliminates the need for the user to operate the filter through his or her own respiratory effort. A PAPR therefore provides both better protection, and a longer work-span, than an APR formed by a face mask and go-bag filter. Thus, in the event that a plaintiff could not pass a fit test because of his religious observance,

---

[34] Chasin Decl. ¶ 6; Evans Decl. ¶ 3; Sterling Decl. ¶ 4; Rashumaa Decl. ¶ 2.

[35] Tr. of Aug. 1, 2005, hearing in *Potter* at 93 (Capt. Flint) ("This particular PAPR uses the same . . . face piece that the SCBA uses").

[36] *Id*. at 93-94 ("The Court: So it turns a negative pressure system into a positive pressure system? The Witness [Capt. Flint]: In essence, yes, it does.").

use of a PAPR would provide him with at least as good a level of respiratory protection as other Department members would obtain using their go-bag equipment, and would enable him to work for longer than he could work using his go-bag equipment.[37]

**Argument**

Plaintiffs satisfy the familiar standards for preliminary injunctive relief: they have a substantial likelihood of prevailing on the merits, absent relief they will suffer irreparable injury, an injunction will not impose substantial harm on the defendant, and the public interest favors relief. *See, e.g., WMATC v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). Those conclusions follow ineluctably from the preliminary injunctions already issued by this Court—and still in effect—in the *Potter* case, for the two cases are materially indistinguishable.

**A. Likelihood of Success**

The Religious Freedom Restoration Act provides, in pertinent part, that:

(a) Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

---

[37] The cost to the Department of issuing PAPRs to plaintiffs would be a minuscule fraction of the Department's operating budget, which exceeds $150 million annually. *See* District of Columbia FY 2006 Proposed Budget and Financial Plan, at p. C-25 (available at http://cfo.dc.gov/cfo/cwp/view,a,1321,q,589949,cfoNav,%7C33210%7C.asp).

The alternatives discussed here are presented for purposes of plaintiffs' motion for a preliminary injunction. They are not the only accommodations that may be available, and RFRA requires the Department carry the burden of showing that no accommodations are possible.

42 U.S.C. § 2000bb-1. In other words, if there is a feasible way of satisfying *both* the government's interest (here, the interest in safety) *and* the individual's religious exercise (here, wearing a beard), that must be done. The government cannot simply ignore such a feasible accommodation because it prefers to enforce its rules uniformly on everyone.[38]

The accommodations that will satisfy both needs are obvious here, and have been discussed above. This Court has already ordered one of them in Potter—allowing plaintiffs to take the fit test. If they pass, they will have shown that they can get an adequate seal, and are as safe as any other members of the Department. The defendant's unwillingness even to allow the plaintiffs in this case to take fit tests—particularly when this Court has already ordered the defendant to give fit tests to the *Potter* plaintiffs, and when most of the plaintiffs in this case have already passed formal fit tests—can only be characterized as irrational and punitive.[39] At a minimum, the Court should enter a parallel injunction in this case.[40]

---

[38] Indeed, a government agency's refusal to accommodate the religious exercises of its employees was the precise issue that led to the enactment of the Religious Freedom Restoration Act. *See City of Boerne v. Flores*, 521 U.S. 507, 512-516 (1997) (noting that RFRA was enacted to legislatively "overrule" *Employment Division v. Smith*, 494 U.S. 872 (1990), which had upheld an employer's discharge of two Native American employees for their religiously-motivated use of peyote).

The fact that plaintiff Rashumaa's spiritual beliefs are not associated with an organized religion of course does not lessen the protection to which his sincere beliefs are entitled. *See, e.g.*, *Frazee v. Illinois Dep't of Employment Security*, 489 U.S. 829, 834 (1989) ("we reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization.").

[39] Perhaps this is not quite fair, as it would be rational for the Fire Chief to seek to prevent a demonstration that his no-beards policy is unnecessary.

[40] Plaintiffs have some reason to think that the defendant may argue that the difference between this case and Potter is that the plaintiffs' beards in Potter are "mature," while the plaintiffs in this case trim their beards. Such an argument would be unavailing because there is no way to know whether all, or some, or none of the plaintiffs in the two cases can pass a fit test without allowing them all to take the fit test. Furthermore, if it is the case that longer beards are *better* able to achieve a good seal, one or more of the plaintiffs in this case would be happy to allow his beard to grow longer, in order to be safer.

Even if one or more plaintiffs is unable to pass a fit test, the needs of both parties can still be fully and easily satisfied through the issuance of powered air-purifying respirators (PAPRs) to the plaintiffs for their go-bags. As explained above, a PAPR is similar to, *but better than*, the APR formed by the face mask and the go-bag filter. In particular, it turns the negative-pressure APR into a positive-pressure system, and thus prevents any inward leakage of harmful material just as an SCBA does. The Department already has such PAPRs that are compatible (or "interoperable") with its other respiratory equipment. It would be a simple matter for the plaintiffs to keep PAPRs in their go-bags for use in the unlikely event that they might be needed.

Because defendant cannot demonstrate that it is *necessary* to discharge the plaintiffs in order to satisfy its interest in safety, it is likely that plaintiffs will prevail on the merits.

