UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEVEN B. CHASIN, *et al.*,

        Plaintiffs,

v.

DISTRICT OF COLUMBIA,

        Defendant.

No. 05-cv-1792 (JR)

**REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs respond briefly to defendant's opposition to their motion for a preliminary injunction.

### I. The Fire Chief's Precipitous Enforcement of Special Order 20 Against Plaintiffs was Unwarranted and Retaliatory.

Defendant agrees that the plaintiffs in this case present the same legal and factual issues as the plaintiffs in the *Potter* case, No. 01-cv-1189 (JR). Defendant nevertheless seeks to justify the Fire Chief's action in enforcing the no-beards rule against plaintiffs beginning on August 24, 2005, on two grounds.

**First**, defendant asserts that "absent an injunction from the Court, the Fire Chief has both a moral and legal obligation to exercise his own judgment on issues of safety." Def. Opp. at 2. But that noble statement is belied by the Fire Chief's *own actions* from the day he became Interim Fire Chief in mid-2002 through August 24, 2005.[1] During that time, an injunction was in effect only as to the named plaintiffs in the *Potter* case. Yet, during that

---

[1] Chief Thompson became Interim D.C. Fire Chief in June 2002. *See* News Release, "Mayor Appoints Adrian Thompson to Head Fire/EMS Department," *available at* http://www.dccfo.dc.gov/mayor/news/release.asp?id=423&mon=200211&archive=1.

entire three-year period, Chief Thompson voluntarily exempted from the facial hair ban all other Department members who had religious reasons for wearing beards. The Chief continued to extend that exemption to members who were not plaintiffs in the *Potter* case even after he issued Special Order 20 on May 25, 2005. *See* "Notice to Persons Seeking Exemption to Special Order 20, 2005 for Religious Reasons," filed herewith as Exhibit A.[2] Even more noteworthy, from June 2002 until June 2005 the Fire Chief continued the Department's decades-old policy of allowing firefighters to wear neatly-trimmed 1/4-inch beards even without any religious reason.

There are only two possible explanations for the Fire Chief's actions. One possibility is that the Chief, exercising "his own judgment on issues of safety," recognized for the past three years that facial hair is *not* unsafe. The other possibility is that the Chief had recognized that it was appropriate, after the *Potter* injunction had issued, to treat similarly-situated members similarly, and that his precipitous change of position on the heels of this Court's order of August 11, 2005, was indeed retaliatory and defiant. No other explanation is suggested by the facts or by defendant's memorandum.

**Second**, defendant suggests that the rationale of this Court's order directing the Fire Department to fit-test the *Potter* plaintiffs would not extend to individuals with beards that are not "fully mature." Def. Opp. at 3. But that is pure speculation. It may be that a mature beard interferes with the seal between a facemask and a face, and it may be that it doesn't. It may be that a short beard interferes with the seal between a facemask and a face, and it may be that it doesn't. It may be that a beard's maturity is not an important factor at all. The Fire Chief's adamant refusal to allow bearded members even to take a fit test obviously has

---

[2] This Notice is also in the Potter record as Exhibit B to the Second Declaration of Raymond Sneed [*Potter* R. Doc. 73].

*prevented* anyone from learning the facts; the obvious purpose of the Court's August 11 order was to find out whether the *Potter* plaintiffs could obtain a good seal with their beards. The tests showed that at least two of them can.³ There is no plausible reason why the plaintiffs in this case should not also be fit-tested so that the Department and the Court can learn whether they, too, can obtain a fully adequate seal—as four of them have already shown they can.⁴

### II. Plaintiffs have demonstrated a likelihood of success on the merits.

A determination of the likelihood of success on the merits necessarily depends upon the rules allocating the burden of proof. If plaintiffs prove a *prima facie* case, so that defendant can only prevail by making out an affirmative defense, and if it appears that the defendant canot carry its burden of proof on the affirmative defense, then it follows that plaintiffs will probably succeed on the merits. *See, e.g., Ashcroft v. ACLU*, 542 U.S. 656, 124 S. Ct. 2783 (2004):

> As the Government bears the burden of proof on the ultimate question of COPA's [the challenged statute's] constitutionality, [plaintiffs] must be deemed likely to prevail unless the Government has shown that

---

³ The Fire Department took nearly six weeks after this Court's August 11 order to arrange for the three *Potter* plaintiffs to take fit tests. On September 21, they took the tests at Engine Company 4. Plaintiffs Potter and Ali easily passed the tests; plaintiff Umrani has not yet passed but the Department did not have in stock the face mask and nose piece that may fit his unique facial structure. The Department is in the process of acquiring those items and plaintiff Umrani's test will be rescheduled.

