UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CALVERT L. POTTER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DISTRICT OF COLUMBIA, <br><br> Defendant. | No. 01-cv-1189 (JR) |
| STEVEN B. CHASIN, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DISTRICT OF COLUMBIA, <br><br> Defendant. | No. 05-cv-1792 (JR) |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTIONS
TO REINSTATE PLAINTIFFS TO REGULAR DUTY**

Plaintiffs Potter and Ali (in *Potter*) and plaintiffs Chasin, Conerly, Rashumaa, Sterling, Evans and Baker (in *Chasin*) filed separate motions for reinstatement (Nos. 103 and 14, respectively), which the defendant opposed jointly (No. 16 in *Chasin;* not filed in *Potter*).[1]  The Plaintiffs now file this joint reply.

Reading defendant's opposition one might get the impression that many plaintiffs had failed the fit tests.  But that would be a false impression.  In fact, *every* plaintiff (except Hassan Umrani, who has not moved for reinstatement) has passed the fit test at *every* testing session at which he has taken it.

---

[1] Plaintiffs do not mean to suggest that the motion in *Potter* was conceded; the opposition was headed with both captions and obviously applies to both cases.

In the face of that record, the Department's position remains what it has been all along: "don't confuse us with the facts; our mind is made up: people with beards can't pass fit tests." But the Department makes no attempt to explain away the successful results obtained by plaintiffs Potter and Ali, and does nothing but speculate—inaccurately, as we show below—about possible reasons to discount the successful results obtained by the other plaintiffs. In general, the Department is reduced to (a) presenting an inaccurate picture of the comparison between clean-shaven firefighters and bearded firefighters who have passed facefit tests, and (b) misstating the controlling legal standard.

Because the Department cannot meet its heavy burden of demonstrating that terminating each of these plaintiffs—or confining them indefinitely to administrative duty status—is the least restrictive means of keeping them and the public safe, the Court should reinstate them to field operations.

**Argument**

As plaintiffs' motions showed, plaintiffs Potter, Ali, Chasin, Conerly, Rashumaa and Sterling have each passed three consecutive fit tests, spaced roughly one month apart, while wearing their beards. Those tests were conducted by the D.C. Fire and EMS Department using its own equipment and personnel, and in the manner of its own choosing. The defendant does not deny these facts.[2] Defendant's quibbles about the sizes of plaintiffs' facemasks or the numerical values of their passing scores are irrelevant because they do not distinguish plaintiffs from other firefighters or paramedics in the

---

[2] The defendant concedes that the Court "left to the District the manner in which this opportunity [for Plaintiffs to demonstrate that they can consistently pass a face-fit test] should be given." Opp. at 2.

2

Department's employ and do not undercut the demonstrated fact that these plaintiffs have shown that they can consistently get an adequate facemask fit.

> **I. The record demonstrates that the plaintiffs who have moved for reinstatement can consistently pass fit tests while wearing their beards.**

> **A. <u>Plaintiffs Potter, Ali, Chasin and Sterling</u>.** Each of these plaintiffs passed each of the fit tests using the same facemask he had previously been issued, and with a score many times above the passing grade of 500. [3]

—Calvert Potter's score ranged from more than seven times the passing score to more than fifteen times the passing score.

—Tarik Ali's scores ranged from more than three times the passing score to more than four times the passing score.

—Steven Chasin's score ranged from more than four times the passing score to more than twelve times the passing score.[4]

—Jasper Sterling's scores ranged from more than thirteen times the passing score to more than twenty times the passing score.[5]

There are no facts in the record to support any conclusion other than that these plaintiffs will continue to be able to achieve a satisfactory facemask fit in the future. Indeed, the defendant makes no effort to explain away the fit test results for plaintiffs Potter and Ali. *See* Opp. at 2.

---

[3] *See* Aug. 1 Tr. at 77:9 (Ass't Chief Fitzgerald) (passing score is 500). Plaintiffs' test results are attached to their motions.

[4] Plaintiff Chasin also passed a fit test, with his beard, when facemasks were first issued to paramedics about four years ago. *See* [First] Chasin Declaration ¶ 6.

