(Slip Opinion)          OCTOBER TERM, 2005                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GONZALES, ATTORNEY GENERAL, ET AL. *v.* O CENTRO ESPIRITA BENEFICENTE UNIAO DO VEGETAL ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 04–1084.   Argued November 1, 2005—Decided February 21, 2006

Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA) in response to *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872, where, in upholding a generally applicable law that burdened the sacramental use of peyote, this Court held that the First Amendment's Free Exercise Clause does not require judges to engage in a case-by-case assessment of the religious burdens imposed by facially constitutional laws, *id.,* at 883–890. Among other things, RFRA prohibits the Federal Government from substantially burdening a person's exercise of religion, "even if the burden results from a rule of general applicability," 42 U. S. C. §2000bb–1(a), except when the Government can "demonstrat[e] that application of the burden to the person (1) [furthers] a compelling government interest; and (2) is the least restrictive means of furthering that . . . interest," §2000bb–1(b).

   Members of respondent church (UDV) receive communion by drinking *hoasca,* a tea brewed from plants unique to the Amazon Rainforest that contains DMT, a hallucinogen regulated under Schedule I of the Controlled Substances Act, see 21 U. S. C. §812(c), Schedule I(c). After U. S. Customs inspectors seized a *hoasca* shipment to the American UDV and threatened prosecution, the UDV filed this suit for declaratory and injunctive relief, alleging, *inter alia,* that applying the Controlled Substances Act to the UDV's sacramental *hoasca* use violates RFRA. At a hearing on the UDV's preliminary injunction motion, the Government conceded that the challenged application would substantially burden a sincere exercise of religion, but argued that this burden did not violate RFRA because applying the

Syllabus

Controlled Substances Act was the least restrictive means of advancing three compelling governmental interests: protecting UDV members' health and safety, preventing the diversion of *hoasca* from the church to recreational users, and complying with the 1971 United Nations Convention on Psychotropic Substances. The District Court granted relief, concluding that, because the parties' evidence on health risks and diversion was equally balanced, the Government had failed to demonstrate a compelling interest justifying the substantial burden on the UDV. The court also held that the 1971 Convention does not apply to *hoasca*. The Tenth Circuit affirmed.

*Held:* The courts below did not err in determining that the Government failed to demonstrate, at the preliminary injunction stage, a compelling interest in barring the UDV's sacramental use of *hoasca*. Pp. 6–19.

  1. This Court rejects the Government's argument that evidentiary equipoise as to potential harm and diversion is an insufficient basis for a preliminary injunction against enforcement of the Controlled Substances Act. Given that the Government conceded the UDV's prima facie RFRA case in the District Court and that the evidence found to be in equipoise related to an affirmative defense as to which the Government bore the burden of proof, the UDV effectively demonstrated a likelihood of success on the merits. The Government's argument that, although it would bear the burden of demonstrating a compelling interest at trial on the merits, the UDV should have borne the burden of disproving such interests at the preliminary injunction hearing is foreclosed by *Ashcroft* v. *American Civil Liberties Union,* 542 U. S. 656, 666. There, in affirming the grant of a preliminary injunction against the Government, this Court reasoned that the burdens with respect to the compelling interest test at the preliminary injunction stage track the burdens at trial. The Government's attempt to limit the *Ashcroft* rule to content-based restrictions on speech is unavailing. The fact that *Ashcroft* involved such a restriction in no way affected the Court's assessment of the consequences of having the burden at trial for preliminary injunction purposes. Congress' express decision to legislate the compelling interest test indicates that RFRA challenges should be adjudicated in the same way as the test's constitutionally mandated applications, including at the preliminary injunction stage. Pp. 6–8.

  2. Also rejected is the Government's central submission that, because it has a compelling interest in the *uniform* application of the Controlled Substances Act, no exception to the DMT ban can be made to accommodate the UDV. The Government argues, *inter alia,* that the Act's description of Schedule I substances as having "a high potential for abuse," "no currently accepted medical use," and "a lack of

Syllabus

accepted safety for use . . . under medical supervision," 21 U. S. C. §812(b)(1), by itself precludes any consideration of individualized exceptions, and that the Act's "closed" regulatory system, which prohibits all use of controlled substances except as the Act itself authorizes, see *Gonzales* v. *Raich,* 545 U. S. ___, ___, cannot function properly if subjected to judicial exemptions.  Pp. 8–16.

