UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CALVERT L. POTTER, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DISTRICT OF COLUMBIA,<br><br>    Defendant. | No. 01-cv-1189 (JR) |
| STEVEN B. CHASIN, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DISTRICT OF COLUMBIA,<br><br>    Defendant. | No. 05-cv-1792 (JR) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO STAY OR
MODIFY, PENDING APPEAL, THE COURT'S ORDERS OF MARCH 20, 2006**

    The defendant has moved [*Potter* 114; *Chasin* 26] to stay or modify, pending appeal, the Court's orders of March 20, 2006 [*Potter* 111; *Chasin* 23]. Those orders directed the defendant to "reinstate . . . to field operations" as firefighters or paramedics six named plaintiffs, each of whom had passed three consecutive face mask fit tests during the preceding months, with the proviso that "within 30 days of this order, and every 30 days thereafter, plaintiffs take and pass the applicable face-fit test for their negative pressure masks."

    The defendant's principal request is for a stay of the March 20 orders, which would return these six plaintiffs to "administrative duties," at significantly reduced pay, for the duration of the defendant's appeals. The defendant also has a fallback request: if

the Court will not grant a complete stay, then it seeks a modification of the orders that would return these six plaintiffs to "administrative duties," but order the Department to pay them the same pay they would earn if they had been reinstated to field operations.[1]

Plaintiffs show below why the Court's March 20 orders should neither be stayed nor modified in the manner requested by the defendant.

### Background

The plaintiffs are District of Columbia firefighters and paramedics whose undisputedly sincere Muslim, Christian and Jewish religious beliefs require them to wear beards. The D.C. Fire and Emergency Medical Services Department takes the position that beards are incompatible with service as a firefighter or paramedic, and intends to discharge the plaintiffs—who have served an average of more than 17 years while wearing their beards—if they do not shave.

After an evidentiary hearing on August 1, 2005, the Court issued an opinion on August 11, finding that "the Department has yet to establish . . . that Special Order 20 [requiring all members to be beardless] embodies the least restrictive means of furthering its compelling interest [in safety]," as it was the Department's burden to show under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq*. Mem. Op.

---

[1] Defendant's motion describes its fallback request as modifying the orders "to require only that the District compensate plaintiffs' [*sic*] for lost overtime pay the [*sic*] otherwise would otherwise have earned." Motion at 8. However, in discussions among counsel, defendant's counsel agreed that the pay differential involves more than simply overtime pay. In particular, for the plaintiffs who are paramedics, the bulk of the pay differential involves their inability to earn the night, weekend, and holiday pay that is part of their *regular* rotating work schedule.

Defendant's counsel has authorized the undersigned to state that a more accurate description of defendant's fallback request is that the March 20 orders be modified to require the District to pay the plaintiffs whatever they would have earned if they were working regular duty.

Plaintiffs appreciate that clarification. They nevertheless oppose the motion for a stay *and* the alternative request for modification.

[*Potter* 98] at 9.  Accordingly, the Court entered a preliminary injunction prohibiting the Fire Department from discharging the plaintiffs for refusing to shave, and ordering the Department to allow the plaintiffs to take a series of face mask fit tests to ascertain whether they could consistently achieve a passing score while wearing their beards.  However, the Court allowed the Department to remove the plaintiffs from field operations and place them on "administrative duty" pending the results of these tests [*Potter* 97].

On November 10 the Court ordered similar relief for the plaintiffs in the *Chasin* case [*Chasin* 11].

As detailed in the plaintiffs' subsequent motions for reinstatement to field operations [*Potter* 103; *Chasin* 14] and their replies thereon [*Potter* 108; *Chasin* 19], all but one of the plaintiffs who took these fit tests passed them on each occasion.  The Fire Department nevertheless continued to insist that people with beards cannot obtain a good face mask fit, and refused to return the plaintiffs to field operations.  After oral argument, the Court granted the motions of six plaintiffs for reinstatement, providing, however, that each reinstated plaintiff take and pass a fit test every 30 days.  Orders of March 20, 2006 [*Potter* 111; *Chasin* 23].

The District has appealed those orders and now seeks a stay or modification pending appeal.

