UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CALVERT L. POTTER, *et al.*, <br>    Plaintiffs, <br>  v. <br> DISTRICT OF COLUMBIA, <br>    Defendant. | No. 01-cv-1189 (JR) |
| STEVEN B. CHASIN, *et al.*, <br>    Plaintiffs, <br>  v. <br> DISTRICT OF COLUMBIA, <br>    Defendant. | No. 05-cv-1792 (JR) |

**OPPOSITION TO DEFENDANT'S MOTION TO STAY DISCOVERY**

Promptly after Defendant began producing documents responsive to Plaintiffs' Third Document Request on July 10, 2006, Plaintiffs on July 21, 2006 noticed the deposition of two employees of the Fire and Emergency Medical Services Department ("Department"), and the deposition of a Rule 30(b)(6) witness for August 7-9, 2006.  As Plaintiffs had advised Defendant, this was done to move forward toward the completion of fact discovery, in order to allow the completion of expert discovery so that Plaintiffs could respond to Defendant's pending motion for summary judgment on September 15, 2006 (and cross-move if there appeared to be no disputes of material fact).

Rejecting this orderly plan for bringing this litigation to a close, Defendant refused to produce the witnesses noticed for deposition, and instead filed the present motion on August 9, which asks the Court to stay discovery until Plaintiffs file their opposition to Defendant's motion

for summary judgment, and then to allow further discovery only if the Plaintiffs can satisfy the requirements of Federal Rule of Civil Procedure 56(f).

Defendant advances three arguments for cutting off discovery in midstream: (1) that this is the result mandated by prior caselaw when a dispositive motion is pending (Def'ts Memo. 5-6); (2) that the "parties [both Plaintiffs and Defendant] … identified a motion for summary judgment, to be filed by the District, as the mechanism to comply with the Court's directive [to propose a method for going forward with the case]" (Def'ts Motion 2); and (3) that this is a sensible and fair way to resolve these cases.

Defendant is wrong on all three points – wrong on the law, wrong on the state of the record as to what the Plaintiffs have agreed, and most importantly wrong as to the sensible and fair way to resolve these cases efficiently and expeditiously.

First, the very precedents upon which Defendant relies confirm that a stay of discovery is <u>not</u> appropriate when the discovery is relevant to the pending motion.

Second, in conferring with counsel for Defendant and submitting the joint report on April 28, counsel for Plaintiffs did <u>not</u> agree with Defendant that an immediate summary judgment motion should be the sole focus of further proceedings. To the contrary, the joint Meet and Confer Report filed April 28, 2006 identifies only the Defendant as the party who "believes there is a sufficient factual record to resolve these cases, and [therefore] plans to file a motion for summary judgment" (p.1), while the Plaintiffs stated plainly that "additional discovery will be required before the merits of the case can properly be placed before the Court for a final judgment" (p.2), and went on to identify fact and expert issues requiring discovery (pp. 1-3). Moreover, Plaintiffs promptly went forward with their announced plans for further discovery by filing their Third Request for the Production of Documents a week later, on May 5, to which the

Defendant did not object as breaking any agreement to focus only on its motion for summary judgment. Instead, Defendant produced a number of documents, some bearing importantly upon issues central to these cases. It was not until Plaintiffs sought to depose fact witnesses to confirm the import of these documents and explore their implications that Defendant suddenly decided the curtain should be pulled down on discovery.

Third, although Defendant believes that it should be allowed to define the issues this Court should decide, and that Plaintiffs should be entitled to discovery only after it spells out for the Defendant and the Court exactly what it hopes to obtain by discovery, this is not in fact a plan for the efficient resolution of these cases, as opposed to an apparent grasping for tactical advantage by the Defendant. These cases should instead go forward in the normal way: Complete factual discovery. Complete expert discovery. Then decide whatever dispositive motions are filed, and hold a trial as to any remaining issues as to which there is a genuine dispute of material fact.

Indeed, if efficiency and expedition are the goals, factual discovery could have been completed in less time than Defendant has consumed by filing this motion for a stay, and without the substantial expenditure of energy required by the motion – factors that should, Plaintiffs submit, be considered in appraising the actual goals of the motion, and whether those goals should be rewarded.

