## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CALVERT L. POTTER, *et al.,*

       Plaintiffs,

    v.

DISTRICT OF COLUMBIA,

       Defendant.

No. 01-cv-1189 (JR)

STEVEN B. CHASIN, *et al.,*

       Plaintiffs,

    v.

DISTRICT OF COLUMBIA,

       Defendant.

No. 05-cv-1792 (JR)

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

William D. Iverson
Joshua A. Doan
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 662-5678
*Counsel for Plaintiffs in No. 01-cv-1189*

Arthur B. Spitzer
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W., Suite 119
Washington, DC 20036
(202) 457-0800
*Counsel for Plaintiffs*

October 13, 2006

# TABLE OF CONTENTS

**STATEMENT OF FACTS** ......................................................................................... 3

    The Department's grooming policy ................................................................. 3

    The Potter lawsuit and preliminary injunction ......................................... 4

    The Chasin lawsuit and preliminary injunction ...................................... 11

    The fit test results .............................................................................................. 13

    The Department's procedures for administering fit tests to Plaintiffs ................. 14

    Powered air-purifying respirators (PAPRs) as a less restrictive alternative ........ 16

**ARGUMENT** ............................................................................................................. 21

**I.**    **Summary Judgment Standards** ............................................................. 21

**II.**   **The Standard of Proof Under RFRA** ..................................................... 22

**III.**  **The Department Has Not Shown that Plaintiffs Cannot Safely Perform
their Jobs Using Standard Equipment** ................................................. 24

    **A.**    **Plaintiffs can safely perform their jobs using standard equipment,
with reasonable accommodation** ................................................ 24

    **B.**    **The Department has not shown that clean-shaven firefighters can
pass monthly fit tests on the first try and without the opportunity to
change masks, as Plaintiffs have been required to do** ........................ 27

**IV.**  **The Department Has Not Shown that a Powered Air Purifying Respirator
Is Not a Reasonable Alternative** ........................................................... 28

    **A.**    **The Department has not shown that the Scott C420 PAPR is not a
suitable alternative** ...................................................................... 29

    **B.**    **Plaintiffs are entitled to judgment as a matter of law because
Defendant has not shown that the use of a Scott C420 PAPR is not
a less restrictive alternative than discharge** .................................... 34

**V.**  **If The Court Concludes That Plaintiffs Are Not Entitled To Judgment as a
Matter Of Law, Plaintiffs Are Entitled To Take Additional Discovery,
Including But Not Limited To Discovery Under Rule 56(f)** ......................... 36

**CONCLUSION** ......................................................................................................... 41

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CALVERT L. POTTER, *et al.,* | |
| Plaintiffs, | |
| v. | No. 01-cv-1189 (JR) |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |
| STEVEN B. CHASIN, *et al.,* | |
| Plaintiffs, | |
| v. | No. 05-cv-1792 (JR) |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT, AND IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Department's motion for summary judgment (*Potter* Dkt. 124; *Chasin* Dkt. 40) is fundamentally deficient because it rests almost entirely on the proposition that this Court's preliminary findings of fact and conclusions of law, as expressed in the Court's preliminary injunction memorandum of August 11, 2005 (*Potter* Dkt. 98), are the "law of the case" and "resolved all the material issues save one." Dep't. Memo. at 12. Thus, for example, the Department's Statement of Material Facts as to Which there is No Genuine Issue does not cite to any factual evidence in the record to support its contention that "there are no reasonable less restrictive options to the requirement that firefighters and medics be able to safely wear negative pressure air purified respirators." That contention is supported only by reference to the August 11 memorandum.

It is black letter law, however, that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Thus, the Court's August 11 memorandum simply will not bear the weight the Department attempts to place upon it. The preliminary findings of fact made at that time do not bind the parties or the Court at this stage of the case both because the factual record was not closed, and because the Court's consideration of the facts and the law were only preliminary. Indeed, the central legal contention of the Department's motion -- that this Court's findings of fact at the preliminary injunction stage are the law of the case -- has been flatly rejected in this Circuit: "That was not a final determination, however, but only a tentative assessment made to support the issuance of a preliminary injunction pending resolution of the issue. It is not even law of the case." *Community Nutrition Institute v. Block*, 749 F.2d 50, 56 (D.C. Cir. 1984) (Scalia, J.).

Once the Department's improper equation of a preliminary injunction decision with a decision on the merits has been set aside, it is clear that the Department has not truly complied with the requirement of Local Civil Rule 56.1 that its statement of material facts "shall include references to the parts of the record relied on to support the statement." The purpose of that rule was to point the opposing party and the Court to the *evidence* in the record that supported the moving party's assertions. The Department's statement of material facts fails to do that; its motion for summary judgment may properly be denied for that reason alone. In addition, however, much factual information has been added to the record of this case since August 2005, and the relevant law has been elucidated by an intervening Supreme Court decision construing the Religious Freedom Restoration Act.

We show below that, based on the record as it exists today, the Department is not entitled

to judgment as a matter of law, and that Plaintiffs are entitled to judgment as a matter of law.

We also show that, should the Court conclude that Plaintiffs are not entitled to summary

judgment on the present record, they are entitled to additional discovery both pursuant to Rule

56(f) and otherwise -- discovery that the Department unilaterally cut off in mid-stream.

## STATEMENT OF FACTS

**The Department's grooming policy**

Going back at least to the 1970s, the Department's Order Book has contained a

culturally-based "personal grooming policy" that, *inter alia*, requires hair to be "trimmed and

styled to present a well groomed appearance" and prohibits hair below "the mid-point of the shirt

collar," or the wearing of "extreme" hairstyles and "unnatural" hair colors.  (*Potter* Dkt. 92,

Exhibit 5 (Fire Dep't Order Book, Article XXI, Section 20).)  Prior to 1997, the grooming policy

prohibited members from wearing beards, except that members who suffered from

*pseudofolliculitis barbae* ("razor bumps") were permitted to wear beards up to 1/4-inch in length.

That discrimination was successfully challenged in *Kennedy v. District of Columbia*, 654 A.2d

847 (D.C. 1994) (affirming a decision of the District's Human Rights agency that the

Department could not prohibit facial hair for firefighters who did not have *pseudofolliculitis*

*barbae* on the ground that it was unsafe when the Department admitted that facial hair was safe

for firefighters who had *pseudofolliculitis barbae*).

In the wake of that decision, the grooming policy was amended to permit all members to

wear 1/4-inch beards.  In practice, however, the 1/4-inch limit was not enforced and many

members, including some of the Plaintiffs in these cases, wore longer beards.  (*See, e.g.,*

Declarations of Calvert Potter, Tarick Ali, and Raymond Sneed.)

**The Potter lawsuit and preliminary injunction**

In 2000, Mayor Williams appointed a new Fire Chief, Ronnie Few, from outside the

Department.  In March 2001, Chief Few issued a Special Order announcing that:

> On Sunday, April 1, 2001, this Department will begin enforcement of a personal
> grooming policy. This policy . . . will be implemented now as part of my effort to
> increase discipline, uniformity, safety and *esprit de corp*[*s*] throughout this
> Department. It is important for our members to project a positive public image
> that is consistent with the wearing of uniforms. Certain hair and beard styles not
> only detract from this positive image, but also present a health and safety risk to
> our members. It is for these reasons that the policy is now being implemented.

(Potter Dkt. 92, Exhibit 4.)  When it became clear that Chief Few would not recognize a religious

exemption from the new policy banning facial hair, six firefighters brought suit under RFRA,

and moved for a preliminary injunction, alleging that they "hold sincere religious convictions

prohibiting them from shaving their beards, cutting their hair, or requiring them to wear religious

head coverings," and that the Department had no compelling reason to require them to do so.

(*Potter* Dkt. 1 (Complaint).)[1]

The Department did not contest the sincerity of the Plaintiffs' religious beliefs or the fact

that compliance with the facial hair, hair length, and head covering portions of the grooming

policy would impose a substantial burden upon their religious practices.  (*Potter* Dkt. 8

(Defendant's Opp. to Mot. for Prelim. Inj.)  Nor did the Department argue that its interests in

discipline, uniformity, and *esprit de corps* -- the primary reasons articulated by Fire Chief Few --

could qualify as "compelling governmental interest[s]" that might overcome that substantial

burden under RFRA.  (*Id.*)

---

[1] In addition to firefighters who wore beards for religious reasons, the Plaintiffs also
included Rastafarians who wore dreadlocks and a Muslim who had been ordered not to wear his
skullcap (kufi). The Department long ago conceded that dreadlocks and skullcaps pose no safety
problems.

The Department did oppose the motion for a preliminary injunction on the ground that beards and long hair posed an unacceptable risk to safety because they might prevent a firefighter from obtaining a good fit with his facemask. (*Id.*) This Court gave careful consideration to that argument but found it unpersuasive, particularly in light of the declaration of Alexander Santora, the recently retired Deputy Chief and Chief of Safety of the New York City Fire Department (FDNY), *Potter* Dkt. 92, Exhibit 9. Chief Santora explained that firefighters wear a Self-Contained Breathing Apparatus ("SCBA") when fighting fires and entering hazardous environments. The Department's SCBAs are "positive pressure" respirators that supply a continuous flow of pressurized air from tanks worn by firefighters into their facemasks, so that any minor imperfections in the facemask's seal will result in an outward flow of clean air from the mask, rather than an inward flow of potentially dangerous gases or particulates. (*Id.*)

Concluding, therefore, that the *Potter* Plaintiffs were likely to succeed on the merits, that they would suffer irreparable injury if the Department were not enjoined, that the Department would not be harmed by an injunction, and that the public interest favored relief, the Court entered a preliminary injunction on June 22, 2001, prohibiting the Department from requiring the Plaintiffs to comply with any requirement of the grooming policy that would require them to violate their religious beliefs. (*Potter* Dkt. 34.) The Department did not appeal that injunction, which remains in effect today, as modified in some respects by the Court's subsequent orders.[2]

---

[2] About two months after the entry of this preliminary injunction, the District moved to dismiss the *Potter* case on the ground that RFRA was unconstitutional as applied to the D.C. government, relying upon *City of Boerne v. Flores*, 521 U.S. 507 (1997), which held RFRA unconstitutional as applied to the States. After the United States intervened to support the constitutionality of its statute, the District withdrew its motion. (*See Potter* Dkts. 15, 23, 25, 26.) The United States has not been active in the case since then.

