### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

CALVERT L. POTTER, *et al.*,　　　　:
　　　　　　　　　　　　　　　　:
　　　　Plaintiffs,　　　　　　　:
　　　　　　　　　　　　　　　　:
　　v.　　　　　　　　　　　　　: Civil Action No. 01-1189 (JR)
　　　　　　　　　　　　　　　　:
DISTRICT OF COLUMBIA,　　　　　:
　　　　　　　　　　　　　　　　:
　　　　Defendant.　　　　　　　:
_____ :
　　　　　　　　　　　　　　　　:
STEVEN B. CHASIN, *et al.*,　　　　:
　　　　　　　　　　　　　　　　:
　　　　Plaintiffs,　　　　　　　:
　　　　　　　　　　　　　　　　:
　　v.　　　　　　　　　　　　　: Civil Action No. 05-1792 (JR)
　　　　　　　　　　　　　　　　:
DISTRICT OF COLUMBIA,　　　　　:
　　　　　　　　　　　　　　　　:
　　　　Defendant.　　　　　　　:

### <u>MEMORANDUM</u>

Justice Holmes once wrote that it brought him the greatest pleasure to enforce those laws which he believed "to be as bad as possible," because he thereby marked the boundary between his beliefs and the law.  <u>See</u> Letter from Oliver Wendell Holmes to John T. Morse (Nov. 28, 1926), <u>quoted in</u> Louis Menand, The Metaphysical Club 67 (2001).  His faith was never tested by the Religious Freedom Restoration Act of 1993 (RFRA), Pub. L. No. 103-141, 107 Stat. 1488, (codified at 42 U.S.C. §§ 2000bb <u>et seq.</u>).  RFRA, by its own terms, imposes upon the courts of the United States the duty of "striking sensible balances between religious liberty and competing prior governmental interests," 42 U.S.C. § 2000bb(a)(5), an obligation whose faithful

performance demands the very kind of inquiry judges have tried to avoid since the advent of rational basis review in the New Deal era.  See, e.g., Williamson v. Lee Optical, 348 U.S. 483 (1955), United States v. Carolene Products Co., 304 U.S. 144 (1938).

The dispute in these RFRA cases – as in most RFRA cases – is precisely the sort of police power matter that is best entrusted to the politically accountable branches.  Courts have little competence to locate and set the proper boundary between the accommodations demanded by persons with religious needs and the general safety and welfare of the public.  See generally Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal, 546 U.S. 418, 439 (2006) ("We have no cause to pretend that the task assigned by Congress to the courts under RFRA is an easy one. Indeed, the very sort of difficulties highlighted by the Government here were cited by this Court in deciding that the approach later mandated by Congress under RFRA was not required as a matter of constitutional law under the Free Exercise Clause."); see also Employment Division v. Smith, 494 U.S. 872, 885-90 (1990).  Without RFRA, it would not be the business of the judicial branch to decide whether it is safe enough for a firefighter to wear a religiously required beard, or whether the mission of a fire brigade is compromised by steps taken to accommodate this religious expression.  Yet, whether or not it

was wise to assign such questions to the courts, Congress has
done so, and I am charged with answering them here.

For the reasons set forth below, I have concluded that
in the District of Columbia – the only local jurisdiction in
which enforcement of RFRA is constitutional, see City of Boerne
v. Flores, 521 U.S. 507 (1997) – the fire department may not
impose a shaving requirement on men who wear their beards for
religious reasons.

## I. BACKGROUND

### A. Procedural History

Plaintiffs are firefighters and paramedics who wear
beards in observance of sincerely held religious beliefs.  They
are suing the District of Columbia, aggrieved by the shaving
requirement of Special Order 20, a regulation of the District's
Department of Fire and Emergency Medical Services ("Department"
or "FEMS").

Plaintiffs initiated this suit in 2001 to challenge the
Department's then-recently enacted "grooming policy."  [*Potter*
Dkt. 1].  On June 22, 2001, I preliminarily enjoined the
Department from enforcing its grooming policy by the imposition
of any sanction upon the plaintiffs for refusing to violate their
religious beliefs.  [*Potter* Dkt. 34].  Nearly two years later, on
May 22, 2003, I dismissed the case for want of prosecution,
[*Potter* Dkt. 40], when it appeared from a joint status report

[*Potter* Dkt. 39] that the Department was accommodating plaintiffs and that they had no need to press the issue further.