### B. Irreparable Injury

As this Court easily concluded in *Potter*, forcing plaintiffs to give up their jobs and careers of many years standing in order to observe their religions—particularly when no such choice is required in order to protect anyone's safety—constitutes irreparable injury. *See* Preliminary Injunction Order, June 22, 2001 [R. Doc. 34].

### C. Harm to Defendant

The preliminary injunction sought here would preserve the longtime *status quo*. While employed by the Department, plaintiff Evans has worn his beard for thirty years, plaintiff Baker for nineteen years, plaintiff Conerly for sixteen years, plaintiff Chasin for fifteen years, plaintiff Sterling for fourteen years and plaintiff Rashumaa since his return to the Department in 2004. It is the Department that seeks to upset the *status quo* here, for reasons that make no sense.

The Department has operated for more than thirty years with bearded firefighters and emergency medical personnel, without a single beard-related safety incident. After this Court issued a preliminary injunction in *Potter* on June 22, 2001, the Department operated safely—and voluntarily allowed many other members with beards to continue on active duty—for more than four years before even getting around to issuing its new policy prohibiting beards in June 2005. Even after issuing that new policy, the Department voluntarily did not discipline or discharge members who had religious reasons to wear beards but who were not plaintiffs in the *Potter* case during June, July, and most of August this year. Nothing changed in late August except that this Court ruled—in the *Potter* plaintiffs' *favor*—that the Department must allow them to take fit tests, must allow them to remain on the payroll until they take those tests, and must allow them to remain on active duty if they pass.

The Department's voluntary actions for the past thirty years, the past four years, and the past three months, show that the Department will suffer no harm if it is ordered to treat the plaintiffs in this case in exactly the same manner as the plaintiffs in *Potter*. What plaintiffs seek is truly an injunction preserving the longtime *status quo*.

**D. The Public Interest**

In enacting RFRA, Congress found that:

(1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

(2) laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise; [and]

 (3) governments should not substantially burden religious exercise without compelling justification.

42 U.S.C. § 2000bb(a). In the absence of any argument by the defendant that RFRA is unconstitutional, this explicit declaration by the legislature defines the applicable public policy here. And as the defendant cannot show a "compelling justification" for discharging these plaintiffs after their cumulative 99 years of faithful service, the public interest here is served by maintaining the *status quo* and by giving the plaintiffs the opportunity to show that they can continue to serve safely while still practicing their religions.

### Requested Relief

The proposed order that is filed herewith contains three items of relief:

—It orders the Department to allow plaintiffs to take fit tests. This relief should be granted for the same reason it was granted in *Potter*.

—It prohibits the Department from disciplining or discharging the plaintiffs, pending a final decision from this Court, and orders the Department to cancel any disciplinary Trial Boards already scheduled. This relief should be granted as a straightforward matter of preserving the *status quo*. Disciplinary proceedings are already underway against several plaintiffs and will probably be underway against all plaintiffs before this Court can act on this motion.[41] Those proceedings should be halted.

—Finally, it provides that if a plaintiff is assigned to administrative duties, he shall serve on his regular duty schedule and shall be paid accordingly. As explained in plaintiffs' declarations, by putting plaintiffs on administrative duties the Fire Chief has imposed a substantial financial penalty on their exercise of religion.[42] If the Department's real purpose in assigning plaintiffs to administrative duties is to somehow protect public safety, then the

---

[41] *See* Chasen Decl. ¶ 9; Conerly Decl. ¶ 8; Evans Decl. ¶ 6; Sterling Decl. ¶ 6; Baker Decl. ¶ 8.

[42] *See* Chasin Decl. ¶ 10; Conerly Decl. ¶ 9; Sterling Decl. ¶ 7.

Department has no interest in cutting their pay and should not oppose allowing them to work their usual schedules. If the Department's real purpose—as plaintiffs believe—is punitive, then this Court should protect plaintiffs from financial punishment, *pendente lite*.[43]

### Conclusion

For the reasons stated above, the plaintiffs' motion should be granted and a preliminary injunction should be issued.

Respectfully submitted,

_____
Arthur B. Spitzer (D.C. Bar No. 235960)
Frederick V. Mulhauser (D.C. Bar No. 455377)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W. #119
Washington, DC 20036
(202) 457-0800 (telephone)
(202) 452-1868 (facsimile)

Counsel for plaintiffs

September 9, 2005

---

[43] It is impossible to believe that the Department's real purpose has anything to do with protecting public safety, for the simple reason that assigning plaintiffs to administrative duties does nothing to advance public safety.

It is indisputable that plaintiffs can safely perform their everyday jobs as they have been doing for many years. Defendant's only safety concern (as articulated in *Potter*) is that plaintiffs will (in defendant's view) be unsafe in the unlikely event of a catastrophic emergency where the go-bag masks have to be used. By defendant's own reasoning, therefore, the public safety could be *fully* protected while this litigation continues by keeping the plaintiffs (in this case and in *Potter*) on regular active duty but requiring them not to participate in field operations in the event of a catastrophic emergency where the go-bag masks have to be used.

If defendants were free to discharge plaintiffs and hire and train replacements, that would be one thing. But so long as plaintiffs remain on the payroll, it makes no sense at all—except punitively—to require them to sit at a station house five days a week doing nothing, rather than allowing them to do the life saving jobs for which they are so well trained and experienced.