We note that despite the fact that plaintiffs Potter and Ali passed their fit tests, the Department has thus far refused to return them to active duty. The Court can anticipate receiving a motion in *Potter* asking that the Department be ordered to return plaintiffs Potter and Ali to active duty.

⁴ *See* Chasin Decl. ¶ 6; Evans Decl. ¶ 3; Sterling Decl. ¶ 4; Rashumaa Decl. ¶ 2 (each reporting that the declarant had passed a formal fit test at the time he was issued a face mask).

3

respondents' proposed less restrictive alternatives are less effective than COPA.

542 U.S. at ___, 124 S. Ct. at 2791-93. "The Government having failed to carry its burden, it was not an abuse of discretion for the District Court to grant the preliminary injunction." *Id.* at 2793.

Plaintiffs here have shown—and the defendant concedes—that their sincere religious beliefs are substantially burdened by defendant's ban on beards. The burden is therefore on the defendant to demonstrate that there is no way plaintiffs religious beliefs can safely be accommodated. Because the defendant has not shown that it is likely to carry *its* burden of proof, plaintiffs are likely to prevail.

> **A. If plaintiffs can obtain a good seal, or if the Department refuses to test them, they will prevail on the merits.**

When the *Potter* case was filed, the Fire Department asserted a right to override the plaintiffs' religious practices on the ground that "'traditional outfitting of personnel in standardized uniforms encourages the subordination of personal preferences and identities in favor of the overall group mission. . . . [T]he necessary habits of discipline and unity must be developed in advance of trouble.'" Defendant's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction, at 15 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 508 (1986)).[5] Defendants soon abandoned that position,

---

[5] *Goldman v. Weinberger* rejected a Jewish Air Force Captain's argument that he had a First Amendment right to wear a skullcap with his uniform. Defendant's papers in *Potter* neglected to point out that Congress had legislatively "overruled" *Goldman v. Weinberger* shortly after it was decided. *See* Pub. L. No. 100-180 § 508, 101 Stat 1019 (1987), *codified at* 10 U.S.C. § 774. Like the enactment of RFRA, the overruling of *Goldman* shows that Congress does not agree that the other branches of government must defer to the judgment of military or paramilitary authorities when matters or religious liberty are involved.

4

presumably recoignizing that "uniformity for uniformity's sake" could not pass muster under the Religious Freedom Restoration Act.

The Fire Department also asserted that clean-shaven cheeks were required for safety in fighting fires, because facial hair would prevent a good seal between a firefighter's face and face mask. But the Department has also abandoned that position, recognizing that the "positive pressure" maintained inside a firefighter's face mask protects his or her safety even in the event of an imperfect seal, as any leakage will be outward.[6]

The Department's defense now rests on its new argument, first unveiled in June 2005, that a tight seal is necessary because a firefighter or paramedic might someday have to work with a negative-pressure respirator in the event of a "cataclysmic event." Def. Opp. at 5. Even assuming that this argument holds water, the Department's concerns are obviously fully satisfied if the plaintiffs are able to get a tight seal, as measured by the same fit test that all other Department members must take. At least two of the three *Potter* plaintiffs have shown that they are able to get a tight seal.[7] And the four paramedic plaintiffs in this case have, in the recent past, taken and passed formal fit tests.[8] Accordingly, the Court cannot reasonably presume that the plaintiffs in this case will be unable to get a tight seal. To the contrary, the only reasonable presumption is that they *can*, as the evidence already in the record shows that the four paramedics can; there is no evidence as to the two firefighters

---

[6] *See Potter* June 13, 2005, Tr. at 5-6 ("The overpressure in the mask, if there's a slight problem with the seal will blow air from the tank to blow contaminants out. That works okay in a fire. . . . That's not what we're worried about.") (Statement of counsel for defendant.)

[7] *See* footnote 3, above.

[8] *See* footnote 4, above.

because the Department has not allowed them to be tested. Under the preliminary injunction standard of a likelihood of success, plaintiffs have shown a very strong likelihood indeed.