[5] Plaintiff Sterling also passed a fit test, with his beard, when facemasks were first issued to paramedics about four years ago. *See* [First] Sterling Declaration ¶ 4.

Regarding Mr. Chasin, the defendant observes that his scores declined from test to test and argues that "as Mr. Chasin's beard grows the seal on his face-piece deteriorates with the likelihood that within a few months he will not be able to achieve a passing score." Opp. at 3. But there are no facts in the record to support the defendant's unfounded assumption that Mr. Chasin's beard grew longer from test to test, or that it will continue to grow longer in the future. Mr. Chasin's third declaration, filed herewith, makes it clear that the facts are otherwise, and that there is no reason to believe that his test scores on any future tests will be any lower than his past scores. Indeed, he notes that his passing score on the November 2005 fit test, taken with a beard, was *better* than his passing score on a June 2005 fit test taken when he was clean-shaven. *See* Chasin 3rd Decl. ¶ 4.

Regarding Mr. Sterling, the defendant similarly posits that "during a two month period while Mr. Sterling grew his beard, his face-fit score dropped by more about [*sic*] a third." Opp. at 4. Again, there are simply no facts in the record to support the defendant's unfounded assumption that Mr. Sterling's beard grew longer from test to test, or that it will continue to grow longer in the future. Like Mr. Chasin, Mr. Sterling keeps his beard trimmed,[6] and it was about the same length for each of the three fit tests he recently passed.[7] The reason for his declining score was probably that he didn't tighten the straps as much for subsequent tests, knowing that he had passed by a large margin.[8] Even if he continues to achieve only the lowest of his three passing scores, that score was

---

[6] *See* [First] Sterling Declaration ¶ 5; Second Sterling Declaration ¶ 3. Mr. Sterling has informed his undersigned counsel that defendant's assumption is not true

[7] Second Sterling Declaration ¶ 3.

[8] *Id.* ¶ 4.

4

still approximately fourteen times higher than the passing score, and above the departmental average for clean-shaven firefighters.[9]

   **B. Plaintiffs Conerly and Rashumaa.**  It is undisputed that each of these plaintiffs *also passed* each of the three monthly fit tests.  The defendant seeks to belittle that straightforward fact on the ground that Mr. Rashumaa had to switch to a smaller facepiece at his second test, and Mr. Conerly had to switch to a smaller facepiece at his third test.  Opp. at 3-4.  But allowing firefighters to try different facepieces until they find one that fits properly is routine Department procedure.  As Captain Flint testified at the August 1 hearing in *Potter*, if a firefighter does not "meet the minimum score of 500, we replace the face piece, give them one that fits better, or we reapply it and make sure that it's not malfunctioning in some way." (Tr. 105:11-14.)  Captain Flint testified that of 1,437 firefighters who had passed the fit test, "about 500" had to be issued a new facepiece.  "[S]ome firefighters have been wearing the wrong face piece for 13 or 14 years." (Tr. 105:17-22.)

  Once again, the defendant assumes, without any foundation, that the reason Messrs Conerly and Rashumaa needed new facepieces was because of their growing beards.  *See* Opp. at 4.  But the fact that plaintiffs Conerly and Rashumaa needed *smaller*, not larger, facepieces itself suggests the improbability of that explanation.

  In fact, Mr. Conerly needed a smaller facepiece because he was losing weight.  He had facial surgery to clear his sinuses and spent two weeks on a liquid diet and then another month on a soft-food diet; the Department presumably knows about his surgery because he was on sick leave.  A gain or loss in weight is well recognized as a factor that

---

[9] *Id.*

5

may require a change in facepiece size.  *See* Aug. 1 Tr. at 87:24-88:7; 105:18-22 (Capt. Flint).  Yet despite the defendant's vaunted concern with facemask fit—especially in the aftermath of the September 11 2001 events, as the Court has so often been informed—the Fire and EMS Department had not done department-wide fit testing from 1998 until the summer of 2005.  *Id.* at 105:17-18 (Capt. Flint).  At that time the Department discovered that *more than one-third of all D.C. firefighters* had been wearing bad facepieces during part or all of the four years that the Department had been trying to fire the *Potter* plaintiffs on the (false) theory that they couldn't get a good fit.  *Id.* at 105:15-18.  The fact that Firefighter Conerly needed a new mask is no more damning to him than it was to the 500 clean-shaven members who also needed new masks.