(a) RFRA and its strict scrutiny test contemplate an inquiry more focused than the Government's categorical approach.  RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law "to the person"—the particular claimant whose sincere exercise of religion is being substantially burdened.  42 U. S. C. §2000bb–1(b).  Section 2000bb(b)(1) expressly adopted the compelling interest test of *Sherbert* v. *Verner,* 374 U. S. 398, and *Wisconsin* v. *Yoder,* 406 U. S. 205.  There, the Court looked beyond broadly formulated interests justifying the general applicability of government mandates, scrutinized the asserted harms, and granted specific exemptions to particular religious claimants.  *Id.,* at 213, 221, 236; *Sherbert, supra,* at 410.  Outside the Free Exercise area as well, the Court has noted that "[c]ontext matters" in applying the compelling interest test, *Grutter* v. *Bollinger,* 539 U. S. 306, 327, and has emphasized that strict scrutiny's fundamental purpose is to take  "relevant differences" into account, *Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 228.  Pp. 9–10.

(b) Under RFRA's more focused inquiry, the Government's mere invocation of the general characteristics of Schedule I substances cannot carry the day.  Although Schedule I substances such as DMT are exceptionally dangerous, see, *e.g., Touby* v. *United States,* 500 U. S. 160, 162, there is no indication that Congress, in classifying DMT, considered the harms posed by the particular use at issue.  That question *was* litigated below.  Before the District Court found that the Government had not carried its burden of showing a compelling interest in preventing such harm, the court noted that it could not ignore the congressional classification and findings.  But Congress' determination that DMT should be listed under Schedule I simply does not provide a categorical answer that relieves the Government of the obligation to shoulder its RFRA burden.  The Controlled Substances Act's authorization to the Attorney General to "waive the requirement for registration of certain manufacturers, distributors, or dispensers if he finds it consistent with the public health and safety," 21 U. S. C. §822(d), reinforces that Congress' findings with respect to Schedule I substances should not carry the determinative weight, for RFRA purposes, that the Government would ascribe to them.  Indeed, despite the fact that everything the Government says about the DMT in *hoasca* applies in equal measure to the

Syllabus

mescaline in peyote, another Schedule I substance, both the Executive and Congress have decreed an exception from the Controlled Substances Act for Native American religious use of peyote, see 21 CFR §1307.31; 42 U. S. C. §1996a(b)(1). If such use is permitted in the face of the general congressional findings for hundreds of thousands of Native Americans practicing their faith, those same findings alone cannot preclude consideration of a similar exception for the 130 or so American members of the UDV who want to practice theirs. See *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520, 547. The Government's argument that the existence of a *congressional* exemption for peyote does not indicate that the Controlled Substances Act is amenable to *judicially crafted* exceptions fails because RFRA plainly contemplates court-recognized exceptions, see §2000bb–1(c). Pp. 11–13.

(c) The peyote exception also fatally undermines the Government's broader contention that the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA. The peyote exception has been in place since the Controlled Substances Act's outset, and there is no evidence that it has undercut the Government's ability to enforce the ban on peyote use by non-Indians. The Government's reliance on pre-*Smith* cases asserting a need for uniformity in rejecting claims for religious exemptions under the Free Exercise Clause is unavailing. Those cases did not embrace the notion that a general interest in uniformity justified a substantial burden on religious exercise, but instead scrutinized the asserted need and explained why the denied exemptions could not be accommodated. See, *e.g., United States* v. *Lee,* 455 U. S. 252, 258, 260. They show that the Government can demonstrate a compelling interest in uniform application of a particular program by offering evidence that granting the requested religious accommodations would seriously compromise its ability to administer the program. Here the Government's uniformity argument rests not so much on the particular statutory program at issue as on slippery slope concerns that could be invoked in response to any RFRA claim for an exception to a generally applicable law, *i.e.,* "if I make an exception for you, I'll have to make one for everybody, so no exceptions." But RFRA operates by mandating consideration, under the compelling interest test, of exceptions to "rule[s] of general applicability." §2000bb–1(a). Congress' determination that the legislated test is "workable . . . for striking sensible balances between religious liberty and competing prior governmental interests," §200bb(a)(5), finds support in *Sherbert, supra,* at 407, and *Cutter* v. *Wilkinson,* 544 U. S. ___, ___. While there may be instances where a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA, it would be surprising to find that this was such a case, given the longstanding pe-

Syllabus

yote exemption and the fact that the very reason Congress enacted RFRA was to respond to a decision denying a claimed right to sacramental use of a controlled substance. The Government has not shown that granting the UDV an exemption would cause the kind of administrative harm recognized as a compelling interest in, *e.g., Lee.* It cannot now compensate for its failure to convince the District Court as to its health or diversion concerns with the bold argument that there can be no RFRA exceptions at all to the Controlled Substances Act. Pp. 13–16.

    3. The Government argues unpersuasively that it has a compelling interest in complying with the 1971 U. N. Convention. While this Court does not agree with the District Court that the Convention does not cover *hoasca,* that does not automatically mean that the Government has demonstrated a compelling interest in applying the Controlled Substances Act, which implements the Convention, to the UDV's sacramental use. At this stage, it suffices that the Government did not submit any evidence addressing the international consequences of granting the UDV an exemption, but simply relied on two affidavits by State Department officials attesting to the general (and undoubted) importance of honoring international obligations and maintaining the United States' leadership in the international war on drugs. Under RFRA, invocation of such general interests, standing alone, is not enough. Pp. 16–18.