## Argument

In order to obtain a stay pending appeal, the moving party must show "(1) that it has a substantial likelihood of success on the merits;  (2) that it will suffer irreparable injury if the stay is denied;  (3) that issuance of the stay will not cause substantial harm to other parties; and (4) that the public interest will be served by issuance of the stay."

*United States v. Philip Morris, Inc.*, 314 F.3d 612, 617 (D.C. Cir. 2003) (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)).  The defendant has not made the required showing.

    **1. The defendant is not likely to succeed in its appeal**.

The defendant's argument regarding the likelihood of success on the merits simply incorporates by reference the arguments it made in opposing plaintiffs' motions for reinstatement.  *See* Motion for Stay at 6.  But the Court has already found those arguments wanting, because the facts in the record—showing that the six plaintiffs who have been ordered reinstated can consistently get a good face mask fit—simply do not allow the defendant to carry its burden, under RFRA, of showing that each of the plaintiffs cannot work safely with a beard.[2]

    **2. The defendant will not suffer irreparable harm absent a stay**.

Even the defendant is unable to say more than that the four plaintiffs now back on active duty "*may not* be able to fulfill their duties safely" and may pose "a *potential* risk" to public safety.  Motion to Stay at 6 (emphasis added).  Of course the very same thing could accurately be said about every overweight firefighter with a cigarette habit, but the Department has made no effort to drum those employees out of their jobs, or even to prohibit them from smoking.  *See* Tr. of 30(b)(6) Deposition of D.C. Fire Dep't at 152

---

[2] Defendant's motion states that two of the plaintiffs who were ordered to be reinstated failed fit tests on March 23 and 27.  Motion for Stay at 6.  But those fit tests were not properly administered, as is described in detail in plaintiffs Rashumaa's and Conerly's Motion for an Order Directing the Fire Department to Give Them Proper Fit Tests, also filed today.

    In any event, the provision of this Court's March 20 orders requiring each plaintiff to "take and pass" a fit test every 30 days automatically protects the defendant's safety interests.  The defendant has no need for a stay with respect to plaintiffs Rashumaa and Conerly, as they are not now on field operations, and the defendant has no intention of returning them to field operations unless ordered to do so by this Court.

4

(Ass't Chief Fitzgerald) (stating that there are overweight firefighters on active duty); *id.* at 161-62 (stating that the Department has no policy concerning overweight firefighters); *id.* (stating that the Department has no policy prohibiting smoking, even on duty).

The defendant concedes that "it is *probable* . . . that no event necessitating the wearing of a negative pressure mask will occur during the pending appeal." Motion to Stay at 7 (emphasis added). It is therefore impossible for the defendant to show that it "*will* suffer irreparable injury if the stay is denied." *Philip Morris*, supra, 314 F.3d at 617 (emphasis added). Nevertheless, the defendant suggests that *if* such an unlikely event should come to pass, and *if* a plaintiff should fail to get a good face mask seal, "the potential harm could be loss of life." Motion to Stay at 7.

But that argument ignores the *undisputed* fact that under the Department's own respiratory protection plan, the negative-pressure Go-Bag filter respirators *are not approved for use in a deadly atmosphere* because they do not provide protection against such a hazard. *See* Tr. of Aug. 1, 2005, hearing at 81-82 (testimony of Ass't Chief Fitzgerald). The defendant's continued linking of the Go-Bag filters and death is just a red herring.[3]

---

[3] Recent developments in the Department demonstrate that its practice does not comport with its preaching regarding the necessity of having *every* member able to use the Go-Bag filter in the event of a major emergency.

Because of recent incidents in which Go-Bag filters provided "not . . . respiratory protection but . . . a mouth full of charcoal dust," Declaration of Kenneth M. Lyons, ¶ 4, filed herewith, the Department last month advised all personnel not to use their Go-Bag filters if "more than a few granules of carbon or more than a small amount of dust is found" when the bag containing the filter is opened, or if "more than a slight amount of black powder dust is released" when the filter is shaken. *See* FEMS Memorandum No. 39, Series 2006 (March 2, 2006), attached as Exhibit A to the Lyons Declaration. However, "the Department has not issued backup canisters to all members to keep in their GO Bags in case one is defective." Lyons Declaration, ¶ 4.

Thus, there may be many clean-shaven firefighters and paramedics lacking respiratory protection should an "event necessitating the wearing of a negative pressure mask" occur during the pending appeal, even though it would not be necessary to order any personnel to violate their religious beliefs in order to provide them with backup filters.