**ARGUMENT**

**1. Defendant Is Wrong In Asserting That Prior Caselaw Mandates A Stay Of Discovery**

Defendant claims that prior caselaw shows that discovery is inappropriate when a dispositive motion is pending. Their own cases provide no support for a stay in the present circumstances, and indeed require denial of Defendant's motion. The first case cited by

Defendant involved a motion to dismiss, an entirely different situation than a motion for summary judgment claiming an absence of disputed facts. *Anderson v. United States Attorneys Office,* 1992 WL 159186 (D.D.C. June 19, 1992).[1]  Defendant's second case involved two discovery motions, and cross motions for summary judgment by the plaintiff and to dismiss by the defendant. *Chavous v. District of Columbia Financial Responsibility and Management Assistance Authority*, 201 F.R.D. 1, 1-2 (D.D.C. 2001).  The court stayed discovery requested by the plaintiff only after determining that the plaintiff did not contend that they needed the discovery to respond to defendant's motion to dismiss. *Id*. at 3.  In doing so, the court cited Defendant's third case, *Coastal States Gas Corp. v. Department of Energy,* 84 F.R.D. 278 (D. Del. 1979), which is the only case factually on point with this case.

In *Coastal States*, the court explained the two relevant principles at play – that discovery prior to deciding a dispositive motion should be stayed if the issues for discovery are irrelevant to the pending motion, but that "Conversely, discovery should precede consideration of dispositive motions when the facts sought to be discovered are relevant to consideration of the particular motion at hand." *Id*. at 282.  The court in *Coastal States* determined that the discovery sought was indeed relevant to the pending motion, and accordingly denied the motion to stay discovery.  The *Chavous* court likewise observed that "a trial court could well be found to have abused its discretion by staying discovery where it is necessary for the party *opposing* summary

---

[1] While not material here, Plaintiffs would point out that stays of discovery pending resolution of a motion to dismiss, while commonplace, are by no means universal, since most courts make a pragmatic examination of the immediacy of the other party's need for discovery, the need for expedition, and length of the delay likely to result from a full briefing of the motion, and other relevant factors. "[A] pending motion to dismiss is not ordinarily a situation that in and of itself would warrant a stay of discovery." *People With Aids Health Group v. Burroughs Wellcome Co*., 1991 WL 221179 (D.D.C.) (alteration by the court; internal quotation and citation omitted).

- 5 -

judgment to develop 'additional facts.'" 201 F.R.D. at 3 (quoting *Moore v. United States,* 213 F.3d 705, 710 n. 3 (D.C. Cir. 2000) (emphasis in original).

The discovery Plaintiffs have been conducting, and wish to complete, also concerns issues plainly relevant to the merits of these cases, and Defendant's motion to halt that discovery should accordingly be denied.

**2.     Plaintiffs Did Not Agree To Terminate Their Ongoing Discovery, Which Is Tightly Focused On Issues Central To These Cases**

Plaintiffs did not agree to terminate their ongoing discovery when counsel met on April 26, 2006 to formulate a joint report to the Court describing each side's plans for moving forward to resolve these cases. At that meeting, counsel for the District stated that he believed the case could be resolved on the existing record by a motion for summary judgment. Counsel for Plaintiffs stated that they believed further discovery was needed, both as to the relevant facts and as to the consultant's declaration Defendant has filed, which contains a number of statements of asserted facts and also expresses expert opinions. (Declaration of William D. Iverson ¶ 2) ("Iverson Decl.") One week after filing the parties' Meet and Confer Report, Plaintiffs went forward with their stated plans for continuing their discovery by filing a Third Request for Production of Documents on May 5.[2] These requests were focused upon issues plainly relevant to the merits of the case, and Defendant did <u>not</u> object to the requests as violating any agreement between the parties or otherwise improper as a general matter.

---

[2] Plaintiffs also served a notice for the deposition of Roy McKay, Defendant's consultant, on April 27, believing that the best starting point for narrowing the remaining issues was to test the basis for his various statements of fact regarding fit tests, and the opinions he expressed. Defendant stated that it was unwilling to produce McKay for deposition at that time. To avoid an arid debate over the timing of this deposition, Plaintiffs therefore proceeded toward the completion of other fact discovery, to be followed by the McKay deposition and any other expert discovery, a deposition which Plaintiffs are plainly entitled to take if Defendant plans to rely upon the statements in his declaration or to present him as a witness.