In obedience to the preliminary injunction, the Department suspended the application of its grooming policy to any members whose religious beliefs prevented compliance.  The Department then informed the Plaintiffs and the Court that it was developing a new "safety policy" that might eliminate the need for further litigation.  (*Potter* Dkt. 39 (status report).)  The Department did not announce any new policy, however, and the Department did nothing to challenge the preliminary injunction.  To all visible appearances, the Department simply lost interest in its asserted concerns for the Plaintiffs' safety -- and for the safety of the many other members of the Department who continued to wear beards without any problems being encountered.

After the Plaintiffs and the Court had waited several years for the Department to produce its new policy, the Court expressed a desire to resolve the case with finality.  On February 11, 2005, the Court ordered the Department to file, "within 15 days . . . a plain statement of what its official policy is with respect to facial hair . . . ."  (*Potter* Dkt. 60.)  On February 28, the Department reported that it still did not have a policy, but that it intended to adopt a policy that would renew its attempts to prohibit "[f]acial hair that comes between the sealing surface of the facepiece and the face or that interferes with valve function [of the breathing apparatus]."  (*Potter* Dkt. 61 (status report).)  After another three months of inactivity, the Fire Chief issued Special Order 20, Series 2005, announcing the rephrasing of the Department's grooming policy giving rise to the present dispute:

> For the safety of the individual concerned, members who are required to wear tight fitting facepieces are not permitted to have:
>
> A.  Facial hair that comes between the sealing surface of the facepiece and the face or that interferes with the valve function; or
>
> B.  Any condition that interferes with the face to face piece seal or valve function.

> Well trimmed mustaches may be worn provided that they do not interfere with a proper seal of face mask pieces.

(*Potter* Dkt. 92, Exhibit 7. )

When the Department made it clear that it would attempt to apply this new policy immediately to the *Potter* Plaintiffs, despite the fact that the 2001 preliminary injunction was still in effect, the Plaintiffs sought protection from this Court.  At a hearing on June 13, 2005 the court stated that the 2001 preliminary injunction would continue to protect the *Potter* Plaintiffs from the new order, and scheduled an evidentiary hearing for August 1, for the purpose of determining whether the preliminary injunction should be further continued or dissolved.  (*Potter* Dkt. 84 (Notice to Counsel).)

At the June 13 hearing, the Department conceded that bearded firefighters could safely use a positive-pressure Self-Contained Breathing Apparatus (SCBA).  As the Department's counsel explained, "the overpressure in the [positive-pressure] mask, if there's a slight problem with the seal will blow air from the tank to blow contaminants out."  (Transcript of June 13, 2005, hearing ("June 13 Tr.") at 5-6.)  He speculated that possible outward leakage of supplied air might mildly reduce the time the air tank would last, but stated "that's not what we're worried about."  (*Id.* at 6.)

Rather, the Department's counsel explained, the Department's attempt to justify its ban on facial hair because of asserted safety concerns related only to the newly perceived possibility that in an unprecedented long-term emergency Plaintiffs might be assigned to less hazardous areas (such as decontamination zones) where they would not need to use their SCBAs but might need to use "negative pressure" cartridge filter respirators that could be fashioned by removing their SCBA air tanks and air supply hoses, and instead attaching to their facemasks the filter

7

cartridges that the Department had issued to personnel three years earlier as part of "Go-Bags"

for possible use in responding to emergencies.  If required to use these cartridge filter respirators,

Plaintiffs would suck air through the cartridge filters and would thereby create a negative

pressure within their masks, with the consequence that a poorly fitting facemask could result in

unfiltered outside air entering the mask through inward leakage.  (*Id*. at 6-7.)

On August 1, 2005 the Court held an evidentiary hearing to consider whether this new

theory justified terminating the preliminary injunction which had been in place, without

challenge from the District, since 2001.  On August 11, the Court issued an opinion and order,

*Potter* Dkt. 97, 98 (also reported at 382 F. Supp. 2d 35), in which it found that:

> The parties have stipulated that [the plaintiffs'] belief in their religious obligation
> to wear beards is sincere.

(Opinion at 6.)

> The plaintiffs have the initial burden under RFRA to demonstrate that the policy
> in question substantially burdens the free exercise of their religion. . . . [I]t
> appears to be undisputed that plaintiffs have sustained their burden on this point.

(*Id*. at 8.)

> The burden now shifts to the government to demonstrate 1) that Special Order 20
> furthers a compelling interest, and 2) that it is the least restrictive means of
> furthering that interest.

(*Id*. at 9.)

> The three plaintiffs have fought hundreds of fires. They have never caused
> injuries to themselves, other firefighters, or members of the public on account of
> their beards.

> It is undisputed that firefighters who wear beards can safely operate[] the positive
> pressure self contained breathing apparatus (SCBA) that firefighters use in
> situations considered to be immediately dangerous to life and health (IDLH), such
> as oxygen-deficient atmospheres. It is undisputed that the SCBA is the safest of
> all the available respiratory protection options, because 1) when using an SCBA a
> firefighter breathes from a bottle filled with air and does not inhale contaminants
> from his surroundings; and 2) any break in the seal between a firefighter's face

and his SCBA mask will cause air from the tank to blow out, due to positive pressure, preventing air from the surrounding environment from entering the mask.

(*Id*. at 6-7.)

The Court also noted -- as the Department had conceded -- that the Department's asserted safety rationale for its new ban on beards depended entirely on its claim that *if* members were ever required to use negative pressure respirators with the filter cartridges the Department has issued as part of their "Go-Bags," bearded members might not be able to achieve an adequate facemask seal. (*Id*. at 7.) Yet, as the Court also found, the "probability that any of these plaintiffs would be called upon to use his Go-Bag canister [the negative-pressure filter] in the next, say, six months, seems *vanishingly remote*." (*Id*. at 13 (emphasis added).)

The Court also found that the "disaster scenarios posited by the Department (nuclear fallout, chlorine gas, to name two) are IDLH situations in which the Go-Bag canisters [the negative-pressure filters] *would be of no use*." (*Id*. (emphasis added).) Indeed, Assistant Fire Chief William Fitzgerald had explicitly confirmed at the hearing that Go-Bag respirators *are not approved for use in an IDLH atmosphere*. (Transcript of August 1, 2005, hearing ("Aug. 1 Tr.") at 81-83.)

Finally, although the Department's argument hinged on the factual proposition that bearded members could not achieve an adequately tight fit with their respirator facemasks, it adamantly refused to allow the *Potter* Plaintiffs to take the same facemask "fit test" that all other Department members had been required to take in the summer of 2005 to determine whether they could obtain a satisfactory facemask seal. There had been uncontradicted testimony by the President of the firefighters' union that hundreds of bearded firefighters had taken and passed facemask fit tests before the Department adopted its new policy of refusing to test such individuals (*id*. at 41–42), and testimony by witnesses from both sides that none of the hundreds of firefighters who wore beards while the Department was not enforcing a policy against beards had ever suffered any injury because of his beard or been responsible for injury to anyone else

(*id.* at 39, 79-80). The Court found that the Department's "rigid refusal" even to test bearded personnel was "not acceptable" in view of "RFRA's command that 'governments should not substantially burden religious exercise without compelling justification.'" (*Potter* Dkt. 98 at 11.) Accordingly, the court ordered the Department to provide the *Potter* Plaintiffs with "the opportunity to take and pass an appropriate face-fit test." (*Potter* Dkt. 97 at 1.)

In ordering a fact-based test of the Department's asserted safety concerns, the Court noted that it was "giv[ing] the District the benefit of the doubt as to the actual need for its policy," since it "appears to be based entirely on concern about future events that are very unlikely to occur" and there was "no evidence that a firefighter with a beard has sustained injuries due to face mask leaks when wearing negative pressure masks or run out of bottled air more quickly than firefighters who do not have beards." (*Potter* Dkt. 98 at 9 & n.5.) Indeed, the Department's own witness could not identify *any* instance in which a firefighter had ever used the filter cartridge from his Go-Bag. (Aug. 1 Tr. at 158.)[3]

Moreover, both the Department's official Respiratory Protection Plan (*Potter* Dkt. 92, Exhibit 13), and the testimony by witnesses for both sides confirmed that a negative pressure respirator with a cartridge filter could *not* safely be used in a situation immediately dangerous to

---

[3] Although the Department issued the Go-Bags with their filter cartridges in April 2002 (*see Potter* Dkt. 92, Exhibit 7 (Special Order 29, Series 2002 (April 16, 2002)), it waited more than three years before testing firefighters and paramedics to see whether they could safely wear negative pressure masks. When the Department finally conducted those tests in summer 2005, it turned out that "[a]bout 500" out of 1,437 personnel failed the tests with the face masks they had been using and had to be issued new face masks; apparently "some firefighters ha[d] been wearing the wrong face piece for 13 or 14 years." (Aug. 1 Tr. at 105, (testimony of Capt. Flint, Department Safety Officer).)