The parties asked that the case be reopened, however, [*Potter* Dkt. 41], and a subsequent status report revealed that, while the Department was accommodating plaintiffs under its "grooming policy," it was drafting a "safety policy" that might implicate RFRA. [*Potter* Dkt. 46]. The Department finally produced its new safety policy on February 28, 2005. [*Potter* Dkt. 61]. That policy, now embodied in Special Order 20, would forbid FEMS workers who use "tight-fitting facepieces" to have "facial hair that comes between the sealing surface of the facepiece and face." Id. There would be no exemption for those who objected on religious grounds, id. at 2; if they refused to shave, they risked termination. [*Potter* Dkt. 140, Attachment #6] at ¶ 3.

The new safety policy had the same effect as the already-enjoined grooming policy on the employment prospects of the plaintiffs, and they filed for various forms of relief. They moved for a "clarification" as to whether the original preliminary injunction covered this new policy, [*Potter* Dkt. 62]; they moved for a permanent injunction against the new policy, [*Potter* Dkt. 63]; they moved for an order to show cause why the fire chief should not be held in contempt under the original injunction when he began enforcing the new policy, [*Potter* Dkt.

- 4 -

73]; and they moved for an injunction preserving the status quo if the contempt motion was not to be granted.  See id.; [*Potter* Dkt. 74].  The District, for its part, moved for judgment as a matter of law that the new policy was not in violation of RFRA. [*Potter* Dkt. 66, 67].  After considerable briefing, see [*Potter* Dkt. 92, 93, 95, 96] and a full-day evidentiary hearing, I granted the motion to clarify the preliminary injunction and denied all other relief on August 11, 2005. [*Potter* Dkt. 97, 98].

At the time of that order, the major dispute between the parties was the Department's refusal to "face-fit test" the plaintiffs to determine whether they could obtain an adequate seal between their faces and their masks while wearing their beards.  The Department maintained that any testing of a bearded person would be incompatible with its standards and refused the plaintiffs even the opportunity to prove that they could obtain a satisfactory seal using their masks.  My clarification of the preliminary injunction thus focused on the issue of fit testing. I required that the Department afford the plaintiffs a "reasonable opportunity to demonstrate that they can pass an appropriate face-fit test," but did permit the Department to require individual plaintiffs to pass such a test before being assigned to field operations.  See [*Potter* Dkt. 97, 98].

Considerable hullabaloo followed the 2005 order.  On September 9, 2005, a second group of plaintiffs filed a

- 5 -

complaint, seeking to ensure that the orders in the _Potter_ matter applied to them as well. [_Chasin_ Dkt. 1]. I granted their request that the terms of the _Potter_ injunction be applied to them, [_Chasin_ Dkt. 11], and consolidated the cases in November of 2005. Id.

Two of the _Potter_ plaintiffs passed fit tests in September 2005. They moved for immediate restoration to field duty, [_Potter_ Dkt. 100], but I declined to order such relief in view of the Department's position that a series of tests would be needed to determine whether a consistent fit was possible. [_Potter_ Dkt. 101]. When those plaintiffs passed two subsequent fit tests, I granted their requests for reinstatement – along with those of the _Chasin_ plaintiffs – on March 20, 2006, upon the condition that they continue to pass monthly face-fit tests. [_Potter_ Dkt. 111]; [_Chasin_ Dkt. 34].

The order of March 20, 2006 was cross-appealed. While the appeals were pending, the Department moved for a stay of the relief I had ordered, in part because two of the plaintiffs had failed subsequent fit tests.[1] [_Potter_ Dkt. 114, 115]. The plaintiffs' response was that those tests had not been properly conducted. [_Potter_ Dkt. 116, 117]. I allowed the Department to continue to exclude from active duty those plaintiffs who had

---

[1]    The appeals were dismissed as moot on November 2, 2006. See [_Potter_ Dkt. 137].

failed a fit test, I declined to recognize a right to regrow beards in those plaintiffs who had shaved, and I did not require further fit testing by the Department after a failed test,[2] noting that:

> [t]he Department's hostility towards plaintiffs' facial hair is now quite evident, and it appears that, at least during the pendency of the appeals, face-fit testing will be an adversary process. I will neither sit as face-fit test monitor nor appoint a special master for that purpose.