The Department speculates that short beards may interfere with a seal more than mature beards, Def. Opp. at 2-3, but that is simply speculation. The Religious Freedom Restoration Act requires the Department to "*demonstrate*[]" that it cannot accommodate plaintiffs' religious needs. 42 U.S.C. § 2000bb-1(b) (emphasis added). What Congress meant by "demonstrate" is precisely specified on the face of the statute: "[D]emonstrates" means "meets the burdens of going forward with the *evidence* and of persuasion." 42 U.S.C. § 2000bb-2(3) (emphasis added). Speculation is not evidence. Furthermore, Congress explicitly provided that a government entity must demonstrate that its "application of [a] burden *to the person*" whose religious practice is burdened is the least restrictive means of serving a compelling interest. 42 U.S.C. § 2000bb-1(b) (emphasis added). Congress used those words advisedly. The fact that one person's beard might interfere with a seal doesn't mean that another person's beard will do so, and the statute requires the Department to *demonstrate*, with *evidence*, that the application of its no-beard rule to each *person* is necessary to serve a compelling interest. It follows that if the Department does not fit-test the plaintiffs, then it is the plaintiffs who must prevail here, for without evidence as to each plaintiff, the Department cannot meet its heavy burden of proof under RFRA.[9]

The Department also points to "the logistical problems of testing individuals whose beards may be one length this week and another next," Def. Opp. at 5, apparently—although not explicitly—arguing that these unspecified "logistical problems" override plaintiffs' rights under the Religious Freedom Restoration Act. That argument only shows that the

---

[9] For the Court's convenience, the full text of the Religious Freedom Restoration Act is appended to this memorandum (pages 13-14, below).

Department continues not to take its RFRA obligations seriously. The Department has adduced *no evidence* that an individual cannot keep his beard trimmed to a constant length—a person can trim his beard before he reports for duty just as easily as he can shave before he reports for duty, and electric trimmers come with standard settings for beard length. Nor has the Department produced any *evidence* to support its apparent position that periodic fit-testing of a small number of firefighters and paramedics would impose significant "logistical problems." The evidence in the *Potter* record is to the contrary: the Department owns fit testing equipment, and the cost of conducting a test is trivial. *See* Tr. of 30(b)(6) deposition of defendant in *Potter*, at 85-86.

In any event, "logistical problems"—unless massive and insuperable—are not the sort of thing that can overcome a person's rights under RFRA. "This Court has held that administrative inconvenience is not alone sufficient to justify a burden on free exercise unless it creates problems of substantial magnitude." *Bowen v. Roy*, 476 U.S. 693, 730-31 (1986) (O'Connor, J., concurring in part and dissenting in part) (citing *Sherbert v. Verner*, 374 U.S. 398, 408-409 (1963) [10]; *see also Stanley v. Illinois*, 405 U.S. 645, 656 (1972) ("Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues . . . it needlessly risks running roughshod over the important interests . . . . It therefore cannot stand.").

The Department says that each of the plaintiffs must be discharged—after many years of safe service—because he cannot get a good fit with a face mask. That is an affirmative defense under the burden-allocating provisions of RFRA. But the Department cannot prove with *evidence* (as RFRA requires) that each of the plaintiffs can't get a good fit, because it

---

[10] In RFRA, Congress specifically provided that it intended "to restore the compelling interest test as set forth in *Sherbert v. Verner*." 42 U.S.C. § 2000bb(b)(1).

won't test them. Accordingly, the Department cannot establish its affirmative defense. Plaintiffs must therefore prevail on the merits.[11]

### B. Even if plaintiffs can't obtain a good seal, they will prevail on the merits.

As noted above, defendant's entire case rests on the proposition that a tight seal is necessary because a firefighter or paramedic might someday have to work with a negative-pressure respirator in the event of a "cataclysmic event." Def. Opp. at 5. But plaintiffs have shown that even if one or more of them cannot obtain a tight seal, there are other practical means of accommodation that would enable them to work safely in such circumstances, such as the use of a powered air-purifying respirator (PAPR), which "provides both better protection, and a longer work-span, than an APR [air purifying respirator] formed by a face mask and go-bag filter." Motion for Preliminary Injunction at 12.

---

[11] The Department's refusal to fit-test plaintiffs apparently rests on an OSHA regulation that the Department characterizes as "applicable," Def. Opp. at 2. But it is clear that the OSHA regulation is not actually applicable to the Department.

Defendant concedes that OSHA regulations do not apply directly to the District of Columbia because the District of Columbia is not an OSHA state. *Potter* Fire Dept. Depo. at 11:15-17. Defendant argues that OSHA's respiratory protection regulation applies indirectly to the Department through certain EPA regulations. But the EPA regulation cited by Defendant provides that the OSHA regulation applies to a local agency only when that local agency "is the lead agency for response" to certain types of incidents, 40 CFR § 300.150(d), pursuant to a written "contract or cooperative agreement" or "designated pursuant to a Superfund Memorandum of Agreement." 40 CFR § 300.5. The *Potter* plaintiffs requested production of any documents that would support Defendant's claim that the D.C. Fire Department is the "lead agency" under these EPA regulations, but none were produced. It follows that the Department is not a "lead agency," and is therefore not required to follow the OSHA regulation—as the Department did not until just a few months ago. The Fire Chief's refusal to test the plaintiffs is simply his own policy, designed to prevent the Court from learning that his factual claims may be false.