      Mr. Rashumaa has a thin face, but he had been issued an extra-large mask because of the volume of hair on the top of his head.[10]  He also lost some weight this fall, and while taking his second fit test, both he and the tester noticed that his facepiece was leaking around his temples—not around his beard—and recognized the need to switch to a smaller mask.  In any event, he too passed all three tests.[11]

      Portentously, defendant proclaims that "[h]ad Mr. Conerly responded to a large scale chlorine spill instead of an administrative face-fit test on January 11, 2006, it is likely that, instead of helping injured citizens, he would have himself been a casualty."  Opp. at 3.  And, "[h]ad Mr. Rashumaa responded to a major event involving a chlorine spill on December 13, 2005, instead of an administrative face-fit test, he could not have

---

[10] *See* photographs attached to [First] Rashumaa Declaration; Second Rashumaa Declaration, ¶ 3, filed herewith.

[11] *Id.* ¶ 5.  Mr. Rashumaa's third test score may have been lower than the first two because he rinsed his mouth with some mouthwash a few minutes before that test.  *See id.* ¶ 7.

6

safely worn his issued face-piece." Opp. at 4. But Firefighter Conerly's and Paramedic Rashumaa's need for new masks were discovered and rectified quickly because they were being tested monthly. Most D.C. firefighters and EMTs have now not been tested for more than six months. Among them are likely to be some who have gained or lost weight and who, if they responded to a large scale chlorine spill tomorrow, might find themselves casualties instead of rescuers. Yet it is only the ones with beards that appear to generate hysteria in the Department.

There is another major flaw in the defendant's argument here. Neither Mr. Conerly, Mr. Rashumaa, or any other firefighter or EMT would respond to a "large scale chlorine spill" wearing his Go-Bag negative pressure respirator. Indeed, in the event of a large scale chlorine spill, Department personnel would be expected to stay *out* of the poisonous cloud. As Assistant Chief Thumann graphically explained, "They would be going backwards. They would try to remove themselves from the hazardous area."[12] Department personnel may enter an IDLH (immediately dangerous to life and health) atmosphere only if they are wearing SCBAs (self-contained breathing apparatus); they may not enter such an area wearing only a Go-Bag filter.[13]

But this case is not about whether plaintiffs are safe when wearing their self-contained breathing apparatus. That issue disappeared from the case in June, 2005, when defendant's counsel stated in open court that leakage from the positive-pressure SCBA was "not what we're worried about."[14] All this case has been about since then is

---

[12] Tr. of Defendant's 30(b)(6) Depo. at 125:6-8.

[13] Tr. of Aug. 1, 2005 hearing at 82:2-13 (Ass't Chief Fitzgerald).

[14] Tr. of June 13, 2005 hearing at 6:16 (Mr. Utiger).

7

plaintiffs' safety when using the negative-pressure APRs (air purifying filters) that come with their Go-Bags. It is therefore disappointing, and unseemly, that the defendant keeps waving the bloody shirt of "large scale chlorine spills" and the like when such disasters are entirely irrelevant to the question whether the plaintiffs can safely use their Go-Bag filters in *non*-IDLH situations. Defendant's inflammatory rhetoric about "large scale chlorine spills" is simply a red herring and should be disregarded.

      C. **Plaintiffs Evans and Baker.** Dwight Evans has passed three fit tests with facial hair, the first when facemasks were issued to paramedics about four years ago,[15] the second in November 2005 (with a score nearly fourteen times the passing grade), and the third in December 2005 (with a score more than twenty-six times the passing grade).[16] It is true that Mr. Evans did not pass three tests in a three month period with a beard of the same length. But he has shown, three times, that his beard does not interfere with his ability to get a good seal with the facemask he has been issued. He is perfectly prepared to take another fit test, or tests, as long as he does not have to go for weeks or months without his regular pay in order to take the test, which he cannot afford to do.