389 F. 3d 973, affirmed and remanded.

    ROBERTS, C. J., delivered the opinion of the Court, in which all other Members joined, except ALITO, J., who took no part in the consideration or decision of the case.

Cite as: 546 U. S. ____ (2006)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 04–1084

————

## ALBERTO R. GONZALES, ATTORNEY GENERAL, ET AL., PETITIONERS *v.* O CENTRO ESPIRITA BENEFICENTE UNIAO DO VEGETAL ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[February 21, 2006]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

A religious sect with origins in the Amazon Rainforest receives communion by drinking a sacramental tea, brewed from plants unique to the region, that contains a hallucinogen regulated under the Controlled Substances Act by the Federal Government. The Government concedes that this practice is a sincere exercise of religion, but nonetheless sought to prohibit the small American branch of the sect from engaging in the practice, on the ground that the Controlled Substances Act bars all use of the hallucinogen. The sect sued to block enforcement against it of the ban on the sacramental tea, and moved for a preliminary injunction.

It relied on the Religious Freedom Restoration Act of 1993, which prohibits the Federal Government from substantially burdening a person's exercise of religion, unless the Government "demonstrates that application of the burden to the person" represents the least restrictive means of advancing a compelling interest. 42 U. S. C.

§2000bb–1(b). The District Court granted the preliminary injunction, and the Court of Appeals affirmed. We granted the Government's petition for certiorari. Before this Court, the Government's central submission is that it has a compelling interest in the *uniform* application of the Controlled Substances Act, such that no exception to the ban on use of the hallucinogen can be made to accommodate the sect's sincere religious practice. We conclude that the Government has not carried the burden expressly placed on it by Congress in the Religious Freedom Restoration Act, and affirm the grant of the preliminary injunction.

I

In *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872 (1990), this Court held that the Free Exercise Clause of the First Amendment does not prohibit governments from burdening religious practices through generally applicable laws. In *Smith*, we rejected a challenge to an Oregon statute that denied unemployment benefits to drug users, including Native Americans engaged in the sacramental use of peyote. *Id.,* at 890. In so doing, we rejected the interpretation of the Free Exercise Clause announced in *Sherbert* v. *Verner*, 374 U. S. 398 (1963), and, in accord with earlier cases, see *Smith*, 494 U. S., at 879–880, 884–885, held that the Constitution does not require judges to engage in a case-by-case assessment of the religious burdens imposed by facially constitutional laws. *Id.,* at 883–890.

Congress responded by enacting the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, as amended, 42 U. S. C. §2000bb *et seq.*, which adopts a statutory rule comparable to the constitutional rule rejected in *Smith*. Under RFRA, the Federal Government may not, as a statutory matter, substantially burden a person's exercise of religion, "even if the burden results

Cite as: 546 U. S. ____ (2006)          3

Opinion of the Court

from a rule of general applicability." §2000bb–1(a). The
only exception recognized by the statute requires the
Government to satisfy the compelling interest test—to
"demonstrat[e] that application of the burden to the per-
son—(1) is in furtherance of a compelling government
interest; and (2) is the least restrictive means of further-
ing that compelling governmental interest." §2000bb–1(b).
A person whose religious practices are burdened in viola-
tion of RFRA "may assert that violation as a claim or
defense in a judicial proceeding and obtain appropriate
relief." §2000bb–1(c).[1]

The Controlled Substances Act, 84 Stat. 1242, as
amended, 21 U. S. C. §801 *et seq.* (2000 ed. and Supp. I),
regulates the importation, manufacture, distribution, and
use of psychotropic substances. The Act classifies sub-
stances into five schedules based on their potential for
abuse, the extent to which they have an accepted medical
use, and their safety. See §812(b) (2000 ed.). Substances
listed in Schedule I of the Act are subject to the most
comprehensive restrictions, including an outright ban on
all importation and use, except pursuant to strictly regu-
lated research projects. See §§823, 960(a)(1). The Act
authorizes the imposition of a criminal sentence for simple
possession of Schedule I substances, see §844(a), and
mandates the imposition of a criminal sentence for posses-
sion "with intent to manufacture, distribute, or dispense"
such substances, see §§841(a), (b).

O Centro Espírita Beneficente União do Vegetal (UDV)
is a Christian Spiritist sect based in Brazil, with an
American branch of approximately 130 individuals. Cen-
tral to the UDV's faith is receiving communion through

_____

[1] As originally enacted, RFRA applied to States as well as the Federal
Government. In *City of Boerne* v. *Flores,* 521 U. S. 507 (1997), we held
the application to States to be beyond Congress' legislative authority
under §5 of the 14th Amendment.