5

### 3. Entry of a stay, or of the requested modification, will cause substantial harm to the plaintiffs.

Defendant's argument on this point is that the loss of income does not constitute "*irreparable* harm." Motion to Stay at 7 (emphasis added). But the applicable legal standard does not require the party *opposing* a stay to demonstrate irreparable harm; only "substantial harm" is required. *Philip Morris, supra.* Plaintiffs' substantial loss of income has caused them substantial harm, as shown by the fact that two of the plaintiffs have felt compelled to shave their beards, in violation of their sincere religious beliefs, in order to regain their regular income.

Thus, it is not simply a loss of income that plaintiffs suffer, but the harm that comes from being forced to choose between their jobs and their religion—the very sort of harm that Congress sought to prevent by enacting the Religious Freedom Restoration Act. Congress declared that "[g]overnment shall not substantially burden a person's exercise of religion . . . [unless] application of the burden to the person-- (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. It violates the spirit, if not the letter, of RFRA to ask the plaintiffs to suffer a substantial burden on their exercise of religion for perhaps more than a year, as if that should be tolerable because they can later be reimbursed for their lost income. Income alone is not the issue: back pay does not retroactively eliminate the psychological, emotional, and *spiritual* burdens placed for months on plaintiffs' exercise of their religion.[4]

---

[4] While the alternative relief sought in defendant's Motion for Stay offers to keep the plaintiffs' incomes whole, *see* footnote 1, *supra*, and plaintiffs assume the defendant would make a good-faith effort to do so, the difficulties of doing so should not be underestimated. How is one to calculate the amount of overtime that a given plaintiff would have worked and earned in a given month?

Defendant also ignores the other significant non-financial harms that plaintiffs will suffer from another lengthy period of exclusion from pursuing their careers. As Union President Lyons attests:

> It is essential for paramedics to keep their skills fresh through regular practice and training. Emergency medical services skills must be used in situations where there is not time for reflection, or for the use of reference books, or for doing something several times before getting it right. A paramedic must be able to respond to an emergency immediately with the proper techniques, properly executed. Without regular training and practice, such skills tend to atrophy. An absence of several months from the job (for example, while on extended forced "administrative duty") is therefore quite deleterious to a paramedic's skills, and it takes some time for him to return to his previous level of performance. Thus, both the paramedic and the people he serves are harmed by an unnecessary prolonged job absence.

Lyons Declaration ¶ 3. The same is obviously true for firefighters. In the analogous context of law enforcement, this Court has recognized that "with each day that [a police officer] is out of the station house or off the streets, he loses the opportunity to gain valuable experience and training . . . For these reasons, the Court finds that Plaintiff is being irreparably harmed by his inability to serve as an active duty police officer." *Robinson v. District of Columbia*, 1997 WL 607450 at *8 (D.D.C.) (Kessler, J.) (also canvassing other reasons why *Sampson v. Murray*, 415 U.S. 61 (1974), cited by the defendant, is not controlling in a case like this one).

**4. Issuing a stay will not serve the public interest**.

It would not serve the public interest to deprive the people of the District of Columbia of the services of these highly trained and dedicated lifesavers. To illustrate, on plaintiff Chasin's very first day back on ambulance duty, the Fire Chief received a letter of commendation from a prominent citizen lauding Mr. Chasin's "professionalism, patience, and 'bedside manner'" in dealing with a "weak, bewildered and embarrassed"

7

patient on an emergency call.  *See* Fourth Declaration of Steven B. Chasin, filed herewith (attaching letter of commendation from Carl Rowan, Jr.).  Nor would it serve the public interest for plaintiffs to be paid their salaries for perhaps a year or more while twiddling their thumbs on "administrative duty."