To the contrary, Defendant produced over 500 pages of documents on July 10, with a subsequent larger supplemental production on August 2, and other smaller supplemental productions on July 20, August 3 and August 7.  (Iverson Decl. ¶ 3)[3]  Many of these documents are highly relevant to the issues in these cases, along with prior documents previously produced by the Defendant since the Preliminary Injunction Hearing in August 2005.

The first principal issue is the accuracy of the fit test results for the Plaintiffs conducted pursuant to the Court's Order of August 11, 2005.  These tests were performed by an employee of the Department, because "none of the vendors that we contacted would perform the fit tests unless the personnel that we presented to them were clean shaven . . . .  And we asked first if they would test [bearded persons], and they said no, they wouldn't."  (Transcript of August 1, 2005 Preliminary Injunction Hearing 107 (Flint)) (henceforth "P.I. Hearing Tr.")

Documents produced by the Department appear to indicate, however, that the requirement for testing only in accordance with the standards of OSHA regulations originated with the Department, in the request for proposal ("RFP") it sent to potential vendors.  (Iverson Decl. ¶ 4 & Ex. A)  Moreover, it appears that the letter sent to the Department by the chosen vendor on May 27, 2005 "to confirm" that fit testing would be performed under the standards set forth in the OSHA regulations, 29 C.F.R. § 1910.134, was in fact drafted on May 20, 2005 by

---

[3] Defendant is somewhat in error in stating that it has produced 2,906 pages of documents in response to these requests.  It had identified 2,906 pages of responsive documents as of August 3, but Defendant has withheld several hundred pages of those documents on the grounds of privilege or personal privacy.  Plaintiffs believe that Defendant has failed to provide the information required by a proper privilege log (e.g., authors, recipients, a meaningful description of subject matter), and has so advised Defendant, which has stated that it will not provide any further information until this motion is resolved, at which time the parties hopefully will be able to resolve these issues without further burdening the Court.

Captain Flint to "have on hand if there are protests or questions … I addressed the letter to you, but we could put anyone's name on it …." (Iverson Decl. ¶ 5 & Ex. B, Ex. C)

Accordingly, it would appear that the fit tests for the Plaintiffs were performed by a Department employee in principal part because the Department requested its outside testing vendor to submit a proposal for testing only pursuant to OSHA regulations (i.e., only on clean-shaven persons), and then engineered a letter "confirm[ing]" this requirement "to have on hand if there are protests or questions."

The difficulty arises from the fact that fit testing is a delicate enterprise with numerous opportunities for error if the person performing the test is not fully trained and qualified. On May 23, 2006, however, Battalion Fire Chief Jeffrey reported to Deputy Fire Chief William Fitzgerald that "I had a discussion with Shelia this morning in reference to her certification for fit testing. I was surprised to discover that she possesses none. It seems that Bob Simms turned her over on the use of the fit test equipment." Shelia Scott is the Department employee who performed all of the Plaintiffs' fit tests. (Iverson Decl. ¶ 6 & Ex D)

Plaintiffs should be entitled to take deposition discovery to determine the true reasons Plaintiffs' fit tests were performed by a Department employee, whether that person or persons were fully trained and qualified to perform such tests, and the other facts relevant to these fit tests, to determine whether further tests or re-tests are appropriate.[4]

---

[4] The Court stated in its April 18, 2006, Memorandum Order that re-testing "will not be permitted during the pendency of the cross-appeals," in view of "[t]he Department's hostility towards plaintiffs' facial hair," but that "If plaintiffs ultimately prevail on their claims …. an appropriate remedy will be considered." Regardless of timing, Plaintiffs submit that they are entitled as a matter of fairness and due process to take discovery on these issues before there is a decision on the merits to determine whether the Department has carried its burden of proof in showing that Plaintiffs cannot reliably pass fit tests.