The fact that so many firefighters had been using ill-fitting masks for so long, and that there had not been a single respirator-related safety problem, provides further strong support — if more were needed — that positive-pressure equipment provides an adequate margin of safety for firefighters whose face masks do not seal tightly to their faces.

life and health ("IDLH"); in such settings, or when the extent of hazard is unknown, the

Department's Respiratory Protection Plan (and common sense) explicitly requires the use of the

safer SCBAs used in firefighting.  (Respiratory Protection Plan at 9-10; *see also* Aug. 1 Tr. at

19–20 (Potter), 82 (Chief Fitzgerald), 100 (Capt. Flint)).  Negative pressure respirators, such as

those fashioned from the Go-Bag filter cartridges, may be used only in less dangerous situations

where more limited respiratory protection is needed, such as in dealing with tear gas or in clean-

up operations after an emergency is over, as in clean-up operations after the World Trade Center

collapse. (Respiratory Protection Plan at 10-11; *see also* Aug. 1 Tr. at 101-103 (Capt. Flint).)[4]

Nevertheless, in order to protect the Department's asserted (if unsubstantiated) safety

concerns, the Court modified its preliminary injunction to allow the Department to place the

Plaintiffs on administrative duty "until or unless they can pass an appropriate face-fit test."

(*Potter* Dkt. 97 at 1.)[5]

Based on this record, the Department elected not to appeal from the modified preliminary

injunction, but instead went forward with the testing program that the Court had ordered.

**The Chasin lawsuit and preliminary injunction**

Despite the fact that the reasoning of  the Court's order in the *Potter* case was clearly

applicable to other members of the Department wearing beards for religious reasons, the

Department announced that it intended to discharge the small number of its other personnel who

also wore beards for that reason, without giving them the opportunity to take the same fit tests

---

[4] The same testimony explained that the health effects on clean-up workers at the World Trade Center site that are now being reported were the consequence not of inadequate respirators, but of the fact that many workers did not wear any respiratory protection at all.  (Aug. 1 Tr. at 103:3-7.)

[5] In doing so, the Court improperly applied the standards of RFRA, which places the burden of proof on the government at all times.  *See infra* at 22-24.

that had been ordered for the *Potter* Plaintiffs.  (*See Chasin* Dkt. 1 (Complaint ¶ 2).)  This led to

the filing of the *Chasin* lawsuit in September 2005.  The Plaintiffs in the *Chasin* case are two

firefighters and four paramedics, each of whom stated under oath that he wore his beard because

of sincerely held religious beliefs.  (*Chasin* Dkt. 3.)[6]

By the time the Department filed its opposition to the *Chasin* preliminary injunction

motion, two of the *Potter* Plaintiffs had already achieved facemask fit test results greatly

exceeding the minimum passing score of 500,[7] and were therefore odds-on candidates to satisfy

the requirement of the preliminary injunction for a return to active duty status.  The Department,

not being blind to that, embarked upon a new approach.  It now argued that passing scores

obtained by bearded firefighters were somehow meaningless because beards -- even beards that

had been worn at the same length for many years -- were somehow unpredictable and would

produce hopelessly variable fit test results for every firefighter who wore a beard.  In support of

that theory, it submitted a declaration by a consultant who had never seen any of the Plaintiffs,

and who was not familiar with the safety record of bearded firefighters in the D.C. Fire

Department, but who opined that facial hair was inherently unsafe for firefighters and

paramedics.  (*Chasin* Dkt. 8 (Decl. of Roy T. McKay ¶ 9 ff).)

But the Court did not buy this new theory, and instead entered a preliminary injunction in

the *Chasin* case putting the *Chasin* Plaintiffs in the same posture as the *Potter* Plaintiffs, *i.e.*,

---

[6]  Paramedics do not use SCBAs, and had never been issued *any* respiratory protection
equipment until they were issued Go-Bags in early 2002.  (*Chasin* Dkt. 3 (Chasin Decl. ¶ 5).)  They
are not trained, or permitted, to enter IDLH situations.  (*Id.*)  Nevertheless the Department has
applied its new prohibition on beards to paramedics as well as to firefighters.

[7]  Calvert Potter had scored 5,190 and Tarik Ali had scored 4,210.  Potter's score was
higher than the scores of 872 clean-shaven personnel and Ali's score was higher than the scores
of 762 clean-shaven personnel.  (*See Chasin* Dkt. 29 (Exhibit C to Declaration of Kenneth M.
Lyons (spreadsheet showing Department-wide test scores).)

allowing the Department to place them on administrative duty pending completion of three face-fit tests to be performed within 90 days, and ordering the consolidation of the two suits. (*Chasin* Dkt. 11.)

**The fit test results**

From the fall of 2005 through January 2006, Plaintiffs Potter, Ali, Chasin, Conerly, Rashumaa and Sterling each took facemask fit tests every 30 days and each passed each one, most with scores well above the minimum passing score of 500. (*See Potter* Dkt. 103; *Chasin* Dkt. 14.) Yet despite the clear language of this Court's August 11 order, the Department refused to restore them to active duty without a further order of the Court. Accordingly Plaintiffs filed motions for reinstatement (*id.*), and after a hearing on March 14, 2006, the Court granted the motions and ordered these six Plaintiffs restored to active duty, provided that "within 30 days of this order, and every 30 days thereafter, Plaintiffs take and pass the applicable face-fit test for their negative pressure masks." (*Potter* Dkt. 111; *Chasin* Dkt. 23.)[8]

---

[8] One of the Plaintiffs in *Potter*, Hassan Umrani, did not pass the Department's fit test and did not move for reinstatement. Mr. Umrani remains on administrative duty status.

Two of the Plaintiffs in *Chasin*, paramedic Dwight Evans and firefighter Eleon Baker, were unable to bear the financial burden of reduced pay that accompanied assignment to administrative duty. Accordingly, they shaved their beards (in Mr. Evan's case after passing a fit test in November 2005) and remained on active duty. When the Court ordered their fellow Plaintiffs returned to active duty, it denied Plaintiffs' motion to allow them to re-grow their beards while remaining on active duty, subject to monthly fit tests. *See* Transcript of March 14, 2006 hearing at 53; (*Chasin* Dkt. 33 at 2.) Plaintiffs believe that ruling improperly shifted to them the burden of proof which lay on the government under RFRA.

The District of Columbia sought a stay of the March 20 orders pending appeal, which this Court denied on April 12, 2006 (Minute Order). Plaintiffs Evans and Baker sought an injunction pending appeal, which this Court denied on April 18. (*Chasin* Dkt. 33.) The District then sought a stay pending appeal from the Court of Appeals, which was denied on May 30. Plaintiffs Evans and Baker sought an injunction pending appeal from the Court of Appeals, which was denied on June 15. Those appeals were consolidated and have been fully briefed. They have been scheduled for oral argument on November 6.

Pursuant to those orders, each of these six Plaintiffs returned to active duty in March 2006 and continued to take monthly fit tests. As time passed, however, each of these Plaintiffs failed a single fit test and was removed from active duty. (*See* Dep't. Mem. at 18.) Thus, for example, Plaintiff Potter passed his fit tests every month from September 2005 through April 2006, but failed his May 2006 test. Plaintiff Chasin passed his fit tests every month from November 2005 through July 2006, but failed his August 2006 test. Plaintiff Ali passed each monthly test until September 2006.[9]

Unlike all other members of the Department to whom fit tests are given, Plaintiffs were not permitted to re-adjust their masks or to try a different size of mask if they did not pass a test on the first try. And pursuant to an order of April 18, 2006 (*Chasin* Dkt. 33), a Plaintiff who failed one test was not allowed to take any further monthly fit tests.

**The Department's procedures for administering fit tests to Plaintiffs**

The fit tests conducted on all other members of the Department in 2005 and 2006 were performed by an outside contractor with experience in that process. But the fit tests conducted on Plaintiffs have all been performed by a Department employee, assertedly because no outside contractor could be found who would conduct fit tests on men with facial hair. (Aug. 1 Tr. at 107:2-6 (Capt. Flint).) However, documents produced by the Department appear to indicate that the requirement for testing only in accordance with the standards of OSHA regulations originated with the Department, in the request for proposal ("RFP") it sent to potential vendors. (Declaration of Joshua Doan ("Doan Decl." ¶ 16 & Ex. H.) Moreover, it appears that the letter

---

[9] The Department refused to allow Plaintiff Ali to retake the test even after Plaintiffs' counsel pointed out that Plaintiff Ali had lost a significant amount of weight since his previous test after undergoing surgery for kidney stones. Plaintiffs have filed a separate motion addressing this issue.

sent to the Department by the chosen vendor on May 27, 2005 "to confirm" that fit testing would be performed under the standards set forth in the OSHA regulations, 29 C.F.R. § 1910.134, was in fact drafted on May 20, 2005 by Captain Flint to "have on hand if there are protests or questions … I addressed the letter to you, but we could put anyone's name on it …."  (Doan Decl. ¶ 17 & Ex. I.)

Accordingly, it would appear that Plaintiffs' fit tests were performed by a Department employee in principal part because the Department requested its outside testing vendor to submit a proposal for testing only pursuant to OSHA regulations (i.e., only on clean-shaven persons), and then drafted a letter "confirm[ing]" this requirement "to have on hand if there are protests or questions."

Having a Department employee conduct Plaintiffs' tests, however, might not have been an adequate alternative.  Battalion Chief Alfred Jeffrey expressed surprise in a May 23, 2006, email to Deputy Chief Fitzgerald that the Department employee who had been conducting Plaintiffs' tests was not certified to administer fit tests, and had apparently received only a cursory explanation of testing procedures from another employee.  (Doan Decl. ¶ 8 & Ex. D.) This may have resulted in deficiencies in the testing procedurally.  For example, the OSHA regulations regarding the conduct of fit tests specify that a mandatory part of the protocol is that the person administering the test must

> Instruct the person to be tested to don the respirator for five minutes before the fit test starts.  This purges the ambient particles trapped inside the respirator and permits the wearer to make certain the respirator is comfortable.

29 C.F.R. § 1910.134, Appendix A, Part C(3)(a)(2).  But the Department employee administering Plaintiffs' tests was apparently unaware of this requirement, and did not follow the required procedure in testing them.  Only after Plaintiffs' counsel sent this regulation to the

Department's counsel did the Department grudgingly inform Plaintiffs that they could

voluntarily wait five minutes between donning their masks and beginning the test, if they wished

to do so (which of course is not what the regulation states: the five-minute period is mandatory).