Id. at 2-3. These proceedings and holdings related to relief under the preliminary injunction; I made no final judgment as to whether it would be safe for plaintiffs to return to active duty given these fit test failures.

On July 7, 2006, the Department moved for summary judgment. [*Potter* Dkt. 124]. Plaintiffs responded on October 13, 2006, [*Potter* Dkt. 132], and cross-moved for summary judgment on October 16, 2006. [*Potter* Dkt. 133]. These motions have been fully briefed and are before me for decision.

**B. Factual Background**

The environments in which firefighters and other "first responders" do their work are either immediately dangerous to

---

[2]    A single exception to this ruling merits note. On October 13, 2006, plaintiffs asked that plaintiff Ali be permitted to re-take his scheduled fit test with a re-sized mask, reciting his alleged loss of 45 pounds. [*Potter* Dkt. 130]. I allowed this re-test over the objection of the Department [*Potter* Dkt. 136], but Ali died that same month of unrelated causes.

life or health ("IDLH"), or not.  IDLH atmospheres "pose[] an
immediate threat to life, would cause irreversible adverse health
effects, or would impair an individual's ability to escape from a
dangerous atmosphere,"  and include active fires and other
oxygen-deprived environments as well as settings where inhalation
of highly toxic contaminants poses an imminent danger.
Respiratory Protection Plan [*Potter* Dkt. 92, Attachment #12] at
5, 9-10; Hearing Transcript 19-20 (Calvert Potter).  Atmospheres
of unknown dangerousness are treated as IDLH, requiring the same
level of respiratory protection.  Respiratory Protection Plan
[*Potter* Dkt. 92, Attachment #12] at 9; Hearing Transcript at 139
(Chief Tippett).

        In non-IDLH zones – those that pose a known threat to
health, but where the threat level is lower – lesser protection
levels are allowed.  Respiratory Protection Plan [*Potter* Dkt. 92,
Attachment #12] at 10; Hearing Transcript at 101 (Captain Flint)
(giving the example of tear gas, and describing non-IDLH
atmospheres as ones where "it's not dangerous to you, but . . . .
you wouldn't want to expose yourself to those levels of
chemicals, because especially the weaponized chemicals, they're
meant to incapacitate you, they're meant to prevent you from
getting your day's work done."); see also Hearing Transcript at
124 (Michael Sellitto) (a "warm zone" is an area where people
working in a "hot zone" are decontaminated, and that those doing

decontamination are allowed lower levels of protection).  Of course, a non-IDLH atmosphere may also be one in which there is no risk to life or health.  There, first responders may operate without any protection at all.  Hearing Transcript at 124 (Michael Sellitto) (describing "cold zones").  Those non-IDLH atmospheres that pose a known but lower-level risk calling for intermediate protection will be referred to here as "warm zones."

FEMS workers have several forms of respiratory protection.  The most powerful is a self-contained breathing apparatus ("SCBA").  See Respiratory Protection Plan [*Potter* Dkt. 92, Attachment #12] at 9-11 (noting that SCBA is approved for use in all atmospheres); Hearing Transcript at 81-83 (Chief Fitzgerald) (agreeing that an SCBA is approved for all environments and that it "absolutely" provides better protection than other systems).  An SCBA utilizes an air tank, so that the emergency worker does not need to inhale any air from the surrounding environment.  Hearing Transcript at 7-11 (Calvert Potter).  Also, the system is "positive pressure," meaning that the air pressure is higher within the firefighter's than in the outside atmosphere.  Any leak in the seal of the mask will cause air to flow out of the mask, not in, so that the firefighter is protected from any dangers in the air.  Id. at 9 (Calvert Potter); id. at 88-89 (Captain Flint).  In an IDLH or unknown

atmosphere, only SCBAs may be worn.  Respiratory Protection Plan
[*Potter* Dkt. 92, Attachment #12] at 9-10.