In any event, the existence of an agency regulation cannot relieve the Department of its statutory obligation under RFRA to show, by evidence, that it cannot accommodate plaintiffs' religious needs. If the Department cannot produce the evidence, it cannot carry its burden of establishing its affirmative defense.

Under RFRA, it is the defendant's burden to show that no workable accommodation is available. (That discharge is the "least restrictive means" to serve the Department's interest in safety means that there is no other means, short of discharge, that will adequately serve the interest.) But the defendant's opposition never even addresses PAPRs, much less makes any attempt to show that they are not an entirely practical alternative. For that reason alone, plaintiffs have shown a likelihood of success, because defendants have utterly failed to support their affirmative defense.

Defendant seems to think that Fire Department should not have to deal with the demanding requirements of RFRA, and that the Court should simply defer to the Fire Chief's judgment. But Congress provided otherwise: "the compelling interest test . . . is a workable test for striking sensible balances between religious liberty and competing prior governmental interests." 42 U.S.C. § 2000bb(a)(5). That is the test the Department must meet. That is the burden the defendant must carry. It cannot do so simply by ignoring plaintiffs' suggested accommodations and the evidence supporting those accomodations.[12]

### III. Plaintiffs satisfy the other criteria for preliminary relief.

Defendant cites *Sampson v. Murray*, 415 U.S. 61 (1973), and other cases for the proposition that loss of pay is not irreparable injury, Def. Opp. at 6, but more is involved here

---

[12] The Declaration of Roy T. McKay, submitted by defendant two days after the already-extended deadline for its opposition, barely touches on the relevant factual issues. For example, Dr. McKay states that "[f]acial hair . . . increases facepiece leakage" (¶ 10) but the only consequence of leakage in a positive presure breathing apparatus is faster use of air supply, and Dr. McKay doesn't deny that other factors (*e.g.*, body weight and fitness) may have a far greater effect on air use than facial hair. Nor does he deny that other factors (*e.g.*, prominent cheekbones) may also increase facepiece leakage. He certainly does not suggest that a bearded person who passes a fit test with a score of *X* is any less safe than a clean-shaven person who passes the same test with the same score. Nor does he address the availability or practicality of the alternative accommodations suggested by plaintiffs—such as PAPRs—although his declaration was executed 18 days after plaintiffs' motion was filed.

than mere loss of pay. As Judge Kessler has explained, "[m]any courts applying *Sampson* have found that injunctive relief should issue [to prevent a pending discharge]." *Robinson v. District of Columbia*, 1997 WL 607450 at *7 (D.D.C. 1997). For example, "discharge from non-probationary job status, in a highly restricted job market for persons with their experience, combined with the handicapping stigma of dismissal in the profession and attendant loss of job benefits [have been held] sufficient to constitute irreparable injury." *Id*. Likewise, where "time spent away from the force would impair the plaintiffs' ability to stay in touch with new developments . . . impairing their effectiveness and that of the [agency] as a whole, if and when they are ultimately reinstated," constituted irreparable injury. *Id*. Similar facts are involved here. And certainly it would be anomolous for the Court to find no irreparable injury here when the similarly-situated plaintiffs in *Potter* continue to be protected by a preliminary injunction, based upon a finding of irreparable injury, as they have been since June 2001.

      Weighing heavily in the equitable balance are the factors of harm to the defendant and others, and the public interest. Plaintiffs are highly trained and experienced firefighters and paramedics. It is undisputed that they perform their jobs well. They are saving lives and property in the District of Columbia on a daily basis, and will continue to do so if not discharged or kept on so-called "administrative duties." The Department does not claim to have a stable of underemployed, trained firefighters and paramedics waiting to take over plaintiffs' jobs. If they are discharged, or remain suspended, their duties will have to be covered by other members working overtime (after the usual very long shifts) at overtime pay. If discharged, plaintiffs will lose experience and training opportunities that cannot

quickly be replaced. The defendant, as well as the public, will be *better* served by keeping plaintiffs on the job.