      Sgt. Baker participated in the Department-wide fit tests administered in the summer of 2005, with his beard, and achieved a score approximately six times the

---

[15] *See* Evans Declaration ¶ 3.

[16] As defendant notes, Mr. Evans had only "a few days growth of beard" when he took the December 2005 fit test on which he scored so well. Opp. at 4. Apparently defendant's earlier position that the *Chasin* plaintiffs should not even be allowed to take fit tests because only persons with "fully mature, grownout beards" might perhaps be able to pass a fit test, *see* Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction [6] in *Chasin*, at 2-3, was no more valid than defendant's various other unsupported positions in this case.

passing grade.[17]  Had he been clean-shaven, that single passing score would have qualified him to remain on regular duty for the entire following year.  As a single parent supporting two children, he was unable to bear the financial burden of "administrative duty" from September 2005 through what now appears to be at least March 2006, in order to prove that he could repeatedly pass the same test.  It is therefore true that he has not *personally* demonstrated that he can "consistently" pass the fit test with a beard.  But the experience of the other plaintiffs makes it reasonably clear that he could so demonstrate if given a reasonable, non-sacrificial opportunity, for no other plaintiff who has achieved a score as high as Sgt. Baker's has even come close to failing.[18]

    **D.  Other FEMS personnel.**  The defendant attempts to contrast "the seven individuals who took part in the Court ordered test process, [of whom] three could not consistently pass the face fit test, or over 42%," with "the over 1800 personnel who took the face-fit test without facial hair, [of whom] *all* passed."  Opp. 6-7 (emphasis in original).  But those figures are cooked.  Of the nine plaintiffs, eight have passed at every testing session at which they have been tested—a total of 21 passed tests in 2005 and 2006 (not counting the fit tests in 2001 that the four paramedic plaintiffs also passed, or the 2002 test that firefighter Potter passed).  Only one plaintiff, Mr. Umrani, has been

---

[17] *See* First and Second Baker Declarations; *see also* Langley Declaration, filed January 12, 2006, p. 18.  It was apparently a fluke that Sgt. Baker was allowed to participate in the July 2005 test.  Had the Fire Chief's instructions been followed, he would have been excluded, so that the Department could continue blindly asserting that Firefighters with beards could not achieve a passing score.

[18] The plaintiffs who passed with relatively marginal scores—Messrs Conerly and Rashumaa—never achieved a score greater than 1350.  Sgt. Baker's score of 2977 puts him in the company of plaintiffs Potter, Ali, Chasin and Sterling, none of whom ever achieved a score of less than three times the passing grade.

unable to pass the fit test.[19]  On the other hand, *no* clean-shaven firefighter or paramedic has ever been asked to demonstrate that he could "consistently" pass the fit test.  If a clean-shaven employee passes once, he's presumed to be safe for a year.[20]  If clean-shaven employees were tested monthly, perhaps some would not "consistently" pass.  Additionally, defendant apparently counts as a test *failure* a situation in which an employee requires an adjustment in his mask—that's the only way get defendant's purported 42% failure rate from the test results.  But if that same criterion were applied to clean-shaven personnel, the failure rate would be a comparable 35%, for approximately 500 of the 1,437 clean-shaven members who had been tested as of the August 1 hearing had required new facepieces in order to pass; "some firefighters ha[d] been wearing the wrong face piece for 13 or 14 years."  Aug. 1 Tr. at 105:21-22 (Capt. Flint).[21]

Similarly, the defendant disparages the "barely passing" score plaintiff Conerly received on two tests.  Opp. at 3.  But a passing score is a passing score.  Clean-shaven personnel who score 500 remain on duty for the following year, without follow-up testing to determine whether they can pass again in a month or two.

Finally, the defendant argues that plaintiffs' success on the fit tests doesn't prove that their facepieces would work "in a real world environment as opposed to the orderly

---

[19] The parties are currently determining whether plaintiff Umrani was tested with every facepiece/nosepiece configuration that is available from Scott.  He will be retested once this determination has been made.