*hoasca* (pronounced "wass-ca"), a sacramental tea made from two plants unique to the Amazon region. One of the plants, *psychotria viridis*, contains dimethyltryptamine (DMT), a hallucinogen whose effects are enhanced by alkaloids from the other plant, *banisteriopsis caapi*. DMT, as well as "any material, compound, mixture, or preparation, which contains any quantity of [DMT]," is listed in Schedule I of the Controlled Substances Act. §812(c), Schedule I(c).

In 1999, United States Customs inspectors intercepted a shipment to the American UDV containing three drums of *hoasca*. A subsequent investigation revealed that the UDV had received 14 prior shipments of *hoasca*. The inspectors seized the intercepted shipment and threatened the UDV with prosecution.

The UDV filed suit against the Attorney General and other federal law enforcement officials, seeking declaratory and injunctive relief. The complaint alleged, *inter alia,* that applying the Controlled Substances Act to the UDV's sacramental use of *hoasca* violates RFRA. Prior to trial, the UDV moved for a preliminary injunction, so that it could continue to practice its faith pending trial on the merits.

At a hearing on the preliminary injunction, the Government conceded that the challenged application of the Controlled Substances Act would substantially burden a sincere exercise of religion by the UDV. See *O Centro Espirita Beneficente Uniao do Vegetal* v. *Ashcroft*, 282 F. Supp. 2d 1236, 1252 (NM 2002). The Government argued, however, that this burden did not violate RFRA, because applying the Controlled Substances Act in this case was the least restrictive means of advancing three compelling governmental interests: protecting the health and safety of UDV members, preventing the diversion of *hoasca* from the church to recreational users, and complying with the 1971 United Nations Convention on Psycho-

Opinion of the Court

tropic Substances, a treaty signed by the United States and implemented by the Act. Feb. 21, 1971, [1979–1980], 32 U. S. T. 543, T. I. A. S. No. 9725. See 282 F. Supp. 2d, at 1252–1253.

The District Court heard evidence from both parties on the health risks of *hoasca* and the potential for diversion from the church. The Government presented evidence to the effect that use of *hoasca*, or DMT more generally, can cause psychotic reactions, cardiac irregularities, and adverse drug interactions. The UDV countered by citing studies documenting the safety of its sacramental use of *hoasca* and presenting evidence that minimized the likelihood of the health risks raised by the Government. With respect to diversion, the Government pointed to a general rise in the illicit use of hallucinogens, and cited interest in the illegal use of DMT and *hoasca* in particular; the UDV emphasized the thinness of any market for *hoasca*, the relatively small amounts of the substance imported by the church, and the absence of any diversion problem in the past.

The District Court concluded that the evidence on health risks was "in equipoise," and similarly that the evidence on diversion was "virtually balanced." *Id.,* at 1262, 1266. In the face of such an even showing, the court reasoned that the Government had failed to demonstrate a compelling interest justifying what it acknowledged was a substantial burden on the UDV's sincere religious exercise. *Id.,* at 1255. The court also rejected the asserted interest in complying with the 1971 Convention on Psychotropic Substances, holding that the Convention does not apply to *hoasca. Id.,* at 1266–1269.

The court entered a preliminary injunction prohibiting the Government from enforcing the Controlled Substances Act with respect to the UDV's importation and use of *hoasca.* The injunction requires the church to import the tea pursuant to federal permits, to restrict control over the

tea to persons of church authority, and to warn particu-
larly susceptible UDV members of the dangers of *hoasca*.
See Preliminary Injunction ¶¶2, 5–12, 32–33, App. F to
App. to Pet. for Cert. 249a, 250a–252a, 258a–259a. The
injunction also provides that "if [the Government] be-
lieve[s] that evidence exists that *hoasca* has negatively
affected the health of UDV members," or "that a shipment
of *hoasca* contain[s] particularly dangerous levels of DMT,
[the Government] may apply to the Court for an expedited
determination of whether the evidence warrants suspen-
sion or revocation of [the UDV's authority to use *hoasca*]."
*Id.*, at 257a, ¶29.

The Government appealed the preliminary injunction
and a panel of the Court of Appeals for the Tenth Circuit
affirmed, *O Centro Espirita Beneficente Uniao do Vegetal*
v. *Ashcroft,* 342 F. 3d 1170 (2003), as did a majority of the
Circuit sitting en banc, 389 F. 3d 973 (2004). We granted
certiorari. 544 U. S. 973 (2005).

## II

Although its briefs contain some discussion of the poten-
tial for harm and diversion from the UDV's use of *hoasca*,
the Government does not challenge the District Court's
factual findings or its conclusion that the evidence submit-
ted on these issues was evenly balanced. Instead, the
Government maintains that such evidentiary equipoise is
an insufficient basis for issuing a preliminary injunction
against enforcement of the Controlled Substances Act. We
review the District Court's legal rulings *de novo* and its
ultimate decision to issue the preliminary injunction for
abuse of discretion. See *McCreary County* v. *American
Civil Liberties Union*, 545 U. S. ___ , ___ (2005) (slip op., at
19).