The defendant reiterates its argument that "[i]n the case of a major release of an inhalation contaminant" the public interest requires "personnel equipped to wear negative pressure masks for extended periods of time."  Motion for Stay at 8.  But, as already noted, it is undisputed that the Go-Bag filters do *not* provide safe respiratory protection in a life-threatening environment.  *See* p. 5, *supra*.  And even if they did, plaintiffs' successful fit testing—which the defendant refused to perform until ordered to do so—show that the reinstated plaintiffs are just as equipped to wear negative pressure masks as their clean-shaven colleagues.[5]

Indeed, additional information recently provided by the Fire Department shows that there are many active-duty personnel whose face mask seals are far more tenuous than those of the reinstated plaintiffs.  *See* Declaration of Kenneth M. Lyons, filed herewith.[6]

---

[5] As it has in the past, the defendant again refers to its "OSHA mandated" face-fit policy, as if that statement were true.  Motion for Stay at 8.  The plaintiffs have shown, with chapter and verse, why the defendant's policy is not mandated by OSHA regulations.  *See* Plaintiffs' Pre-Hearing Memorandum [*Potter* 92] at 26-29.  The defendant has never even attempted to respond to that showing, and when asked in discovery for any documents that would support its contention it was unable to produce any.  The defendant should stop fibbing about this.

[6] Exhibit B to Mr. Lyons' declaration is a printout of a portion of a spreadsheet provided by the Fire Department to Local 3721, AFGE, showing the results for the Department-wide fit testing that was conducted last summer.  Exhibit C to his declaration shows the same data arranged in ascending test-score order.  *See* Lyons Decl. ¶¶ 5-7.
  The data show that more than 72% of Department members had lower fit test scores than the average score of plaintiff Dwight Evans, whose average score on the two

## Conclusion

For the reasons stated above and in plaintiffs' earlier motion papers, defendant's motion for a stay or modification of the March 20 orders should be denied.[7]

A proposed order is filed herewith.

---

fit tests he took with his beard was 10,330.  (The fit test scores of each plaintiff were attached to their motions for reinstatement.)  More than 64% of Department members had lower fit test scores than the average score of plaintiff Jasper Sterling, whose average score on three fit tests was 8,207.  More than 52% of members had lower fit test scores than the average score of plaintiff Calvert Potter (5,863).  More than 43% of members had lower fit test scores than the average score of plaintiff Steven Chasin (4,360).  Thirty-six percent of members had lower fit test scores than the average score of plaintiff Tarik Ali (3,397).  More than 31% of members had lower fit test scores than the score of plaintiff Eleon Baker on the one test he took with a beard (2,977).  More than 12% of members had lower fit test scores than the average score of plaintiff Rashumaa (1,112).  And more than 8% of members had lower fit test scores than the average score of the lowest-scoring plaintiff, Kevin Conerly, whose average score on three tests was 799.

The defendant characterizes Mr. Rashumaa's and Conerly's passing scores as "marginal."  Motion for Stay at 6.  But the Fire Department has shown no apparent concern about the even more "marginal" scores of more than 100 other members who passed with scores below his—scores as low as 501 (two members) and 502 (one member).  Eleven members passed with scores below 530.  Thirty-seven members passed with scores below 600.  They remain on active duty, with no re-testing and no apparent concern by the Department about their ability to get a good seal in an emergency.

Even more remarkably, the data show that 51 members apparently *failed* their fit tests.  *See* Exhibit C to Lyons' Decl., at pp. 1-2.  We have been orally informed by defendant's counsel that all members did pass a fit test last summer, so apparently these 51 members were subsequently able to pass a test.  But the Department apparently has no concern about their ability to obtain a good seal "consistently," despite the fact that they were unable to do so when tested last summer.  And despite the existence of a very active grapevine within the Department, none of the plaintiffs has heard of anyone being suspended or placed on administrative duty last summer after having failed a fit test.

[7] While the plaintiffs oppose any stay, should the Court decide to issue a stay, plaintiffs respectfully request that it impose the "full pay" fallback option suggested by the defendant, further modified to require that the plaintiffs be allowed to work their normal schedules and to participate in all normal training, so as to minimize their loss of skills.

      Respectfully submitted,

          /s/

_____
Arthur B. Spitzer (D.C. Bar No. 235960)
Frederick V. Mulhauser (D.C. Bar No. 455377)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W. #119
Washington, DC 20036
(202) 457-0800

*Counsel for Plaintiffs*

          /s/

_____
William D. Iverson (D.C. Bar No. 88872)
Joshua A. Doan (D.C. Bar No. 490879)
Covington & Burling
1201 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 662-6000

*Counsel for Plaintiffs in No. 01-1189*

April 11, 2006