The second principal issue addressed by Plaintiffs' May 5 document requests and deposition notices concerns whether Defendant has shown that Powered Air-Purifying Respirators (PAPRs), and particularly the Scott C-420 PAPR demonstrated by the Department at the Preliminary Injunction Hearing, cannot provide an alternative form of respiratory protection in situations not immediately dangerous to life and health ("non-IDLH") if some Plaintiffs are ultimately found unable to pass a fit test using the negative-pressure APR issued with the Department's Go-Bags.  Asked by the Court whether the powered fan included in the Scott C-420 PAPR turns the negative-pressure APR into a positive-pressure system, Captain Flint testified, "In essence, yes, it does."  (P.I. Hearing Tr. 93:25-94:2).  Former Deputy Chief Sellito further testified that the Scott C-420 PAPR was actually even "a little easier to work with" than a negative-pressure APR "because it makes your breathing a little easier to work with because it's providing you some air," rather than requiring the user to pull air through the filter as the APR does.  (P.I. Hearing Tr. Tr. 124:5-12)

Defendant wishes to rule all possible alternatives to the Go-Bag APR's out of the case, arguing that the Court conclusively, for all time, rejected all possible alternatives in its August 11, 2005, Memorandum Opinion.  Putting aside the obvious point that the Court was merely ruling upon the preliminary injunction motion, and not making a final ruling on the merits, all that the Court stated, at page 10 of its Opinion, was that

> "[Plaintiffs] have not successfully rebutted the Department's compelling testimony that it must maintain interoperability with other responders from the D.C. metropolitan area Council of Government, and neither those fire departments nor the equipment caches that have been established since 9/11 have the PAPR's (or enough of them) or the hooded PAPR's that plaintiffs say could be less restrictive alternatives to the negative pressure APR's."

There was testimony by the Department's witnesses that other fire departments did not use the loose-fitting "hooded" types of PAPRs that plaintiffs had suggested as one alternative.

But there was <u>no</u> testimony that the Scott C-420 PAPRs were not used by other fire departments, or stocked in sufficient quantities to accommodate a small number of Department members wearing beards for religious reasons who might conceivably be required not only to use Scott C-420 PAPRs provided by the Department, but somehow, for some reason, required to use similar PAPRs from other fire departments.

To the exact contrary, Captain Flint testified, "One advantage to the [Scott C-420] PAPR that is used – and here again, it's used by the surrounding jurisdictions as well – everybody in the COG has made a decision to buy these because they're interoperable."  (P.I. Hearing Tr. 95:7-10)  And Former Deputy Chief Sellito likewise testified, with regard to the Scott C-420 PAPRs, "we got everybody [in the COG] on board with the program that we were going to develop regional caches of equipment such as SCBAs, PAPR's, and APR's …. And a lot of this equipment has been purchased or is in the process of being purchased."  (P.I. Hearing Tr. 122:2-8; <u>see also</u> <u>id</u>. at 127:15-18 referring to the Scott "SCBA, PAPR, APR" products as "a great system").

More to the point of the present motion, document discovery since the Preliminary Injunction Hearing appears to provide rich confirmation of the availability of Scott C-420 PAPRs in the Department and, if for some reason necessary, in surrounding jurisdictions.  The Department has produced a purchase order for 100 Scott C-420 PAPRs and a requisition for the same or an additional 100 PAPRs – a seemingly more than adequate supply in comparison with the handful of Plaintiffs.  (Iverson Decl. ¶ 7 & Ex. E, Ex F)  A document produced in response to Plaintiffs' most recent Third Request for the Production of Documents indicates that at a meeting in August 2004 of the Fire Chiefs' Committee of the COG, "It was agreed that the number of PAPRs that Chiefs decided to purchase, <u>50% of on-duty riding positions</u>, was a valid plan and it

would not be changed (emphasis added)," and an attached spreadsheet indicates the purchase or plans to purchase 909 PAPRs – a dramatically large supply of PAPRs in comparison with the number of Plaintiffs. (Iverson Decl. ¶ 8 & Ex. G)[5]

Finally, another series of documents produced by the Department on August 2, 2006, just a week before its sudden motion attempting to clamp down on Plaintiffs' ongoing discovery, shows that the Department – obviously recognizing the importance of PAPRs as a less restrictive alternative – sent an e-mail to a number of surrounding jurisdictions a few weeks before the Preliminary Injunction Hearing asking what type of PAPRs they used. All the responses produced by the Department – from Frederick County, Montgomery County, Arlington VA and Fort Belvoir – indicate they use Scott PAPRs. (Iverson Decl. ¶ 9 & Ex. H, Ex. I, Ex. J, Ex. K, Ex. L)