(Doan Decl. ¶s 12-14.)

**Powered air-purifying respirators (PAPRs) as a less restrictive alternative**

Other facts developed since the preliminary injunction hearing in August 2005 show that

even if some (or all) Plaintiffs are from time to time unable to pass fit tests for the use of

negative-pressure respirators, there are reasonably available alternatives to allow Plaintiffs to

continue as firefighters and paramedics while wearing beards in accordance with their religious

beliefs. Specifically, the Department owns, and deploys for other purposes, powered air-

purifying respirators ("PAPRs") that are compatible (or "interoperable") with its other

respiratory equipment and that that can be used safely by the Plaintiffs in any situation in which

Go-Bag respirators would be used.

Documents produced by the Department since the August 1, 2005, hearing reveal that the

Department has purchased at least 100 PAPRs for use by its members. (*Id.* ¶ 18 & Ex. J.) The

PAPR selected by the Department, the Scott C420 PAPR, is manufactured by Scott Health &

Safety, the same company that makes the Department's SCBAs, Go-Bag respirators, and

facepieces. The C420 PAPR "is designed for use in Domestic Preparedness environments." (*Id.*

¶ 19 & Ex. K.)

A PAPR is an Air-Purifying Respirator that uses a fan assembly blower to draw the

ambient atmosphere through air-purifying elements and force it into the user's facepiece. (*Id.* ¶

21 & Ex. M.) PAPRs come in two varieties. Some, like the 3M Breathe Easy PAPR, use a hood

that the user wears over his head, into which the powered fan assembly blows air that it has

drawn through a cartridge filter. (Aug. 1 Tr. at 130:8-131:3.) Others, like the Scott C420 PAPR

16

that the Department has purchased, use a facepiece into which the fan assembly blows air that it has drawn through the cartridge filter (rather than requiring the user to suck air through the filter when he or she inhales, which creates a negative pressure inside the facepiece).  (Doan Decl. ¶ 24 & Ex. P.)  The Scott C420 PAPR uses the same facepieces as the Department's SCBAs and Go-Bag respirators.  (Aug. 1 Tr. at 127:15-18.)

      PAPRs are like the Department's Go-Bag respirators in that they depend on air from the environment that has been purified by passing through a cartridge filter (rather than air from a pressurized tank), and therefore cannot be worn in environments considered immediately dangerous to life or health ("IDLH"), because the air in such environments may be highly toxic.  (Doan Decl. ¶ 21 & Ex. M; Potter Dkt. 98 at 13.)  PAPRs are lightweight and are designed to be worn for extended periods of time in less-toxic non-IDLH environments, such as a decontamination area or in a clean-up operation, where Go-Bag respirators might also be used.  (Doan Decl. ¶ 21 & Ex. M.)  The Scott C420 PAPR, for example, weighs only 5.25 pounds.  (*Id.* ¶ 23 & Ex. O.)  The Scott specifications for the C420 PAPR state that it is supplied with a lithium sulfur dioxide battery that lasts up to 10 hours and provides a minimum rate of air flow of 4 cubic feet per minute ("cfm") for a minimum of four hours.  (*Id.* ¶ 22 & Ex. N; *id* ¶ 20 & Ex. L.)

      The Scott C420 PAPR (and similar facepiece PAPRs made by other manufacturers) differs from the Department's Go-Bag respirators in two important respects, because of the battery-powered fan assembly that blows air into the user's facepiece.  First, the Scott C420 PAPR increases the user's comfort by creating "'A FANNING EFFECT' that keeps the facepiece from fogging and the wearer more comfortable."  (*Id.* ¶ 21 & Ex. M.)  Because the users find PAPRs more comfortable to wear, users are more likely to in fact wear their PAPRs

for extended periods when they are needed.  Experience has shown that respirators that require

the user to suck air through a cartridge filter, such as the Department's Go-Bag respirators, are

uncomfortable and less likely to be worn as a result.  This was in fact frequently what happened

with negative-pressure respirators during the World Trade Center cleanup.  (*Potter* Dkt. 93,

Hartman Decl. Ex. 14 ("Compliance with respiratory protection was generally poor at Ground

Zero . . . .[L]ess than one-half, and sometimes less than one-third, of the heavy equipment

operators were wearing their respirators while working on the pile.  Anecdotally, this was fairly

representative of most other trades at Ground Zero.")).

Second, because of the powered air supply, a PAPR is a positive-pressure respirator,

unlike the Department's negative-pressure Go-Bag respirator.  Scott C420 PAPRs "maintain a

slight positive pressure through a continuous flow of filtered ambient air."  (Doan Decl. ¶ 21 &

Ex. M.)  The C420's motorized blower produces an airflow rate of four cubic feet per minute,

and meets stringent airflow and vacuum test requirements.  (*Id.* ¶ 24 & Ex. P.).  The PAPR's

positive pressure benefits the user.  In addition to "virtually eliminating breathing resistance thus

reducing worker fatigue" (*id.* ¶ 21 & Ex. M) -- which enables the user to work *longer* than with a

negative-pressure respirator -- the positive pressure created inside the facepiece means that air

will flow outward if there is not a perfect facepiece fit, rather than allowing outside air to be

drawn into the facepiece by the negative pressure inside a Go-Bag respirator.

At the August 1, 2005, Hearing, the Department acknowledged that PAPRs increase user

comfort.  (Aug. 1 Tr. 124:5-12 & 132:15-20 (retired Deputy Chief Sellito).)  The Department

also acknowledged that the Scott C420 PAPR functions as a positive-pressure respirator.  (*Id.* at

93:25-94:2 (Flint).)  But the Department raised three objections to PAPRs as an alternative to

Go-Bag respirators for the *Potter* Plaintiffs.

The Department's first objection was that a PAPR's cartridge filter might clog during use.  (*Id.* at 94:12-16 (Capt. Flint).)  But the Scott C420 PAPR uses the same filter cartridges as the Go-Bag respirators the Department has provided to all firefighters and paramedics (*Id.* at 92:14-93:15), and so in that respect the C420 PAPR is indistinguishable from the Go-Bag respirators.  In addition, of course, both PAPRs and Go-Bag respirators may only be worn in non-IDLH environments.  If a PAPR filter clogged to the point of failure the user would not be incapacitated (*Id.* at 100:22-25 (Flint)); he or she could simply move to a safer location and replace the clogged filter.[10]

The Department's second objection was that a PAPR's battery or motor might fail.  (*Id.* at 96:5-8 (Capt. Flint).)  But the Department has provided no evidence to support this speculation, and the specifications for the Scott PAPR show that the equipment is reliable.  The blower unit on the C420 PAPR has an expected service life of at least 1,000 hours.  (Doan Decl. ¶ 22 & Ex. N.)  The PAPR uses a lithium sulfur dioxide battery that is approved by NIOSH.  This battery lasts up to 10 hours, has a minimum operational time of four hours, and has a shelf-life of 10 years.  (*Id.* ¶ 19 & Ex. K; *id*. ¶ 22 & Ex. N.)  Furthermore, lithium sulfide dioxide batteries have a flat discharge curve, which means that the battery's voltage is stable over the life of the battery.  (*Id.* ¶ 25 & Ex. Q.)  The batteries are also small and lightweight, and if the Department were worried that they might run out during use, it would be easy to supply each user  (bearded or clean-shaven) with a spare.

---

[10] Unlike the Department's Go-Bag respirators, moreover, the Scott C420 PAPR comes with an air flow indicator that can alert the user if the PAPR's filters are becoming clogged and thereby reducing air flow.  (Doan Decl. ¶ 22 & Ex. N.)  So in this respect, the Scott PAPR is superior to the Go-Bag respirator.

The Department's final objection was that the PAPRs proposed by Plaintiffs were not compatible, or "interoperable," with other equipment used by the Department or by other metropolitan area jurisdictions. (Aug. 1 Tr. at 135:1-11 (Sellito).) But the Department's witnesses were testifying about the interoperability issues they perceived with *hooded* PAPRs like the 3M Breathe Easy PAPR, not the Scott C420 PAPR. (*See id.* at 127:15-18; *id.* at 92:14-93:15.) The C420 PAPR uses the same facepiece as the Department's SCBAs and Go-Bag respirators, and uses the same filter cartridges as the Go-Bag respirators, and as the Department's own witness acknowledges, it is fully interoperable (*Id.* at 95:7-13.)

Documents produced by the Department since the August 1 hearing confirm that fire departments in the surrounding COG jurisdictions also use the Scott C420 PAPR, and intend to stockpile significant quantities of these PAPRs. At least four COG jurisdictions responded to inquiries from the Department in July 2005 by confirming that they use Scott PAPRs, showing that the Department was well aware of the interoperability of the Scott C420 PAPR at the time of August 2005 hearing. (Doan Decl. ¶s 26, 27, 28, and 29 & Exs. R, S, T, and U; *see also* Aug. 1 Tr. at 95:7-10 (Capt. Flint).) COG participants have agreed to purchase PAPRs sufficient to equip half of their on-duty riding positions, and plan to acquire a total of over 900 PAPRs in all. (Doan Decl. ¶ 30 & Ex. V.) Thus, the Scott C420 PAPR presents no issues of interoperability either with the Department's other equipment or with the equipment used by departments in surrounding jurisdictions.[11]

---

[11] In any event, interoperability is a goal, not a requirement. Documents produced by the Department since the August 1 hearing reveal that some COG jurisdictions do not use Scott SCBAs. (Doan Decl. ¶ 30 & Ex. V.) Interoperability between SCBAs is more important than interoperability between PAPRs because an SCBA's air tank must be replaced or refilled frequently, requiring special machinery and personnel trained to operate that machinery. (*Id.* ¶ 30 & Ex. V.)