An air-purifying respirator ("APR") uses a filter to
clean air from the surrounding environment.  The firefighter
draws air through the filter when he inhales, and the APR thus
functions as a "negative pressure" system – the pressure inside
the mask being lower than exterior pressure, at least during
inhalation.  Hearing Transcript at 16 (Calvert Potter) (a filter
cartridge fitted to a facepiece makes a "negative pressure
respirator"); id. at 92-93 (Captain Flint) (same).  Leaks in the
seal will allow air from the outside environment to enter the
mask, exposing the firefighter to any contaminants in the
atmosphere.  APRs may not be used in IDLH atmospheres or unknown
atmospheres, Respiratory Protection Plan [*Potter* Dkt. 92,
Attachment #12] at 9-10, but they may be used in warm zones if
their use is compatible with the level of risk presented.  Id. at
10-11 (allowing APRs for protection against gases and
particulates in non-IDLH atmospheres); Hearing Transcript at 125
(Michael Sellitto) (describing certain warm zone activities that
can be done in APRs); id. at 156 (Captain Flint) (same).

A powered air-purifying respirator ("PAPR") uses a
battery powered fan to force air through a filter, removing
contaminants from the outside air.  Hearing Transcript at 93-96
(Captain Flint).  PAPRs have some advantages over APRs.  The flow

of forced air has a fanning effect, making it more comfortable
for the firefighter to wear the mask for an extended period, and
the forced air reduces breathing resistance, making it physically
easier to work in a PAPR for an extended period of time.  Id. at
124 (Michael Sellitto) (a PAPR is "easier to work with because it
makes your breathing easier because it's providing you some
air.").  The PAPR also functions as a slightly positive pressure
system, providing extra protection in the case of a poor seal.
Id. at 93-94 (Captain Flint) (noting that a PAPR turns a negative
pressure system into a positive pressure system).[3]  If a PAPR fan
fails for any reason, the system will simply function as a
negative pressure APR, provided it is affixed to a tight-fitting
mask.  Id. at 95 (Captain Flint).  PAPRs may be used wherever APRs
are approved for use, but, like APRs generally, cannot be used in
IDLH or unknown atmospheres.  Respiratory Protection Plan [*Potter*
Dkt. 92, Attachment #12] at 9-11.

---

[3]    Although both SCBAs and PAPRs function as positive
pressure systems, they supply that pressure in different ways.
An SCBA works by supplying air in response to lowered pressure
when the wearer inhales.  This means that the SCBA affirmatively
maintains positive pressure.  The PAPR supplies a constant flow
of air.  This means that the system will only function as a
positive pressure system as long as the blower is supplying air
at a rate greater than or equal to the rate at which air is being
inhaled.  Neither side has provided evidence to show whether or
not a PAPR can provide sufficient air flow to guarantee the
maintenance of positive pressure when a tight-fitting mask is
worn by a bearded firefighter.  See Hearing Transcript at 94
(Testimony of Captain Flint) (speculating that a PAPR "can be
overbreathed . . . you can breathe in more air than that pump is
putting out.").

Firefighters may wear various styles of masks. Loose-fitting "hoods" are more comfortable and easily accommodate bearded firefighters. Id. at 24-25 (Calvert Potter) (noting that hoods reduce face fatigue). Hood-based PAPR systems do not failsafe to negative pressure APR systems the way that tight-fitting systems do, however; if the airflow mechanism on a hooded PAPR system malfunctions, the firefighter is exposed. Id. at 95-96 (Captain Flint). Moreover, there is no hood-based system that is "interoperable" with the equipment used in the District or surrounding regions. Id. at 134-138 (Michael Sellitto). Interoperability is vitally important, because it allows for the coordination of a large-scale, multi-district response in the event of a mass-casualty or mass-terror event.

Instead of hoods, the Department uses tight-fitting masks for all its systems. Indeed, the SCBAs, APRs, and PAPRs that the Department uses can all be configured to a single mask, manufactured by Scott, which is issued to the individual firefighter. See Defendant's Response to Plaintiffs' Statement of Material Facts ("Defendant's Response Facts") [Potter Dkt. 140, Attachment #5] at ¶ 18.