Defendant argues that all of this is outweighed by "the *possibility* . . . that the worst might occur," and the further *possibility* that "plaintiffs cannot achieve an adequate seal," and the further *possibility* that if both of those things occur simultaneously, it "*may* cost" a life. Def. Opp. at 7. But it is more likely, as we have shown, that plaintiffs *can* achieve an adequate seal, or can use alternative equipment to operate safely.[13] If there is an occasion where "all hands' are needed to rescue victims, defendant's preferred course of conduct would remove six highly trained and experienced rescue personnel from the scene, likely leading to greater loss of life than if they were on duty. Defendant's assessment of the balance of harms simply ignores the real-world likelihoods.[14]

Defendant voluntarily kept plaintiffs on the job, with their beards, for nearly four years after September 11, 2001, and continued to do so even after Special Order 20 took

---

[13] In any event, it is defendant that has intentionally prevented the creation of evidence that would establish which of these facts is true; the defendant should not profit from the missing evidence for which it is entirely responsible.

[14] Defendant's doomsday scenario likewise ignores the evidence. Defendant hypothesizes a "toxic cloud" of chlorine that "could kill tens of thousands," and asserts that it is "un-controverted" that "SCBA's would not provide sufficient air to allow firefighters and EMS workers to adequately aid the injured," requiring them to use their negative-pressure air filters. Def. Opp. at 4-5. But defendant provides no citation to any such "un-controverted" evidence, and plaintiffs' counsel recalls none. To the contrary, the evidence in *Potter* is that the Department has more than a thousand spare air tanks that can be brought to the scene of an emergency, *see* Fire Dep't. Depo. in *Potter* at Tr. 114-115 (Capt. Flint), and that neighboring jurisdictions use compatible ("interoperable") equipment that could also be made available, and that federal money has been used to stockpile additional caches of such supplies for use in such events. *See Potter* Aug. 1 Tr. at 99 (Capt. Flint). Even more important, the uncontroverted evidence is that the go-bag filter masks are *not* approved for use in an IDLH atmosphere; firefighters would simply not enter a toxic cloud with anything less than SCBA protection, if even then. *See* Fire Dep't. Depo. in *Potter* at Tr. 82 (Ass't Chief Fitzgerald). Defendant's go-bag filters are intended for tear gas or for clean-up, not for toxic plumes.

effect in early June 2005. It was defendant's judgment for all that time that this was appropriate and safe. Nothing has changed since that time except the defendant's litigation strategy. But that is not a factor to which this Court owes deference.

The function of a preliminary injunction is to preserve the *status quo*, and that is what plaintiffs seek here. There is truly no likelihood that any harm will befall any person by allowing plaintiffs to continue working with their beards, as they have done safely for a cumulative total of nearly 100 years.

### Conclusion

For the reasons stated above and in earlier filings,[15] the plaintiffs' motion should be granted and a preliminary injunction should be issued.

Respectfully submitted,

_____
Arthur B. Spitzer (D.C. Bar No. 235960)
Frederick V. Mulhauser (D.C. Bar No. 455377)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W. #119
Washington, DC 20036
(202) 457-0800 (telephone)
(202) 452-1868 (facsimile)

Counsel for plaintiffs

September 30, 2005

---

[15] Following the defendant's lead, *see* Def. Opp. at 1, the plaintiffs hereby incorporate and adopt the arguments set out in plaintiffs' filings in the *Potter* case.

# APPENDIX

## Religious Freedom Restoration Act, 42 U.S.C. Chapter 21B.

**§ 2000bb. Congressional findings and declaration of purposes**

(a) Findings

The Congress finds that--

 (1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;
(2) laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;
(3) governments should not substantially burden religious exercise without compelling justification;
(4) in Employment Division v. Smith, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on
religious exercise imposed by laws neutral toward religion; and
(5) the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

(b) Purposes

The purposes of this chapter are--

 (1) to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and
(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

**§ 2000bb-1. Free exercise of religion protected**

 (a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

 (b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.

13

(c) Judicial relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.  Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

**§ 2000bb-2. Definitions**

As used in this chapter--

(1) the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;
(2) the term "covered entity" means the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States;
(3) the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion; and
(4) the term "exercise of religion" means religious exercise, as defined in section 2000cc-5 of this title.

**§ 2000bb-3. Applicability**

(a) In general

This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.

(b) Rule of construction

Federal statutory law adopted after November 16, 1993 is subject to this chapter unless such law explicitly excludes such application by reference to this chapter.

(c) Religious belief unaffected

Nothing in this chapter shall be construed to authorize any government to burden any religious belief.

**§ 2000bb-4. Establishment clause unaffected**

Nothing in this chapter shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion (referred to in this section as the "Establishment Clause").  Granting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this chapter.  As used in this section, the term "granting", used with respect to government funding, benefits, or exemptions, does not include the denial of government funding, benefits, or exemptions.

14