[20] *At least* a year.  Before the summer 2005 tests, the last set of department-wide tests was seven years earlier, in 1998.  Aug. 1 Tr. at 105:17-18 (Capt. Flint).  For nearly four years after September 11, the Department did not bother to require fit tests of its personnel, even as it was arguing that the plaintiffs in *Potter* should be dismissed because they could not pass fit tests.

[21] We are uncertain where the defendant gets its "over 1800 personnel" figure.  Perhaps additional personnel were tested after the August 1 hearing.  In that case, the record does not reflect how many of them also required new facepieces.

procedures in a testing setting." Opp. at 6. Of course, the fact that a clean-shaven firefighter passes a fit test in the "orderly procedures [of] a testing setting" equally fails to prove that *his* facepiece would work "in a real world environment." Defendant's persistence in seeking to apply a double standard is remarkable. In fact, however, it is not necessary to speculate about whether plaintiffs' facepieces will work "in a real world environment." Plaintiffs and many other bearded firefighters have been working in the real world of D.C. firefighting for *decades*, and the record is entirely clear that their facemasks work just fine, and that there has never been an injury or accident caused by facial hair.

The purpose of these months of fit testing was to establish whether the *facts* fit defendant's theory that personnel with beards could not achieve an acceptable fit. Now that the facts have disproved defendant's theory, defendants want to return to speculation rather than face the facts.

### II. Defendant misstates the governing legal standard; applying the correct standard it is clear that plaintiffs should be reinstated to regular duty.

Defendant sums up its opposition with the conclusion that "[t]he District's regulation forbidding facial hair at the point of seal of a face-piece is a *legitimate* and *rational* safety regulation based on *assumptions* firmly rooted in science." Opp. at 7 (emphasis added). Defendant seems to forget that this case is not a review of an agency decision governed by the "substantial evidence in the record" or "arbitrary and capricious" standards of the Administrative Procedure Act. This case is governed by the Religious Freedom Restoration Act, which provides that "Government may substantially burden *a person's* exercise of religion only if *it demonstrates* that application of the

11

burden *to the person*— (1) is in furtherance of a compelling governmental interest; and (2) *is the least restrictive means* of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b) (emphasis added).[22]

It is therefore the *defendant's burden* in this case to demonstrate that discharging a particular employee—which is what the Department wants to do to each of the plaintiffs here—is the only practical way of protecting his safety and the safety of others. A "rational" regulation rooted in reasonable "assumptions" may withstand legal challenge in some other contexts, but the Religious Freedom Restoration Act is not such a context, for it "imposes *strict scrutiny* 'in all cases where free exercise of religion is substantially burdened.'" *Campbell-El v. District of Columbia*, 874 F. Supp. 403, 408 (D.D.C. 1994) (quoting the statutory statement of purpose, 42 U.S.C. § 2000bb(b)(1)) (emphasis added).[23]

---

[22] "Demonstrates" is itself a carefully defined term: "The term 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion." 42 U.S.C. § 2000bb-2(3).

[23] As the Sixth Circuit recently explained:

> In 1990, the Supreme Court held in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878-82 (1990), that laws of general applicability that incidentally burden religious conduct are not subject to strict-scrutiny review under the First Amendment's Free Exercise Clause. Congress responded to *Smith* by enacting the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. § 2000bb-1 to -4. RFRA bars the government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," unless the government can proffer a compelling interest and show that the law "is the least restrictive means of furthering" that interest. 42 U.S.C. § 2000bb-1(a), (b). *This test effectively reinstated the strict-scrutiny standard that the Court had rejected in Smith.*

*Cutter v. Wilkinson*, 423 F.3d 579, 582 (6th Cir. 2005) (emphasis added).

It follows that for a plaintiff to prevail on his motion for reinstatement to active duty—which is technically a motion to modify the terms of the pending preliminary injunction in his case—he need only show that he is *likely* to prevail on the merits, *i.e.*, that the government is *unlikely* to be able to carry *its* heavy burden of demonstrating that applying the no-beard rule *to him* is the least restrictive means of furthering the Department's interest in safety. *See, e.g., Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) ("As the government bears the burden of proof on the ultimate question . . . [plaintiffs] must be deemed likely to prevail unless the Government has shown that respondents' proposed less restrictive alternatives are less effective than [the challenged statute]."