The Government begins by invoking the well-
established principle that the party seeking pretrial relief
bears the burden of demonstrating a likelihood of success

Opinion of the Court

on the merits. See, *e.g., Mazurek* v. *Armstrong,* 520 U. S. 968, 972 (1997) *(per curiam); Doran* v. *Salem Inn, Inc.,* 422 U. S. 922, 931 (1975). The Government argues that the District Court lost sight of this principle in issuing the injunction based on a mere tie in the evidentiary record.

A majority of the en banc Court of Appeals rejected this argument, and so do we. Before the District Court, the Government conceded the UDV's prima facie case under RFRA. See 282 F. Supp. 2d, at 1252 (application of the Controlled Substances Act would (1) substantially burden (2) a sincere (3) religious exercise). The evidence the District Court found to be in equipoise related to two of the compelling interests asserted by the Government, which formed part of the Government's affirmative defense. See 42 U. S. C. §2000bb–1(b) ("Government may substantially burden a person's exercise of religion only if *it demonstrates* that application of the burden to the person—(1) is in furtherance of a compelling government interest . . ." (emphasis added)); §2000bb–2(3) ("[T]he term 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion"). Accordingly, the UDV effectively demonstrated that its sincere exercise of religion was substantially burdened, and the Government failed to demonstrate that the application of the burden to the UDV would, more likely than not, be justified by the asserted compelling interests. See 389 F. 3d, at 1009 (Seymour, J., concurring in part and dissenting in part) ("[T]he balance is between actual irreparable harm to [the] plaintiff and potential harm to the government which does not even rise to the level of a preponderance of the evidence").

The Government argues that, although it would bear the burden of demonstrating a compelling interest as part of its affirmative defense at trial on the merits, the UDV should have borne the burden of disproving the asserted compelling interests at the hearing on the preliminary

injunction. This argument is foreclosed by our recent decision in *Ashcroft* v. *American Civil Liberties Union,* 542 U. S. 656 (2004). In *Ashcroft,* we affirmed the grant of a preliminary injunction in a case where the Government had failed to show a likelihood of success under the compelling interest test. We reasoned that "[a]s the Government bears the burden of proof on the ultimate question of [the challenged Act's] constitutionality, respondents [the movants] must be deemed likely to prevail unless the Government has shown that respondents' proposed less restrictive alternatives are less effective than [enforcing the Act]." *Id.,* at 666. That logic extends to this case; here the Government failed on the first prong of the compelling interest test, and did not reach the least restrictive means prong, but that can make no difference. The point remains that the burdens at the preliminary injunction stage track the burdens at trial.

The Government attempts to limit the rule announced in *Ashcroft* to content-based restrictions on speech, but the distinction is unavailing. The fact that *Ashcroft* involved such a restriction was the reason the Government had the burden of proof at trial under the First Amendment, see *id.,* at 665, but in no way affected the Court's assessment of the consequences of having that burden for purposes of the preliminary injunction. Here the burden is placed squarely on the Government by RFRA rather than the First Amendment, see 42 U. S. C. §§2000bb–1(b), 2000bb– 2(3), but the consequences are the same. Congress' express decision to legislate the compelling interest test indicates that RFRA challenges should be adjudicated in the same manner as constitutionally mandated applications of the test, including at the preliminary injunction stage.

### III

The Government's second line of argument rests on the

Opinion of the Court

Controlled Substances Act itself. The Government contends that the Act's description of Schedule I substances as having "a high potential for abuse," "no currently accepted medical use in treatment in the United States," and "a lack of accepted safety for use . . . under medical supervision," 21 U. S. C. §812(b)(1), by itself precludes any consideration of individualized exceptions such as that sought by the UDV. The Government goes on to argue that the regulatory regime established by the Act—a "closed" system that prohibits all use of controlled substances except as authorized by the Act itself, see *Gonzales* v. *Raich,* 545 U. S. ___, ___ (2005) (slip op., at 10)—"cannot function with its necessary rigor and comprehensiveness if subjected to judicial exemptions." Brief for Petitioners 18. According to the Government, there would be no way to cabin religious exceptions once recognized, and "the public will misread" such exceptions as signaling that the substance at issue is not harmful after all. *Id.,* at 23. Under the Government's view, there is no need to assess the particulars of the UDV's use or weigh the impact of an exemption for that specific use, because the Controlled Substances Act serves a compelling purpose and simply admits of no exceptions.