It is easy to see why Defendant feels compelled to argue that this issue is somehow out of the case, and that Plaintiffs should not be allowed to complete their discovery focused on the availability of PAPRs, including particularly the Department's area-standard Scott C-420 PAPR.[6] But that would simply be unfair. Plaintiffs have been conducting document discovery on this issue during the past year, without objection at any time by the Defendant that such

---

[5] Another document produced by the Department in response to Plaintiffs' Third Request, numbered by the Department as 204-205, also addresses the purchase of additional PAPRs. That document is stamped Confidential, somewhat inexplicably since the Department has not stamped similar documents Confidential, and Plaintiffs request the Department to remove the Confidential designation so that it can be placed before the Court without the inconvenience of a filing under seal.

[6] A related issue concerns the importance of area-wide uniformity of equipment, which the Defendant has presented as absolutely essential. But in fact discovery documents indicate that not all COG jurisdictions use the same equipment or have immediate plans to do so. Uniformity of SCBAs and air tanks, for example, is obviously more important that uniformity of PAPRs, since SCBA air tanks are routinely recharged and replaced, as contrasted with PAPRs, which would require at most a replacement battery easily carried by the user. But not all jurisdictions use Scott SCBAs.

merits discovery was inappropriate. Plaintiffs should be allowed to complete this relevant fact discovery by taking a limited number of depositions – which would have already been completed but for Defendant's motion.

A third discovery subject of potentially great significance is Plaintiffs' pending request for the results of the second round of Department-wide fit testing that is being conducted right now. The record shows that in last summer's testing, approximately 1/3 of all Department members were unable to obtain a satisfactory fit with the facemasks they had been using, and had to be issued new facemasks. (P.I. Hearing Tr. 105 (Flint)) The Department's presumption that clean-shaven members can continue to obtain a good fit has not been tested until now. If it turns out that a significant number of members again fail to obtain a satisfactory fit – and perhaps have been responding to IDLH situations with an unsatisfactory fit for their masks (which are used with SCBAs in such hazardous situations) for anywhere from several weeks to 11 months – that will plainly put a different face on the case. Yet Defendant seeks to withhold these test results until the case is closed.

3. **Defendant Is Wrong In Asserting That Staying Discovery Except Under Rule 56(f) Is Efficient or Fair:  Those Goals Instead Mandate Allowing Plaintiffs To Complete Fact and Expert Discovery**

Defendant wants to interrupt Plaintiffs in completing their fact discovery, and instead force Plaintiffs to do nothing but respond to Defendant's unilaterally decided upon summary judgment motion, with Plaintiffs allowed to take discovery thereafter only if they can satisfy the requirements of Rule 56(f) – with the safe assumption being that Defendant will argue that Plaintiffs have not satisfied those requirements, thus requiring the Court to resolve yet another dispute.

This is not a recipe for the efficient resolution of this case, even if it is an excellent recipe to require Plaintiffs to tell Defendant beforehand just what they plan to accomplish by discovery. Plaintiffs have no intention of engaging in litigation by ambush, as their prior quite forthright briefs and other filings show. But neither should we have to invite Defendant's counsel to each of our discovery strategy meetings.

Plaintiffs heartily agree that this litigation should be resolved as promptly and efficiently as possible. Plaintiffs have no motivation to delay, nor to engage in make work projects.

In order to reach the finish line efficiently, Plaintiffs respectfully submit that they should be allowed to complete their interrupted fact discovery. After that, expert discovery can be quickly completed, hopefully by agreement between the parties. Plaintiffs' summary judgment motion and any cross-motion can then be decided, and if necessary any genuine disputes of material fact can be quickly tried.

## CONCLUSION

For the foregoing reasons, the Court should deny the District of Columbia's motion to stay discovery.

August 18, 2006

Respectfully submitted,

/s/ Arthur B. Spitzer
Arthur B. Spitzer
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W. #119
Washington, DC 20036
(202) 457-0800
  *Counsel for Plaintiffs*

/s/ William D. Iverson
William D. Iverson
Joshua A. Doan
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 662-6000
  *Counsel for Plaintiffs in No. 01-cv-1189*