# ARGUMENT

## I.     Summary Judgment Standards

Summary judgment may be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

Because "the inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits," *id*. at 252, "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."  *Id*. at 254.  Thus, "if the movant bears the burden of proof on an issue . . . he must establish beyond peradventure *all* of the essential elements of [his case] to warrant judgment in his favor."  *Chaplin v. Nations-Credit Corp*., 307 F.3d 368, 372 (5th Cir. 2002) (emphasis in original) (internal quotation omitted).  Because the District of Columbia bears the burden of proof in this case under the Religious Freedom Restoration Act,[12] its motion for summary judgment may not be granted unless it would be entitled to a directed verdict.  *Anderson*, 477 U.S. at 250.  It follows that "it takes but little evidence" on the part of the opposing Plaintiffs "to create the necessary issue for trial."  *Kozup v. Georgetown University,* 851 F.2d 437, 439 (D.C. Cir. 1988).

---

[12]  Plaintiffs bear the initial burden of proof in showing that their religious beliefs are sincere and are burdened, but those matters have been conceded.

With respect to Plaintiff's cross-motion for summary judgment, by contrast, the burden falls upon the non-moving party that bears the burden on the merits (the Department) to demonstrate by specific evidence in the record that there are material facts genuinely in dispute. *Celotex*, 477 U.S. at 324.  Not any disagreement will do; a genuine dispute of material fact is one that "might affect the outcome of the suit."  *Anderson*, 477 U.S. at 248.  Thus, for Plaintiffs to prevail on their cross-motion, they need only show that the Department has "fail[ed] to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Thus, unless the Department can demonstrate that there are no accommodations that will permit Plaintiffs to perform their jobs safely, summary judgment should be entered against the Department.

## II.    The Strict Scrutiny Standard Mandated By RFRA

The law is clear, and the Department has already conceded in its Memorandum in support of its Motion for Summary Judgment (at 12), that under the Religious Freedom Restoration Act it bears the heavy burden of demonstrating that discharging Plaintiffs is the *least restrictive means* of serving its compelling interest in safety -- in other words, that there is *no* accommodation that can allow Plaintiffs to perform their jobs safely.  That burden derives directly from the statute, which provides that:

> (a) Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

> (b) Government may substantially burden a person's exercise of religion only if *it demonstrates* that application of the burden to the person—

>> (1) is in furtherance of a compelling governmental interest; and

>> (2) is the *least restrictive means* of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1 (emphasis added).  This Court therefore concluded more than a decade

ago that RFRA "imposes *strict scrutiny* 'in all cases where free exercise of religion is

substantially burdened.'" *Campbell-El v. District of Columbia*, 874 F. Supp. 403, 408 (D.D.C.

1994) (quoting the statutory statement of purpose, 42 U.S.C. § 2000bb(b)(1)) (emphasis added).

The Supreme Court confirmed the correctness of that conclusion earlier this year. *Gonzales v. O*

*Centro Espirita Beneficente Uniao Do Vegetal*, 126 S. Ct. 1211, 1220 (2006) (applying "RFRA,

and the strict scrutiny test it adopted").

     Moreover, the government's burden to "demonstrate" that any burden it imposes is the

least restrictive means of furthering a compelling governmental interest is itself carefully defined

in the statute:

> The term "demonstrates" means meets the burdens of going forward *with the*
> *evidence* and of persuasion.

42 U.S.C. § 2000bb-2(3) (emphasis added).  RFRA thus requires the government to carry its

burden "with . . . evidence," not just speculation.  In practice, that means it is the government's

obligation affirmatively to consider potential methods of accommodating the religious needs of

its employees.  The government cannot carry its burden simply by announcing a rule and then

leaving it to religious employees to develop an accommodation if they can. *See, e.g., Cheema v.*

*Thompson*, 67 F.3d 883, 885 (9th Cir. 1995) (government failed to demonstrate lack of a less

restrictive alternative; "Its stance . . . that it had no obligation to do so . . . was quite mistaken.").

     The "compelling interest test" is "'the most demanding test known to constitutional [or

other] law.'" *Village of Bensenville v. FAA*, 457 F.3d 52, 67 (D.C. Cir. 2006) (quoting *City of*

*Boerne v. Flores*, 521 U.S. 507, 534 (1997)).  And while Plaintiffs have never disputed that

safety can be a compelling governmental interest in the context of the Fire and Emergency

Medical Services Department, that does not lighten the Department's burden of proving with

*undisputed* evidence, to prevail on its motion for summary judgment, that *discharging* the

Plaintiffs for their religious observance is the only way to protect the safety of the District of Columbia. The Department has not met that burden.

## III.    The Department Has Not Shown that Plaintiffs Cannot Safely Perform their Jobs Using Standard Equipment.

The Department's motion for summary judgment takes it for granted that Plaintiffs cannot  perform their jobs safely using standard respiratory protection equipment. But the Department has not proved that case, which is its burden to do. It has demonstrated neither that the standard equipment is insufficient for Plaintiffs (with reasonable accommodation), nor that clean-shaven firefighters and paramedics are required to meet the exacting standards to which it seeks to hold Plaintiffs.

### A.    Plaintiffs can safely perform their jobs using standard equipment, with reasonable accommodation.

As noted above, the Department has conceded that Plaintiffs can safely use their Self-Contained Breathing Apparatus when fighting fires and entering hazardous environments. And it is undisputed that the SCBA provides better protection than a Go-Bag respirator in all situations in which the Go-Bag respirator might be used. It is therefore undisputed that Plaintiffs can perform their jobs, month in and month out, without *any* need for accommodation.

The Department's asserted need to discharge the Plaintiffs rests on the proposition that there may come a time when members *must* use their Go-Bag respirators rather than their SCBAs and that the Plaintiffs cannot safely do so. While no such occasion has ever yet occurred, the Department has hypothesized situations, such as the  clean-up after a terrorist attack, where emergency personnel may be required to work for such long periods of time in non-IDLH atmospheres that it would be impractical (too tiring and uncomfortable) for them to use the heavier SCBAs.

Plaintiffs recognize the possibility that such an occasion might arise. But the Department

has not demonstrated, as it must, that Plaintiffs could not be accommodated in that hypothetical situation, even on the assumption that they cannot safely use their Go-Bag respirators.  We describe below the ways in which the Department has failed to make that showing.  We also show in Part IV that Plaintiffs can easily be accommodated by providing them with different equipment that is fully interoperable and that provides greater safety and comfort of use than Go-Bag respirators in every way.

The Department has argued that in a situation where Go-Bags would be used, *every member* would be required to don his or her filter mask and work long hours in the "warm zone." But nothing in its summary judgment motion, or even in the Court's August 11, 2005 Memorandum on which it (mistakenly) relies, supports that conclusion.[13]  To the contrary, common sense suggests that even in an emergency some personnel will be needed to perform duties outside the hazardous atmosphere, such as communications, decontamination, and (particularly for the paramedics) medical triage and treatment.  The Department points to no *evidence* (as RFRA requires, see 42 U.S.C. § 2000bb-2(3)) demonstrating why Plaintiffs cannot

---

[13]  The August 11 memorandum explicitly notes that the Court's acceptance of  the Department's no-beard policy "gives the District the benefit of the doubt as to the actual need for its policy."  (*Potter* Dkt 98 at 9 n.5.)  But under RFRA's strict scrutiny test, it is Plaintiffs and not the Department who are entitled to the benefit of any doubts.

The past history of this litigation also shows that it is inadvisable to give the Department the benefit of the doubt regarding the hypothetical doomsday scenarios it predicts.  For example, at the June 13, 2005 hearing, the Department explained the purpose of the Go-Bags as follows:

> [F]irefighters are required to take their face plates home with them when they go home at night and keep it with their [Go-]bag, and the reason for that is if they ever had to come in to work in case of an emergency, they might have to go to a contaminated area.  They're not going to have a tank of air to do that with. They're going to have to use it [the Go-Bag filter and face piece] as a negative pressure mask in order to get to work.

(June 13, 2005 Tr. at 9.)  Discovery soon established, however, that firefighters do *not* take their facemasks and Go-Bags home with them at all.  They are kept at the firehouses.  (*Potter* Dkt. 92, Declaration of Raymond Sneed.)

be assigned to such tasks rather than some clean-shaven personnel[14].  Moreover, the Department

has admitted that there are active-duty firefighters who are significantly overweight (Doan Decl.

at ¶ 31 & Ex. W), from which one must conclude that the Fire Department is willing and able to

accommodate clean-shaven members who may become casualties rather than rescuers in an

extreme emergency.[15]

In its August 11 Memorandum, the Court indicated that it would not "second-guess" the

Department's assessment of risk.  (*Id*. at 13.)  But it is clear now, even if it was not clear in 2005,

that RFRA *does* require a court to "second-guess" a government agency if the agency makes a

determination that it cannot accommodate a sincere religious exercise on which it has placed a

substantial burden.

The Supreme Court's recent decision in *Gonzales v. O Centro Espirita Beneficente Uniao*

*Do Vegetal*, 126 S. Ct. 1211 (2006), is a good illustration.  There, the Justice Department and the

State Department assessed the risks of allowing the members of a small church to drink a

---

[14] The Department's counsel has suggested in argument that firefighters are assigned to teams where all members are needed.  But in the kind of 9/11 situation that the Department must hypothesize in order to require the use of Go-Bags, it is inevitable that  some personnel will be injured or separated from their units and that some engines or trucks will be disabled or blocked. The likely need for *ad hoc* reassignments would appear to be just as great as the likelihood of such an event.

[15]  The Court raised the issue of other safety risks that the Department tolerates at the hearing in this case on June 13, 2005:

> THE COURT: [T]he question is if you're going to go this far with face masks, how far are you going to go with all of the other, it would seem to me, intuitively more likely causes that somebody would go out?  Somebody who is overweight, somebody who can't make it up the ladder anymore, somebody has tachycardia and all of a sudden is disabled.