The Department's Special Order 20, and the OSHA regulations upon which it is based, do not permit facial hair between the sealing surface of a tight-fitting mask and the face of the wearer because of concerns that the facial hair may

- 12 -

compromise the seal.  Special Order 20 [*Potter* Dkt. 92,
Attachment #11].  This policy has to do with masks – the
Department's tight fitting masks – and is indifferent to the kind
of respiratory protection system the mask is connected to.  Id.
Bearded firefighters have long worn tight-fitting masks on their
SCBA units without incident, however, Defendant's Response Facts
[*Potter* Dkt. 140, Attachment #5] at ¶¶ 1-4, and the Department
now apparently concedes that the positive pressure in the SCBA
system is adequate to protect the bearded firefighter from any
leakage that may be caused by facial hair.  See Memorandum
[*Potter* Dkt. 98] at 6-7.  The central dispute in this case is
thus whether bearded firefighters can safely operate using
negative pressure protection systems (APRs) in a tight-fitting
mask, and whether they need to be able to do so.

        In 2002, following the attacks of September 11, 2001,
members of the Department were issued "Go-Bags" for use during an
emergency.  Special Order 29 [*Potter* Dkt. 92, Attachment #11].
One element of these Go-Bags was a filter that could be attached
to the tight-fitting Scott facepiece in order to form a negative
pressure APR system.  Hearing Transcript at 16 (Calvert Potter).
Since the issuance of the Go-Bags, there has not been a single
event requiring their use by any firefighter.  Defendant's
Response Facts [*Potter* Dkt. 140, Attachment #5] at ¶ 8.  As for
paramedics, they had never been issued respiratory protection of

any kind before 2002, they are not trained for work in IDLH

environments or in warm zones now, and they have never had

occasion to use their Go-Bag systems.  Id. at ¶¶ 7-8.

        The Department has made use of non-SCBA protection

systems on occasion, although not from the Go-Bags.  Certain

protocols for hazardous material ("hazmat") teams allow workers

operating in the "warm zone" to use APR or PAPR protection while

"decontaminating" the workers operating in the hot zone.  Id. at

124-125 (Michael Sellitto) (decontamination of FBI agents during

the "white powder" incidents on Capitol Hill was often done in

lower-level, APR protection).  These decontamination tasks are

often performed by workers wearing SCBAs, however, especially for

high-level threats posed by dangerous contaminants.  Id. at 124

(Michael Sellitto) (hazmat Level B requires an SCBA and chemical

resistant suit, while hazmat Level A requires even greater

protection).

        The record establishes that the vast majority of

firefighter work is done in SCBAs, if respiratory protection is

required at all, and that the use of any other system of

protection – in almost any scenario – is the exception and not

the rule.

## II.  ANALYSIS

        My preliminary rulings in this case – that testing

would be required and that only bearded firefighters who could

pass the test would be reinstated – were issued in support of
preliminary relief and, contrary to the Department's argument,
are not law of the case.  Univ. of Texas v. Camenisch, 451 U.S.
390, 395 (1981) ("[T]he findings of fact and conclusions of law
made by a court granting a preliminary injunction are not binding
at trial on the merits."); see also Cmty. Nutrition Inst. v.
Block, 749 F.2d 50, 56 (D.C. Cir. 1984).


**A.  RFRA Claim**

        Because the Department has conceded that the
plaintiffs' beards are worn as a matter of sincere religious
observance, Defendant's Response Facts [*Potter* Dkt. 140,
Attachment #5] at ¶ 3, the burden has shifted to the Department
to identify a compelling interest that is served by its clean-
shave policy, and to prove that the clean-shave policy is the
least restrictive means of serving it.  See Gozales v. O Centro
Espirita, 546 U.S. 418, 428-30 (2006) (burden on the government
to demonstrate compelling interest achieved by the least
restrictive means); see also 42 U.S.C. § 2000bb-1(b) ("Government
may substantially burden a person's exercise of religion only if
it demonstrates that application of the burden to the person –
(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling
governmental interest."); § 2000bb-2(3) ("[T]he term

'demonstrates' means meets the burdens of going forward with the evidence and of persuasion."). This is a burden the Department has not carried.

The self-evidently compelling interest asserted by the Department is protecting the respiratory health and general safety of its personnel, as well as their ability to assist the public effectively in the event of an emergency. The questions presented here are whether Special Order 20's beard ban actually serves these interests, and, if it does, whether it is the least restrictive means of doing so.