Finally, it is crucial to note that the government must carry its heavy burden as to *each* plaintiff individually. The statute is explicitly so written (government must demonstrate "that application of the burden *to the person*" meets the strict scrutiny test), and that careful drafting reflects the congressional purpose. As summarized in footnote 23 above, the enactment of RFRA was sparked by the Supreme Court's decision in *Employment Division v. Smith*, 485 U.S. 660 (1988), which controversially held that an individual government employee was not entitled to a personal exemption from a Oregon State law of general applicability. The purpose of RFRA was to override *Smith*, and affirmatively require the government to grant a religion-based exemption from an otherwise valid law or rule of general applicability *to an individual* who has a religious need for such an exemption, if the individual can demonstrate that the law imposes a substantial burden on his religious practice, and if the government cannot show that the application of the law *to him* is the least restrictive means of serving its compelling interest. Such an exemption is precisely the relief that each plaintiff seeks here. Thus, to

the extent (if any) that the material facts may differ from plaintiff to plaintiff—*e.g.*, that application of the beard ban is necessary as to one plaintiff but not as to another— each plaintiff's case must be adjudged on his own facts.

Applying these standards, The Department is not likely to be able to demonstrate that requiring Calvert Potter to shave is *necessary* to protect his safety or the safety of others. It is undisputed that he has worked safely as a D.C. firefighter for more than 13 years. It is undisputed that he passed three consecutive fit tests with scores averaging more than eleven times the passing grade. Nor can the Department demonstrate that the beard ban must be applied to Firefighter Tarik Ali, with more than 14 years of safe service and fit test scores averaging more than six times the passing grade. Nor to plaintiffs Chasin, Sterling, Conerly or Rashumaa, each of whom has served safely for years, and each of whom has passed three consecutive fit tests. Nor can the government carry its heavy burden with respect to plaintiff Dwight Evans, who has served safely as a paramedic for more than 30 years, who is likely to reach retirement eligibility (in April 2007)[24] before he will ever be required to use his Go-Bag, and who has passed three fit tests with his beard and failed none. Finally, the Department cannot carry its burden with respect to plaintiff Eleon Baker because his own comfortable passing score in June 2005, his 20 years of safe service, and the fit test results of the other plaintiffs in these cases, make it *unlikely* that the government will be able to show that he *cannot* safely wear a facepiece. It is not, after all, his burden to show that he can. It is the government's burden to show—"with . . . evidence," 42 U.S.C. § 2000bb-2(3)—that he cannot. The government cannot make that factual showing on the basis of an assumption the validity

---

[24] *See* Evans Declaration ¶ 1.

of which has now been thoroughly disproved by the test results of the other plaintiffs.[25]

## Conclusion

For the reasons stated above and in plaintiffs' motions, the preliminary injunctions that are in force in these cases should be modified to order the defendant to reinstate to regular duty the plaintiffs who have moved for reinstatement, pending further order of the Court.

Respectfully submitted,

/s/
_____
Arthur B. Spitzer (D.C. Bar No. 235960)
Fritz Mulhauser (D.C. Bar No. 455377)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W. #119
Washington, DC 20036
(202) 457-0800

*Counsel for Plaintiffs*


_____
William D. Iverson (D.C. Bar No. 88872)
Michael C. Boteler (D.C. Bar No. 474504)
Joshua A. Doan (D.C. Bar No. 490879)
Covington & Burling
1201 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 662-6000

*Counsel for Plaintiffs in No. 01-1189*

February 7, 2006

---

[25] Lacking evidence in the factual record on which to rest its case, the Department relies on the opinion of Roy T. McKay, Ph.D.  *See* Opp. at 5-6.  On December 16, 2005, plaintiffs requested from the Department all documents on which Dr. McKay based the opinions recited in his declaration.  Plaintiffs await the production of responsive documents.  Meanwhile, the concrete facts in the record show that the moving plaintiffs *can* obtain an adequate facemask fit with their beards, whatever Dr. McKay's opinion may be.