## A

RFRA, and the strict scrutiny test it adopted, contemplate an inquiry more focused than the Government's categorical approach. RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law "to the person"—the particular claimant whose sincere exercise of religion is being substantially burdened. 42 U. S. C. §2000bb–1(b). RFRA expressly adopted the compelling interest test "as set forth in *Sherbert* v. *Verner*, 374 U. S. 398 (1963) and *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972)." 42 U. S. C. §2000bb(b)(1). In each of those cases, this

Court looked beyond broadly formulated interests justifying the general applicability of government mandates and scrutinized the asserted harm of granting specific exemptions to particular religious claimants. In *Yoder,* for example, we permitted an exemption for Amish children from a compulsory school attendance law. We recognized that the State had a "paramount" interest in education, but held that "despite its admitted validity in the generality of cases, we must searchingly examine the interests that the State seeks to promote . . . and the impediment to those objectives that would flow from recognizing *the claimed Amish exemption.*" 406 U. S., at 213, 221 (emphasis added). The Court explained that the State needed "to show with more particularity how its admittedly strong interest . . . would be adversely affected by granting an exemption *to the Amish.*" *Id.,* at 236 (emphasis added).

In *Sherbert,* the Court upheld a particular claim to a religious exemption from a state law denying unemployment benefits to those who would not work on Saturdays, but explained that it was not announcing a constitutional right to unemployment benefits for "*all* persons whose religious convictions are the cause of their unemployment." 374 U. S., at 410 (emphasis added). The Court distinguished the case "in which an employee's religious convictions serve to make him a nonproductive member of society." *Ibid.;* see also *Smith,* 494 U. S., at 899 (O'Connor, J., concurring in judgment) (strict scrutiny "at least requires a case-by-case determination of the question, sensitive to the facts of each particular claim"). Outside the Free Exercise area as well, the Court has noted that "[c]ontext matters" in applying the compelling interest test, *Grutter* v. *Bollinger,* 539 U. S. 306, 327 (2003), and has emphasized that "strict scrutiny *does* take 'relevant differences' into account—indeed, that is its fundamental purpose," *Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 228 (1995).

Opinion of the Court

### B

Under the more focused inquiry required by RFRA and the compelling interest test, the Government's mere invocation of the general characteristics of Schedule I substances, as set forth in the Controlled Substances Act, cannot carry the day. It is true, of course, that Schedule I substances such as DMT are exceptionally dangerous. See, *e.g., Touby* v. *United States,* 500 U. S. 160, 162 (1991). Nevertheless, there is no indication that Congress, in classifying DMT, considered the harms posed by the particular use at issue here—the circumscribed, sacramental use of *hoasca* by the UDV. The question of the harms from the sacramental use of *hoasca* by the UDV *was* litigated below. Before the District Court found that the Government had not carried its burden of showing a compelling interest in preventing such harms, the court noted that it could not "ignore that the legislative branch of the government elected to place materials containing DMT on Schedule I of the [Act], reflecting findings that substances containing DMT  have 'a high potential for abuse,' and 'no currently accepted medical use in treatment in the United States,' and that '[t]here is a lack of accepted safety for use of [DMT] under medical supervision.'" 282 F. Supp. 2d, at 1254. But Congress' determination that DMT should be listed under Schedule I simply does not provide a categorical answer that relieves the Government of the obligation to shoulder its burden under RFRA.

This conclusion is reinforced by the Controlled Substances Act itself. The Act contains a provision authorizing the Attorney General to "waive the requirement for registration of certain manufacturers, distributors, or dispensers if he finds it consistent with the public health and safety." 21 U. S. C. §822(d). The fact that the Act itself contemplates that exempting certain people from its requirements would be "consistent with the public health and safety" indicates that congressional findings with

respect to Schedule I substances should not carry the determinative weight, for RFRA purposes, that the Government would ascribe to them.

And in fact an exception has been made to the Schedule I ban for religious use. For the past 35 years, there has been a regulatory exemption for use of peyote—a Schedule I substance—by the Native American Church. See 21 CFR §1307.31 (2005). In 1994, Congress extended that exemption to all members of every recognized Indian Tribe. See 42 U. S. C. §1996a(b)(1). Everything the Government says about the DMT in *hoasca*—that, as a Schedule I substance, Congress has determined that it "has a high potential for abuse," "has no currently accepted medical use," and has "a lack of accepted safety for use . . . under medical supervision," 21 U. S. C. §812(b)(1)— applies in equal measure to the mescaline in peyote, yet both the Executive and Congress itself have decreed an exception from the Controlled Substances Act for Native American religious use of peyote. If such use is permitted in the face of the congressional findings in §812(b)(1) for hundreds of thousands of Native Americans practicing their faith, it is difficult to see how those same findings alone can preclude any consideration of a similar exception for the 130 or so American members of the UDV who want to practice theirs. See *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520, 547 (1993) ("It is established in our strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited'" (quoting *Florida Star* v. *B. J. F.,* 491 U. S. 524, 541–542 (1989) (SCALIA, J., concurring in part and concurring in judgment))).