(June 13 Tr. at 14.)  The Department responded that it was planning to require stress tests as part of physical exams.  But despite the Court's question and the Department's profession that it is essential that every man be able to work long hours with a respirator in an emergency, nothing in the record establishes that the Department has implemented any physical fitness or weight requirements.

sacramental "*hoasca*" tea that contained a Schedule I prohibited hallucinogen.  They concluded

that the risks -- "of [not] protecting [church members'] health and safety, of [not] preventing the

diversion of *hoasca* from the church to recreational users, and of [not] complying with the 1971

United Nations Convention on Psychotropic Substances," to which the United States is a

signatory, 126 S. Ct. at 1218 -- were too great to tolerate, and they refused to exempt the church

from the law prohibiting the importation, possession and use of *hoasca.*

Confronted with a challenge to that determination under RFRA, the district court, the

court of appeals, and the Supreme Court all "second guessed" those agencies and concluded that

the risks were not sufficient to preclude an exemption, considering the evidence adduced by the

government to support its risk assessment and considering the other risks that are tolerated in the

drug control field.  The Supreme Court explained that "RFRA operates by mandating

consideration, under the compelling interest test, of exceptions to "rule[s] of general

applicability," *id*. at 1223, and that federal courts are "up to the task" of deciding when

exceptions are appropriate.  *Id*. at 1224.  The same is true in the prison context, another area

where executive agencies might lecture courts not to "second guess" them.  *See id*. at 1223-24

(citing *Cutter v. Wilkinson*, 544 U.S. 709 (2005) (applying the Religious Land Use and

Institutionalized Persons Act, 42 U.S.C. § 2000cc-1(a)(1)-(2), which allows federal and state

prisoners to seek religious accommodations pursuant to the same standard as in RFRA).  It is the

Department's burden to justify its refusal to accommodate Plaintiffs, and it cannot carry its

burden by telling the Court not to look behind the curtain of its decisionmaking.

**B.    The Department has not shown that clean-shaven firefighters can pass monthly fit tests on the first try and without the opportunity to change masks, as Plaintiffs have been required to do.**

The standard to which Plaintiffs have been held is significantly more rigorous than the

standard to which other Department members are held.  Other members were tested once in the

27

summer of 2005 and once in the summer of 2006. They had unlimited opportunities to try to pass the test, and *on each occasion* they could try as many different facepieces as they wished. Indeed, in at least 28 instances clean-shaven members were scored as passing *even when they had previously failed on the same day while wearing the same model and size facepiece*. (Doan Decl. ¶ 9 & Ex. E.) By contrast, each Plaintiff who was reinstated to active duty by the Court's March 20 Order was subsequently restricted to using only the same facepiece, and has not been allowed to re-adjust his masks or try the test a second time. Additionally, once a clean-shaven (or female) member passed the fit test, the Department conclusively presumed that he or she could obtain a satisfactory fit for the next twelve months. (Doan Decl. ¶ 9 & Ex. F.) But nothing in the record demonstrates -- as the Department should have to demonstrate -- that each of its clean-shaven members could indeed consistently obtain a satisfactory facemask fit -- on the first try, and without changing facemasks -- on a monthly basis during the year, which is the standard to which the Plaintiffs are being held.

The results of the summer 2006 Department-wide fit tests might provide relevant evidence in this regard, showing how many clean-shaven members who passed the 2005 test did not pass the 2006 test on their first try. Plaintiffs have asked for those data, but the Department has declined to produce them, in accordance with its unilateral decision that discovery closed at some point in the past. (Doan Decl. ¶ 9 & Ex. F.)

## IV.    The Department Has Not Shown that a Powered Air Purifying Respirator Is Not a Reasonable Alternative.

The Department has not borne, and cannot bear, its burden to show that the Scott C420 PAPR is not a safe, reliable, and suitable alternative to the Department's Go-Bag respirator. The Department is well aware of this alternative, and was well aware of it before the August 2005 evidentiary hearing, having previously surveyed surrounding jurisdictions and having confirmed

that they, like the Department, use this PAPR.  This Court should therefore conclude, on the undisputed evidence, that Plaintiffs' religious obligations can safely be accommodated by issuing to each Plaintiff a suitable PAPR for use in situations in which the Department's Go-Bag respirator would otherwise be used.

The Department's summary judgment motion attempts to avoid joining issue as to the suitability of PAPRs as an alternative to Go-Bag respirators by asserting that the Court has already "determined that there is no practical alternative to the use of negative pressure masks issued by the District," and that this is the law of the case.  (Dep't. Mem. at 9 & 12-13.)  But we have already explained, supra p. 2, why the Court's preliminary injunction ruling made no such "determination."

A.    **The Department has not shown that the Scott C420 PAPR is not a suitable alternative.**

At the outset, it is important to distinguish clearly between the hooded PAPRs to which the Department's witnesses objected and PAPRs that use the same make and model facemasks that D.C. firefighters already use.  At the August 1, 2005 hearing, Department witnesses raised the objection that surrounding jurisdictions did not use hooded PAPRs, and therefore that issuing even a small number of hooded PAPRs to firefighters and paramedics wearing beards for religious reasons would raise such serious concerns of "interoperability" that hooded PAPRs had to be rejected as an alternative.  (Aug . 1 Tr. at 135:1-11 (Sellito).)  On the other hand, the Department presented testimony that it already owned and used Scott C420 PAPRs, which use the *same facepieces* that the Department's SCBAs and Go-Bag cartridge filters use, and which use the *same filters* that are issued in the Department's Go-Bags.  (*Id*. at 92:14-93:15; 127:15-18.)  And the Department confirmed that surrounding jurisdictions also use the Scott 420 PAPR.  (*Id*. at 95:9-10 ("everybody in the COG has made a decision to buy these because they're

interoperable").)  Thus, the Department's reliance on "interoperability" concerns as a basis to reject the use of *hooded* PAPRs is simply a distraction.

The Scott C420 PAPR provides an alternative such that interoperability is not a concern, and therefore its suitability as an alternative deserves detailed examination.  When examined, the evidence shows that the Department has not borne (and cannot bear) its burden of disproving that use of the Scott C420 PAPR allows Plaintiffs to wear beards for religious reasons while remaining safe in even the rare situation where they would be required to use respirators but unable to use their SCBAs.

The Scott C420 PAPR uses a battery-powered fan assembly that draws outside air through air-purifying cartridge filters and blows it into the user's facepiece.  (Doan Decl. ¶ 21 & Ex. M.)  Like the Department's Go-Bag respirator, which is also an air purifying respirator ("APR"), the Scott PAPR cannot be used in environments considered immediately dangerous to life or health.  (*Id.* ("PAPRs are Air Purifying Respirators and are not approved for use in IDLH environments.").)  Rather, it is designed to be worn for extended periods of time in "Domestic Preparedness environments" in which the full level of protection offered by an SCBA isn't needed.  (*Id.* ("The PAPRs make sense where extended wear times of Air Purifying respirators are necessary.").)

The Scott C420 PAPR differs from the Department's Go-Bag APRs in two important respects..  First, the PAPR's battery-powered fan assembly blows air into the user's facepiece, creating "'A FANNING EFFECT' that keeps the facepiece from fogging and the wearer more comfortable."  (*Id.*)  The entire point of using PAPRs or APRs is to allow firefighters and paramedics to work longer shifts than they could with SCBAs (Aug. 1 Tr. at 102:13-16 (Capt. Flint)), so respirators that increase comfort further this goal.  Furthermore, because PAPRs are

more comfortable, users are more likely to in fact wear their PAPRs for extended periods when they are needed.  Respirators (like the Department's Go-Bag respirators) that require the user to suck air through a cartridge filter, on the other hand, are uncomfortable and less likely to be worn for extended durations.  This was in fact frequently what happened with negative-pressure respirators during the World Trade Center cleanup.  (*Potter* Dkt. 93, Hartman Decl. Ex. 14.)

Second, because of its powered air supply, a PAPR, unlike the Department's Go-Bag respirator, is a positive-pressure respirator.  The C420 PAPRs "maintain a slight positive pressure through a continuous flow of filtered ambient air."  (Doan Decl. ¶ 21 & Ex. M.)  The C420's motorized blower produces an airflow rate of four cubic feet per minute (*id.* ¶ 22 & Ex. N), and meets stringent airflow and vacuum test requirements, (*id.* ¶ 19 & Ex. K).  The PAPR's positive pressure benefits the user by "virtually eliminating breathing resistance thus reducing worker fatigue."  (*Id.* ¶ 21 & Ex. M.)  Moreover, the positive pressure created inside the facepiece means that air will flow outward if there is not a perfect facepiece fit, rather than being allowing outside air to be drawn into the facepiece by the negative pressure inside a Go-Bag respirator.

The Department -- which has purchased at least 100 Scott C420 PAPRs for use by its members -- apparently agrees that PAPRs are a suitable alternative to its Go-Bag respirators. The Department's witnesses acknowledged at the August 1, 2005, hearing that PAPRs offer increased user comfort over negative pressure APRs (Aug. 1 Tr. 124:5-12 & 132:15-20 (Sellito)), and that PAPRs are positive pressure respirators (*Id.* at 93:25-94:2 (Flint)).