The Department has argued that, although bearded firefighters can pass face-fit tests, they cannot do so <u>consistently</u> on account of their facial hair. The Department further argues that this fact has been demonstrated because each of the plaintiffs eventually failed a face-fit test after repeated monthly testing, and because its expert has said that facial hair makes a seal less consistent. The evidence shows, however, that clean-shaven FEMS workers also fail face-fit tests with regularity, and that they will also sometimes fail with a given mask and then pass with the same mask on the same day. <u>See</u> <u>infra</u> at 19. The Department has not proven or even attempted to prove that bearded firefighters <u>fail tests</u> more frequently than clean-shaven firefighters, or that they fail so often that their use of APRs is ultimately unsafe.

- 16 -

After six years of litigation, indeed, neither side has shown any enthusiasm for getting to the bottom of this key factual issue. It must accordingly be resolved by considering where the burden of proof lies. The Department had the burden of proving their theory that negative pressure APRs are unsafe for bearded firefighters because all positive test results must be distrusted as inconsistent or purely temporary. It has not carried this burden.

Moreover, the Department has conceded that, for the vast majority of firefighter activity, a perfect seal between the face mask and the face is not required for safety. The SCBA is the only form of respiratory protection approved for most firefighting situations – including active fires where smoke and low levels of oxygen create an IDLH atmosphere. The SCBA, because it is a positive pressure system, will allow air to leak out but not in if the seal is imperfect. A negative pressure system is never appropriate for IDLH situations. The Department fully concedes that bearded firefighters have worn SCBA units for many years without incident. The evidence (and the Department's concession) thus demonstrate, and I find, that there is no rational connection between the Department's clean-shaven policy and the compelling interest it asserts <u>when SCBA units are called for or in use</u> – that is, in almost every firefighting or hazmat operation in which respiratory protection is used at all.

The Department has been at pains to posit a situation in which the atmosphere is dangerous enough to pose a serious risk to the health and effectiveness of bearded firefighters, but which is <u>not</u> an IDLH situation, so that lesser forms of protection such as an APR from a Go-Bag would be required.  It suggests that, while an initial catastrophic event involving harmful contaminants might pose an IDLH scenario, "as contamination spreads, the concentration will decrease, and the environment may go from IDLH to a less hazardous, but still dangerous, environment and a Department-issued Scott facemask configured as a negative pressure air purifying respirator (APR) may be used."  Defendant's Response Facts [*Potter* Dkt. 140, Attachment #5] at ¶¶ 6-7.  The parties have apparently consulted spin doctors for advice on how to characterize such a scenario.  For the plaintiffs, it would be a "clean up," <u>see</u> Plaintiffs' Motion for Summary Judgment [*Potter* Dkt. 133] at 11, 17, 24; for the Department, a "time sensitive rescue mission."  Defendant's Opposition to Summary Judgment [*Potter* Dkt. 140] at 11.  Yet even assuming – as all emergency planners must – that such a scenario will become a reality one day, the Department has not carried its burden of persuasion that <u>these plaintiffs</u> must necessarily function in negative pressure APRs in order for the Department's ("time sensitive rescue") mission to be accomplished – its compelling interest served.  <u>See</u> <u>Gozales</u>, 546 U.S. at 430-34

- 18 -

(application of Controlled Substances Act to religious minority must be justified on particular – rather than general – concerns).

The Department concedes, as it must, that until the precise nature and level of a respiratory threat is known, no level of protection short of an SCBA is acceptable.  Department regulations require as much, and Captain Flint testified that:

> <u>Our hazmat protocols often call on initial attack and recon being done in a high level of protection</u>, but as soon as we can not only identify the substance that we're trying to guard against, but quantify the levels of exposure, we try and get down quickly to the lowest acceptable levels of protection. . . .

Hearing Transcript at 113 (emphasis added).  Thus, initial response is not actually done with the Go-Bag APR system, but is always done at the highest level of protection.

It is only after positive identification of a lower threat level that any negative pressure APR system could be employed, likely a substantial period of time after the initial emergency.  The Department has not sustained its burden of showing why, during that period, bearded firefighters not approved for use of negative pressure APR systems could not be redeployed either "up" to areas of duty where SCBA use is required, or "down" to cold zone areas where no respiratory protection is needed.

Captain Flint, a Department witness, testified that even hazmat team members routinely fill roles which do not require them to use APR systems. He noted that "very often, as the hazmat team assembles, the actual members of the hazmat team assemble and go into, if not administrative, then research functions, and actually the people doing the recon are assigned to the rescue squads." Hearing Transcript at 156-157. The limited evidence on this point thus demonstrates that, when APR duty is called for, there are other functions for which bearded firefighters and EMS workers are trained and to which they could be assigned.