The Government responds that there is a "unique relationship" between the United States and the Tribes, Brief for Petitioners 27; see *Morton* v. *Mancari,* 417 U. S. 535 (1974), but never explains what about that "unique" rela-

Opinion of the Court

tionship justifies overriding the same congressional findings on which the Government relies in resisting any exception for the UDV's religious use of *hoasca*. In other words, if any Schedule I substance is in fact *always* highly dangerous in any amount no matter how used, what about the unique relationship with the Tribes justifies allowing their use of peyote? Nothing about the unique political status of the Tribes makes their members immune from the health risks the Government asserts accompany any use of a Schedule I substance, nor insulates the Schedule I substance the Tribes use in religious exercise from the alleged risk of diversion.

The Government argues that the existence of a *congressional* exemption for peyote does not indicate that the Controlled Substances Act is amenable to *judicially crafted* exceptions. RFRA, however, plainly contemplates that *courts* would recognize exceptions—that is how the law works. See 42 U. S. C. §2000bb–1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government"). Congress' role in the peyote exemption—and the Executive's, see 21 CFR §1307.31 (2005)—confirms that the findings in the Controlled Substances Act do not preclude exceptions altogether; RFRA makes clear that it is the obligation of the courts to consider whether exceptions are required under the test set forth by Congress.

C

The well-established peyote exception also fatally undermines the Government's broader contention that the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA. The Government argues that the effectiveness of the Controlled Substances Act will be "necessarily . . . undercut" if the Act is not uniformly applied, without regard to burdens on religious exercise. Brief for Petitioners 18. The

peyote exception, however, has been in place since the outset of the Controlled Substances Act, and there is no evidence that it has "undercut" the Government's ability to enforce the ban on peyote use by non-Indians.

The Government points to some pre-*Smith* cases relying on a need for uniformity in rejecting claims for religious exemptions under the Free Exercise Clause, see Brief for Petitioners 16, but those cases strike us as quite different from the present one. Those cases did not embrace the notion that a general interest in uniformity justified a substantial burden on religious exercise; they instead scrutinized the asserted need and explained why the denied exemptions could not be accommodated. In *United States* v. *Lee,* 455 U. S. 252 (1982), for example, the Court rejected a claimed exception to the obligation to pay Social Security taxes, noting that "mandatory participation is indispensable to the fiscal vitality of the social security system" and that the "tax system could not function if denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious belief." *Id.,* at 258, 260. See also *Hernandez* v. *Commissioner,* 490 U. S. 680, 700 (1989) (same). In *Braunfeld* v. *Brown,* 366 U. S. 599 (1961) (plurality opinion), the Court denied a claimed exception to Sunday closing laws, in part because allowing such exceptions "might well provide [the claimants] with an economic advantage over their competitors who must remain closed on that day." *Id.,* at 608–609. The whole point of a "uniform day of rest for all workers" would have been defeated by exceptions. See *Sherbert,* 374 U. S., at 408 (discussing *Braunfeld*). These cases show that the Government can demonstrate a compelling interest in uniform application of a particular program by offering evidence that granting the requested religious accommodations would seriously compromise its ability to administer the program.

Here the Government's argument for uniformity is differ-

Opinion of the Court

ent; it rests not so much on the particular statutory program at issue as on slippery-slope concerns that could be invoked in response to any RFRA claim for an exception to a generally applicable law.  The Government's argument echoes the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions.  But RFRA operates by mandating consideration, under the compelling interest test, of exceptions to "rule[s] of general applicability."    42 U. S. C. §2000bb–1(a).  Congress determined that the legislated test "is a workable test for striking sensible balances between religious liberty and competing prior governmental interests." §200bb(a)(5).  This determination finds support in our cases; in *Sherbert*, for example, we rejected a slippery-slope argument similar to the one offered in this case, dismissing as "no more than a possibility" the State's speculation "that the filing of fraudulent claims by unscrupulous claimants feigning religious objections to Saturday work" would drain the unemployment benefits fund. 374 U. S., at 407.

We reaffirmed just last Term the feasibility of case-by-case consideration of religious exemptions to generally applicable rules.  In *Cutter* v. *Wilkinson*, 544 U. S. ___ (2005), we held that the Religious Land Use and Institutionalized Persons Act of 2000, which allows federal and state prisoners to seek religious accommodations pursuant to the same standard as set forth in RFRA, does not violate the Establishment Clause.  We had "no cause to believe" that the compelling interest test "would not be applied in an appropriately balanced way" to specific claims for exemptions as they arose.  *Id.,* at ___ (slip op., at 12).  Nothing in our opinion suggested that courts were not up to the task.