The Department raised three objections to PAPRs at that hearing.  First, the Department asserted that  PAPR filters might clog during use.  (*Id.* at 94:12-16 (Capt. Flint)).  But because the Scott C420 PAPR uses the *same filter cartridges* as the Department's Go-Bag respirator, any

concern about clogging is equally applicable to the Go-Bag respirators issued to non-bearded Department members. (*Id.* at 92:14-93:15.) Since the Department has issued Go-Bag respirators to every member of the Department, and PAPRs use the same cartridge filters as the Go-Bag respirators, there is clearly no reason for the Department to reject PAPRs as an alternative on this ground. And because they may only be worn in non-IDLH environments which are not highly toxic, if a filter cartridge used with a Go-Bag respirator or PAPR became clogged to the point of failure the user would not be incapacitated and could simply move to a safer location and replace the clogged filter, as the Department has contemplated in issuing Go-Bag respirators to every member of the Department.[16]

Second, the Department speculated -- without pointing to any evidence -- that a PAPR's battery or motor might fail. (Aug. 1 Tr. at 96:5-8 (Capt. Flint).) In fact, the Scott C420 PAPRs that the Department has purchased are highly reliable. The blower unit on the C420 PAPR has an expected service life of at least 1,000 hours. (Doan Decl. ¶ 22 & Ex. N.) The PAPR uses a disposable, NIOSH-approved lithium sulfur dioxide battery, which lasts up to 10 hours, has a minimum operational time of four hours, and has a shelf-life of 10 years. (*Id.* ¶ 20 & Ex. L; *id.* ¶ 22 & Ex. N.)[17] Thus, the evidence fails to suggest, let alone support, the Department's speculative concerns relating to reliability during the "four-hour" shifts in which the Department

---

[16] Unlike the Department's Go-Bag respirator, moreover, the Scott C420 PAPR comes with an air flow indicator that alerts the user when the PAPR's filters are becoming clogged, making the Scott C420 PAPR superior to the Go-Bag respirator in this regard. (Doan Decl. ¶ 22 & Ex. N.)

[17] As discussed in the Statement of Facts, lithium sulfur dioxide batteries have a flat discharge curve, which means that the battery's voltage is stable over the life of the battery. (Doan Decl. ¶ 25 & Ex. Q.) Furthermore, the batteries are compact and lightweight, and if the Department were truly worried that they might run out during use, it would be easy enough to supply each user (bearded or clean-shaven) with a spare.

envisions using its Go-Bag respirators (Aug. 1 Tr. at 102:13-16 (Capt. Flint)), and for which the Scott C420 PAPR might be used as an alternative. And, of course, if there were a problem, the user would simply leave the non-IDLH environment where Go-Bag respirators or PAPRs might be in use in order to address any problem that arose.

Third (and finally), the Department asserted that the PAPRs proposed by Plaintiffs were not "interoperable." (*Id.* at 135:1-11 (Dep. Chief Sellito).) But the Department's witnesses were discussing the interoperability of *hooded* PAPRs like the 3M Breathe Easy PAPR, rather than the facemask Scott C420 PAPR, which the Department has actually purchased for use by its members. The C420 PAPR uses the same facepiece as the Department's SCBAs and Go-Bag respirators and uses the same filter cartridges as the Go-Bag respirators. (Aug. 1 Tr. at 92:14-93:15; *id.* at 94:3-4.) Therefore, allowing Plaintiffs to use C420 PAPRs instead of Go-Bag respirators would not create any interoperability problems with the Department's other equipment.

Nor would C420 PAPRs create interoperability problems with equipment purchased by other jurisdictions. The Department was well aware at the time of the August 2005 hearing that surrounding jurisdictions also had purchased the Scott C420 PAPR, as shown by its July 2005 correspondence with fire departments in Arlington, Montgomery County, Frederick County, and Fort Belvoir. (Doan Decl. ¶s 26,27,28, and 29 & Exs. R, S, T, and U.) In 2004, the assembled Fire Chiefs from COG jurisdictions agreed to purchase and stockpile enough PAPRs to equip half of their riding positions. (*Id.* ¶ 30 & Ex. V ("It was agreed that the number of PAPRs that Chiefs decided to purchase, 50% of on-duty riding positions, was a valid plan and it would not be changed.").) These jurisdictions plan to acquire a total of over 900 PAPRs in all. (*Id.*) Thus, as Capt. Flint testified at the August 1, 2005 hearing, "the [Scott C-420] PAPR . . . [is] used by

the surrounding jurisdictions as well -- everybody in the COG has made a decision to buy these because they're interoperable."  (Aug. 1 Tr. at 95:7-10.)  Therefore, the Department's third objection to PAPRs simply has no applicability to the Scott C420 PAPR.[18]

In short, it would be cost-free and fully compatible for the Department to allocate nine PAPRs to Plaintiffs for their use in the unlikely event that Department members were required to use their Go-Bag respirators.

**B.      Plaintiffs are entitled to judgment as a matter of law because Defendant has not shown that the use of a Scott C420 PAPR is not a less restrictive alternative than discharge.**

Under RFRA, the Department has the burden of demonstrating that the Scott C420 PAPR is not a viable alternative to the Department's negative-pressure Go-Bag respirator, meaning that it must "meet[] the burdens of going forward with the evidence and of persuasion."  42 U.S.C. § 2000bb-2(3).  The Department has met neither of these burdens.

The Department has long been aware of the Scott C420 PAPR as a potential alternative, as demonstrated by the fact that it has already purchased at least 100 of them.  Even if the Department were not aware of this alternative, Plaintiffs have come forward with evidence developed during the year since the prior hearing, that shows that the Scott C420 PAPR is a suitable alternative to the Department's negative-pressure Go-Bag respirators.

-----

[18] In any event, interoperability with other jurisdictions is only a goal, not an inflexible operational requirement, and certainly not a requirement that would allow the Department to reject an otherwise suitable accommodation under RFRA.  Documents produced by the Department since the August 1, 2005, hearing show that while metropolitan area jurisdictions recognize that interoperability is an important goal, it is not a reality, and will not become a reality in the foreseeable future. *See, e.g.,* (Doan Decl. ¶ 30 & Ex. V (discussion at September 2004 Special Fire Chiefs' Committee Meeting).)  Under RFRA, the Department cannot claim that interoperability is essential for PAPRs that would be given to Plaintiffs while merely a goal that everyone recognizes will not be achieved anytime soon for equipment used by all Department members.

Under RFRA, the Department has the burden of proving that discharging Plaintiffs is the least restrictive means of furthering its compelling interest in safety during non-IDLH situations in which an SCBA would not be used.[19]  Plaintiffs are not even required to suggest less restrictive alternatives to the Department's facial hair ban or Go-Bag respirators; the Department is obliged to explore reasonable alternatives on its own motion.  *See, e.g.*, *Cheema v. Thompson*, 67 F.3d 883 (9th Cir. 1995); *Rourke v. NY State Dep't of Corr. Servs*, 915 F. Supp. 525 (N.D.N.Y. 1995); *Bessard v. CA Cmty. Colleges*, 867 F. Supp. 1454, 1465 (E.D. Cal. 1994).  For example, in *Cheema*, the plaintiffs were Sikh children whose school refused to allow them to wear a "kirpan," or ceremonial knife, which was one of five symbols of their faith that they were required to wear at all times.  *Id.* at 884.  The Ninth Circuit emphasized that the record contained evidence of other school districts that allowed students to wear "kirpans so long as the blades were dulled, no more than 2 1/2 inches, and securely riveted to their sheaths."  *Id.* at 885 n.4. Because the plaintiffs' school district had failed to consider this alternative to its ban, the court held that it had not met its burden under RFRA's least-restrictive-means test.

In this case, the Department was well aware of the possibility of using the Scott C420 PAPR as an alternative to its Go-Bag APR.  The Department has purchased at least 100 PAPRs for use by its members and was aware that other fire departments in the COG had purchased Scott PAPRs.  The Department was also aware that COG departments intended to stockpile more than 900 PAPRs for use by their members.

---

[19] In its August 11 memorandum, the Court noted that situations in which Go-Bag respirators would need to be worn instead of SCBAs were "very unlikely to occur."  (*Potter* Dkt. 98 at 9 n.5.)  No new evidence produced since then provides any basis for changing that assessment.

The defendant's refusal to explore the possibility of accommodating Plaintiffs' religious needs in this manner

> echoes the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions. But RFRA operates by mandating consideration, under the compelling interest test, of exceptions to "rules of general applicability."

*Gonzales v. O Centro Espirita*, 126 S. Ct. at 1223 (quoting RFRA, 42 U.S.C. § 2000bb-1(a)).

Because the Department has failed to demonstrate that the Scott C420 PAPR is not a suitable alternative to the Go-Bag APR, Plaintiffs are entitled to judgment as a matter of law that they should be provided with PAPRs to use in the limited situations in which a Go-Bag respirator would have to be worn.

**V.    If The Court Concludes That Plaintiffs Are Not Entitled To Judgment as a Matter Of Law, Plaintiffs Are Entitled To Take Additional Discovery, Including But Not Limited To Discovery Under Rule 56(f).**

The Department has asserted, both in its summary judgment motion and in its pending motion to stay discovery, that no further discovery is necessary and this case should be resolved on evidence currently available to the parties.  That evidence, as set forth in this memorandum and the accompanying Declaration of Joshua Doan, shows that Plaintiffs are entitled to a summary judgment in their favor on the existing record.

If, however, the Court determines that Plaintiffs are not entitled to summary judgment at this time, the Court should allow Plaintiffs to take additional discovery to gather additional evidence as to any material fact as to which the Court concludes there is a genuine dispute.  This discovery would allow Plaintiffs to present additional evidence to further confirm the facts relied upon in Plaintiffs' summary judgment motion, such as (a) that the Department has purchased Scott C420 PAPRs for use by its members; (b) that surrounding jurisdictions have also purchased the same PAPRs; and (c) that PAPRs are reliable, positive-pressure respirators that can be used

in for extended periods in non-IDLH environments.  The Department has not come forward with evidence disputing any of these material facts and has not demonstrated that the Scott C420 PAPR is unsuitable as an alternative to its Go-Bag respirator.

In addition to discovery to support their summary judgment motion, Plaintiffs should also be permitted to conduct discovery to oppose the Department's summary judgment motion.  According to Federal Rule of Civil Procedure Rule 56(f):

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Similarly, the District of Columbia Circuit "has long recognized that a party opposing summary judgment" needs a "reasonable opportunity" to complete discovery before responding to a summary judgment motion.  *Khan v. Parsons Global Servs.,* 428 F.3d 1079, 1087 (D.C. Cir. 2005).  Plaintiffs should therefore be allowed an adequate opportunity to complete discovery regarding the factual assertions relied upon by the Department in its motion for summary judgment, if the Court believes that those assertions would, if correct, be sufficient to justify granting the motion.