The Department responds that in the time sensitive scenarios it has posited, such reassignments are "unacceptable" because "every available resource" may be required in response to a mass casualty or terrorist event. This is exactly the place where the Religious Freedom Restoration Act comes into play. It requires an assessment of whether what is "unacceptable" to the Department must nevertheless be accommodated. The Department has the burden of showing that it cannot serve its compelling interest in protecting the health and effectiveness of its FEMS workers and the public if it must – in the remotely possible scenario it posits – move men to different jobs. It does not sustain that burden with the bare assertion that "every available resource" is required when the record shows that, even in hazmat

situations, different resources are applied to different duties, the tiny minority of which actually require the services of the negative pressure APR system from the Go-Bags.

And indeed, the record reveals that the Department's actions do not manifest the same level of concern with the ability of bearded firefighters to safely use their Go-Bag systems that is described by its lawyers in its litigation papers.  Recently, a number of Go-Bag filters provided "a mouthful of charcoal dust" when they were tested, but the Department did not immediately replace existing canisters or issue back-ups in case of future malfunctions.  See Declaration of Kenneth Lyons [*Potter* Dkt. 116, Attachment #1] at 2-3.  The Department also tests the face fit of its masks for clean-shaven FEMS workers only annually.  When these tests are conducted, many members fail and must be re-fit.  The Department concedes that nearly a third of the members failed their initial test in 2005. Defendant's Response Facts [*Potter* Dkt. 140, Attachment #5] at ¶ 10 ("In the course of the Department-wide fit testing in the summer of 2005, approximately 500 members – nearly a third of the Department – could not obtain a satisfactory seal with the equipment they had been using, and had to be issued new face masks."); see also 2005 Fittest Spreadsheet [*Potter* Dkt. 133, Attachments #3-#4].  Apparently, bearded firefighters and paramedics are not the only FEMS workers who may be incapable of

doing immediate APR duty in the event of a "time sensitive rescue mission."  The Department's concern that "every available" field-trained FEMS worker be available <u>for APR duty</u> in the event of a "time sensitive rescue mission" simply lacks credibility in light of this record.

The Department's emphasis on Go-Bag readiness also lacks credibility.  In practice, the Department does not require FEMS workers to take their Go-Bag and Scott facepieces home with them.[4]  FEMS workers are required to respond first to their station houses, and not directly to the scene of an emergency, and this is unquestionably the practice in reality.  <u>See</u> Hearing Transcript at 45-46 (Raymond Sneed).  They are not expected to respond to a mass casualty event like Clark Kent rushing into a phone booth – transforming at a moment's notice into an individually capable rescuer.  Instead, the Department's response strategy contemplates that FEMS workers will respond first to their stations, and that they will be deployed from there in a

---

[4]    The regulation on this point is unclear.  Special Order 29 states that: "All personnel shall carry this [Go-Bag] as part of their personal protection equipment (PPE) at all times when on duty.  Members shall carry their 'Go-Bags' while traveling to and from work assignments."  [*Potter* Dkt. 92, Attachment #11].  There was uncontroverted testimony that this Order is interpreted *not* to require members to take their Go-Bags home with them, and that "traveling to and from work assignments" contemplates travel between details once a FEMS worker has already begun his duty for the day.  *See* Hearing Transcript at 45-46, 58-61 (Raymond Sneed).  In any event, the uncontroverted testimony also shows that FEMS workers do not in fact carry their Go-Bags home with them.  See *id*.

coordinated, team-based rescue and response effort that fully allows different "available resource[s]" to be assigned to different tasks.[5]

The Department's hypothetical simply cannot carry the weight that RFRA requires. Even in the catastrophic scenario the Department imagines, there will be time to assign the tiny minority of firefighters whose religions require them to wear beards away from negative pressure APR duty. Outside this scenario, the evidence shows that a beard has never interfered with the ability of a FEMS worker to do his duty, and is unlikely to do so. RFRA therefore requires that I hold Special Order 20 inapplicable to these plaintiffs, as it is not the least restrictive means of protecting the safety of bearded firefighters, or ensuring that they can help their cohorts and protect the public.