We do not doubt that there may be instances in which a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA.  But it would

have been surprising to find that this was such a case, given the longstanding exemption from the Controlled Substances Act for religious use of peyote, and the fact that the very reason Congress enacted RFRA was to respond to a decision denying a claimed right to sacramental use of a controlled substance. See 42 U. S. C. §2000bb(a)(4). And in fact the Government has not offered evidence demonstrating that granting the UDV an exemption would cause the kind of administrative harm recognized as a compelling interest in *Lee*, *Hernandez*, and *Braunfeld*. The Government failed to convince the District Court at the preliminary injunction hearing that health or diversion concerns provide a compelling interest in banning the UDV's sacramental use of *hoasca*. It cannot compensate for that failure now with the bold argument that there can be no RFRA exceptions at all to the Controlled Substances Act. See Tr. of Oral Arg. 17 (Deputy Solicitor General statement that exception could not be made even for "rigorously policed" use of "one drop" of substance "once a year").

IV

Before the District Court, the Government also asserted an interest in compliance with the 1971 United Nations Convention on Psychotropic Substances, Feb. 21, 1971, [1979–1980], 32 U. S. T. 543, T. I. A. S. No. 9725. The Convention, signed by the United States and implemented by the Controlled Substances Act, calls on signatories to prohibit the use of hallucinogens, including DMT. The Government argues that it has a compelling interest in meeting its international obligations by complying with the Convention.

The District Court rejected this interest because it found that the Convention does not cover *hoasca*. The court relied on the official commentary to the Convention, which notes that "Schedule I [of the Convention] does not list . . .

Opinion of the Court

natural hallucinogenic materials," and that "[p]lants as such are not, and it is submitted are also not likely to be, listed in Schedule I, but only some products obtained from plants." U. N. Commentary on the Convention on Psychotropic Substances 387, 385 (1976). The court reasoned that *hoasca*, like the plants from which the tea is made, is sufficiently distinct from DMT itself to fall outside the treaty. See 282 F. Supp. 2d, at 1266–1269.

We do not agree. The Convention provides that "a preparation is subject to the same measures of control as the psychotropic substance which it contains," and defines "preparation" as "any solution or mixture, in whatever physical state, containing one or more psychotropic substances." See 32 U. S. T., at 546, Art. 1(f)(i); *id.,* at 551, Art. 3. *Hoasca* is a "solution or mixture" containing DMT; the fact that it is made by the simple process of brewing plants in water, as opposed to some more advanced method, does not change that. To the extent the commentary suggests plants themselves are not covered by the Convention, that is of no moment—the UDV seeks to import and use a tea brewed from plants, not the plants themselves, and the tea plainly qualifies as a "preparation" under the Convention.

The fact that *hoasca* is covered by the Convention, however, does not automatically mean that the Government has demonstrated a compelling interest in applying the Controlled Substances Act, which implements the Convention, to the UDV's sacramental use of the tea. At the present stage, it suffices to observe that the Government did not even *submit* evidence addressing the international consequences of granting an exemption for the UDV. The Government simply submitted two affidavits by State Department officials attesting to the general importance of honoring international obligations and of maintaining the leadership position of the United States in the international war on drugs. See Declaration of

Gary T. Sheridan (Jan. 24, 2001), App. G to App. to Pet. for Cert. 261a; Declaration of Robert E. Dalton (Jan. 24, 2001), App. H, *id.,* at 265a. We do not doubt the validity of these interests, any more than we doubt the general interest in promoting public health and safety by enforcing the Controlled Substances Act, but under RFRA invocation of such general interests, standing alone, is not enough.[2]

*     *     *

The Government repeatedly invokes Congress' findings and purposes underlying the Controlled Substances Act, but Congress had a reason for enacting RFRA, too. Congress recognized that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise," and legislated "the compelling interest test" as the means for the courts to "strik[e] sensible balances between religious liberty and competing prior governmental interests." 42 U. S. C. §§2000bb(a)(2), (5).

We have no cause to pretend that the task assigned by Congress to the courts under RFRA is an easy one. Indeed, the very sort of difficulties highlighted by the Government here were cited by this Court in deciding that the approach later mandated by Congress under RFRA was not required as a matter of constitutional law under the Free Exercise Clause. See *Smith,* 494 U. S., at 885–890. But Congress has determined that courts should strike sensible balances, pursuant to a compelling interest test that requires the Government to address the particular practice at issue. Applying that test, we conclude that the courts below did not err in determining that the Government failed to demonstrate, at the preliminary injunction stage, a compelling interest in barring the UDV's sacra-

--------

[2]In light of the foregoing, we do not reach the UDV's argument that Art. 22, ¶5, of the Convention should be read to accommodate exceptions under domestic laws such as RFRA.

Cite as: 546 U. S. ____ (2006)                    19

Opinion of the Court

mental use of *hoasca*.

The judgment of the United States Court of Appeals for the Tenth Circuit is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE ALITO took no part in the consideration or decision of this case.