The Department's summary judgment motion relies on (a) the opinions contained in its consultant's hearsay declaration and (b) fit test results obtained by six of the Plaintiffs since the Court entered its March 20 Order returning them to active duty status (and the results of one Plaintiff, Hassan Umrani, who was not returned to active duty).  The Court cannot accept the assertions in the Department's motion as dispositive without allowing Plaintiffs an opportunity to conduct the discovery in which they were engaged when the Department suddenly, two months before Plaintiffs were to submit their response to the Department's summary judgment motion,

37

refused to respond further to pending discovery requests and proper notices for depositions and instead filed their motion to stay discovery.

First, the Department has refused to produce for deposition the consultant upon whose declaration the Department relies, although Plaintiffs served a proper notice of deposition to take the testimony of that consultant several months ago, on April 27. The Federal Rules of Evidence and fundamental fairness require that Plaintiffs be allowed to cross-examine McKay before the Court can grant summary judgment based upon his testimony, which the Department unjustifiably characterizes as "undisputed." And if the Department intends to call McKay at any future evidentiary hearing or trial, he should first be made available for a deposition at which Plaintiffs can test the basis for, and limitations of, the opinions set forth in his declaration.

Second, Plaintiffs should be permitted to take discovery into the training and qualifications of the Department employee who has administered their fit tests. A Department official, Battalion Chief Alfred Jeffrey, expressed surprise in a May 23, 2006 email to Deputy Chief Fitzgerald that that employee was not certified to administer fit tests, and had apparently received only a cursory explanation of testing procedures from another employee.[20] (Doan Decl. ¶ 8 & Ex. D.) This email was not produced by the Department in response to Plaintiffs' document requests until August 2, 2006, the day after the Department's counsel informed Plaintiffs' counsel that he would not make witnesses available for noticed depositions and would move to stay discovery. Plaintiffs should be permitted to discover whether that Department employee was an appropriate person to administer Plaintiffs' fit tests and whether Plaintiffs'

---

[20] As the Court is aware, the Department uses an outside vendor rather than a Department employee to conduct its Department-wide fit testing program for non-bearded employees. (Doan Decl. ¶ 16 & Ex. H.)

results can be considered reliable in light of her lack of certification and the level of training she did or did not receive.[21]

Third, Plaintiffs should also be given the opportunity to take discovery on the Department-wide fit tests conducted in 2005 and 2006. Documents produced by the Department suggest that the Department overlooks variable fit test results obtained by non-bearded members while asserting -- both directly and through its consultant's declaration -- that variability caused by facial hair is a major concern justifying its facial hair ban. Plaintiffs have not had the opportunity to explore this issue at a deposition. Plaintiffs also have not had the opportunity to review the results of the 2006 Department-wide fit tests to determine whether those results reveal similar trends, or to determine how many of the Department's clean-shaven members were unable to pass a fit test one year after having passed one, having not been tested in the interim. The Department has specifically refused to provide the results of these 2006 tests, relying on its belief that Plaintiffs should not be allowed to complete the discovery in which they were engaged.

As explained in the accompanying Declaration of Joshua Doan, Plaintiffs diligently attempted to take discovery prior to opposing the Department's summary judgment motion. In the parties' April 28 joint submission, *Potter* Dkt. 120, Plaintiffs stated that they intended to pursue further discovery. Plaintiffs had noticed Mr. McKay's deposition on April 27, the day before the joint statement was filed. One week after the joint statement was filed, on May 5, Plaintiffs served their third set of requests for production of documents on the Department.

---

[21] For example, as discussed above in this memorandum's Statement of Facts, the Department was unaware of the requirement under OSHA's regulations that a person taking a fit test don his or her mask for five minutes before the test commences.

When the Department (belatedly) began producing responsive documents on July 11 it never objected that discovery in the case was closed.

On July 21, Plaintiffs noticed the depositions of Department employees Mitchell Molenof and John Donnelly, and the 30(b)(6) deposition of the District of Columbia which sought testimony on topics including the results of fit testing conducted on Plaintiffs and all other Department members in 2005 and 2006 and the purchase and use of PAPRs by the Department and other COG jurisdictions. On August 1 the Department informed Plaintiffs that it refused to produce any of the deposition witnesses, and on August 9 it moved the Court to stay discovery. As a result of the Department's refusal to provide deposition witnesses, Plaintiffs were unable to discover and confirm facts that would have supported both Plaintiffs' opposition to the Department's summary judgment motion and Plaintiffs' own summary judgment motion.

Because Plaintiffs diligently attempted to take discovery before opposing the Department's summary judgment motion or filing their own motion, the Court should permit reasonable discovery if it cannot grant Plaintiffs' summary judgment motion at this time. Plaintiffs respectfully submit that they should be given at least 60 days to conduct discovery (including expert discovery if necessary) on any remaining issues of material fact.

**CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Summary

Judgment and deny the Department's Motion for Summary Judgment.


October 13, 2006

                                                    Respectfully submitted,


/s/ Joshua A. Doan_____          /s/ Arthur B. Spitzer_____
William D. Iverson                                 Arthur B. Spitzer
Joshua A. Doan                                     American Civil Liberties Union
Covington & Burling LLP                         of the National Capital Area
1201 Pennsylvania Avenue, N.W.          1400 20th Street, N.W., Suite 119
Washington, DC 20004                           Washington, DC 20036
(202) 662-5678                                       (202) 457-0800
*Counsel for Plaintiffs in No. 01-cv-1189*          *Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CALVERT L. POTTER, *et al.,* | |
| Plaintiffs, | |
| v. | No. 01-cv-1189 (JR) |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |
| STEVEN B. CHASIN, *et al.,* | |
| Plaintiffs, | |
| v. | No. 05-cv-1792 (JR) |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

**PLAINTIFFS' STATEMENT OF GENUINE ISSUES IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1, Plaintiffs submit the following statement of
genuine issues as to the purported facts set forth in Defendant's Statement of Material Facts As
To Which There Is No Genuine Issue submitted by Defendant in support of its Motion for
Summary Judgment.  Plaintiffs have moved for summary judgment, and as set forth in that
motion and the materials submitted in support of that motion, Plaintiffs do not believe that there
is any genuine dispute as to any fact material to a resolution of this litigation at this time by the
entry of summary judgment in favor of plaintiffs.  However, because numerous incorrect
statements are set forth as purported facts in Defendant's Statement of Material Facts As To
Which There Is No Genuine Issue, Plaintiffs are forced to submit the following responses to the
numbered paragraphs of that Statement as follows (Plaintiffs also incorporate by reference the

contents of Plaintiffs' Statement of Material Facts As To Which There Is No Genuine Issue submitted in support of Plaintiffs' Motion for Summary Judgment):

      1.      Plaintiffs do not dispute the statements set forth in paragraph 1.

      2.      Plaintiffs do not dispute the accuracy of the partial quotation set forth in paragraph 2 from Special Order 20, which in its entirety speaks for itself.

      3.      Plaintiffs do not dispute that Defendant asserts that Special Order 20 allows Defendant to terminate persons who do not comply with its provisions as set forth in paragraph 3, but Plaintiffs assert that the provisions of Special Order 20 relating to facial hair are unlawful for the reasons set forth in Plaintiffs' Motion for Summary Judgment.

      4.      Plaintiffs deny the assertion in paragraph 4 that Special Order 20 was issued in compliance with 29 C.F.R. § 1910.34, which does not apply to the District of Columbia for the reasons set forth in the previous filings by Plaintiffs in support of their motions for preliminary relief, to which Defendant has not responded.

      5.      Plaintiffs do not dispute the statements set forth in paragraph 5.

      6.      Plaintiffs do not dispute the statements set forth in paragraph 6.

      7.      Plaintiffs deny the correctness of the assertions of paragraph 7 for the reasons set forth in their Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment.

8.    Plaintiffs deny the correctness of the assertions of paragraph 8 for the reasons set forth in their Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment.

9.    Plaintiffs deny the correctness of the assertions of paragraph 9 for the reasons set forth in their Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment.

10.    Plaintiffs deny the correctness of the assertions of paragraph 10 for the reasons set forth in their Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment.

11.    Plaintiffs do not dispute the statements set forth in paragraph 11.

12.    Plaintiffs do not dispute the statements set forth in paragraph 12.

13.    Plaintiffs do not dispute the statements set forth in paragraph 13, except that plaintiffs deny that the face mask fit tests administered to Plaintiffs were appropriately administered, for the reasons set forth in their Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment.

14.    Plaintiffs do not dispute the statements set forth in paragraph 14.

15.    Plaintiffs deny the correctness of the assertions of paragraph 15, except the Plaintiffs do not dispute that Plaintiffs Conerly and Rashumaa each failed a single face fit test, after previously passing face fit tests.

3

16.     Plaintiffs deny the correctness of the assertions of paragraph 16, except that Plaintiffs do not dispute that on March 20, 2006 the Court entered an order reinstating Plaintiffs Potter, Ali, Conerly, Chasin, Rashumaa, and Sterling on the conditions set forth in that order.

17.     Plaintiffs do not dispute the statements set forth in paragraph 17.

18.     Plaintiffs do not dispute the statements set forth in paragraph 18.

19.     Plaintiffs do not dispute the statements set forth in paragraph 19.

20.     Plaintiffs do not dispute the statements set forth in paragraph 20.

21.     Plaintiffs do not dispute the statements set forth in paragraph 20 were correct at the time that Defendant filed its Statement of Material Facts As To Which There Is No Genuine Issue.

October 13, 2006

Respectfully submitted,

/s/ Joshua A. Doan
William D. Iverson
Joshua A. Doan
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 662-5678
*Counsel for Plaintiffs in No. 01-cv-1189*

/s/ Arthur B. Spitzer
Arthur B. Spitzer
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W., Suite 119
Washington, DC 20036
(202) 457-0800
*Counsel for Plaintiffs*

4