## B.  Other Less Restrictive Means

Because I have held that reassignment away from APR duty in the event of a catastrophic contingency is a less restrictive means of accommodating plaintiffs' religious practices while continuing to serve the Department's compelling

---

[5]    It seems obvious, too, that if the Department's hypothetical mass casualty event occurs, some workers will be incapable of responding to their station houses, and that their teams will be both forced to operate without them and likely well trained to do so.

interest, I have no occasion to pass upon other less-restrictive means that the parties have mooted.  Only the following brief observations are necessary.

The plaintiffs have occasionally maintained that allowing them to simply use an SCBA whenever an APR is called for would be a means of accommodating their religious practice.  That is not so.  SCBAs provide time-limited protection and are extremely heavy relative to APRs and PAPRs.  Hearing Transcript at 112-113 (Captain Flint) ("time and weight" are the principal limitations with use of an SCBA).  There are situations, including extended service in a warm zone, where SCBAs are not interchangeable with the less safe but more manageable forms of respiratory protection provided by negative pressure APRs.  Hearing Transcript at 123-124 (Michael Sellitto).  A policeman who is allergic to kevlar cannot be accommodated by allowing him to walk the beat in a full suit of medieval armor.

Not all technological alternatives have been addressed, however.  The parties have spilled considerable ink over whether the Scott C420 PAPR represents a safe means of accommodating these plaintiffs' religious practices.  This PAPR is interoperable with current systems, and could be attached directly to the plaintiffs' current facemasks.  Defendant's Response Facts [*Potter* Dkt. 140, Attachment #5] at ¶¶ 18-19.  The plaintiffs maintain that because this PAPR is a positive pressure

system, see id. at ¶ 21, it can be safely operated even with an imperfect seal.  The Department has presented an expert who argues otherwise, but his determination appears to be based on OSHA regulations and the manufacturer's instructions regarding tight-fitting masks themselves, rather than any expert opinion as to whether the positive pressure in the system is adequate to protect against an imperfect seal.  See Third Declaration of Roy McKay [*Potter* Dkt. 140, Attachment #1] at ¶¶ 26-27.  Captain Flint did testify that, although the PAPR is "rated at a fairly high rate of flow," it is possible to "overbreathe" the system – that is, breathe in more air than the fan is pushing in, yielding a negative pressure system.  See Hearing Transcript at 94 (Captain Flint).  The Department's expert testimony is equivocal on this point.  See Third Declaration of Roy McKay [*Potter* Dkt. 140, Attachment #1] at ¶¶ 26-27 (noting that hood-based PAPRs provide more airflow than the Scott unit, and stating that "PAPRs *may* operate in a negative pressure mode of operation during heaving exertion.").

Thus, it may be the case that a properly configured Scott C420 PAPR would represent a technological means of accommodating these plaintiffs, if its flow rate were high enough.  It may also present such a solution in the unknown future of technological innovation, even if it does not do so now.  It may well not, but the Department does not appear to have

investigated the matter beyond adverting to the manufacturer's manual and its reliance (in turn) on OSHA's facial hair standards.

It is also possible that proper fit testing will reveal that these plaintiffs can safely wear their tight fitting facemasks configured as negative pressure APR systems. Many of the plaintiffs passed repeated tests before finally failing, see, e.g., Defendant's Reply Facts [*Potter* Dkt. 140, Attachment #6] at ¶¶ 15, 21, and there is inadequate evidence in the record as to whether clean-shaven individuals would pass such monthly tests at higher or lower rates than bearded FEMS workers. It may be the case that bearded firefighters can pass appropriate fit tests with the frequency and consistency necessary to ensure an adequate margin of safety even where they operate their masks as negative pressure APRs. It may not, but the Department does not appear to have investigated the matter beyond the bare administration of fit tests pursuant to this Court's preliminary injunction, and, as noted above, has not carried its burden of proof on this point.

Because the record is far from complete on these other alternatives – and because in any event these matters lie beyond ordinary judicial competence – I will not pass upon them here.

The role of the judiciary, even under RFRA, is only to approve or invalidate policies, not to make policy or technical decisions for the State.

An appropriate order accompanies this memorandum.


JAMES ROBERTSON
United States District Judge